UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO.: 1:20-CR-040 |
| | ) |
| JESSICA JOHANNA OSEGUERA GONZALEZ, | ) |
| also known as "Jessica Johanna Castillo" and "La Negra," | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S REPLY IN SUPPORT OF ITS
OMNIBUS SET OF PRETRIAL MOTIONS**

On July 31, 2020, the government filed an Omnibus Set of Pretrial Motions containing three separate pretrial motions. *See* Dkt. No. 63 ("Omnibus Motion"). On September 2, 2020, the defendant filed an opposition to the Omnibus Motion, opposing the government's arguments. *See* Dkt. No. 96 ("Opposition" or "Opp."). The government hereby submits this reply in further support of its arguments.

**ARGUMENT**

**I.   The Government's Proposed "Other Crimes" Evidence is Admissible**

The defendant opposes the government's motion to admit "other crimes" evidence of her affiliation with a business designated by the Department of the Treasury's Office of Foreign Assets Control ("OFAC") prior to the designation of the six entities underlying the five counts of the Superseding Indictment. *See* Opp. at 1-12. As a result of her affiliation with that designated entity, a company called BRIC Inmobiliaria, her business websites were shut down (for the first time, but not the last), and she received an email from her web hosting provider explaining the OFAC sanctions. The next day, the phone number that she had used to register the websites contacted the web hosting company's customer service line and had a 26-minute conversation.

Records from the web hosting company show that they partially restored her account, until an additional round of OFAC sanctions the next month, whereupon the web hosting company shut down her websites again—including the websites of the OFAC-designated companies underlying the Superseding Indictment.  Particularly given that the government must show that the defendant's transactions and dealings with the OFAC-designated businesses were "willful," the defendant's prior entanglement with an OFAC-designated business, its concrete impacts on her livelihood (including shutting down her business websites), and the description of the OFAC sanctions provided by the web hosting service are powerful evidence in the government's favor.  The authorities and argument in the defendant's opposition do not compel the exclusion of that evidence, and it should be admitted either as intrinsic evidence or pursuant to Rule 404(b), for both the reasons stated in the government's motion and further detailed herein.

First, however, some context is in order, as the defendant's entanglement with BRIC Inmobiliaria and the actions taken by her web hosting service did not arise in a vacuum.  On April 8, 2015, OFAC announced the designation of Mexico's Cartel de Jalisco Nueva Generacion ("CJNG") and the Los Cuinis Drug Trafficking Organization ("Los Cuinis DTO") as Specially Designated Narcotics Traffickers pursuant to the Foreign Narcotics Kingpin Designation Act (the "Kingpin Act," 21 U.S.C. § 1901 *et seq.*).  OFAC simultaneously announced the designations of Nemesio Oseguera Cervantes, the leader of the CJNG, and Abigael Gonzalez Valencia, the leader of the Los Cuinis DTO.  The designations were announced publicly, published in the Federal Register, widely covered in the news media, particularly in Mexico, and disseminated in "blocking notice" letters mailed to various known associates and affiliates of the designees.

These actions were not remote to or disconnected from the defendant here: Oseguera Cervantes is her father, Gonzalez Valencia is her uncle, and various of her relatives received the "blocking notices" sent by OFAC.[1] OFAC attempted to send a blocking notice to the defendant as well, at an address she had previously used in California, but it was returned.

On August 19, 2015, OFAC designated various persons and businesses, including BRIC Inmobiliaria, a real estate business based in the state of Jalisco, Mexico. The published designation included BRIC Inmobiliaria's website address. Shortly thereafter, presumably in an effort not to run afoul of the Kingpin Act's prohibition on U.S. persons transacting with OFAC-designated persons, the web hosting service that hosted BRIC Inmobiliaria's website decided to shut down the entire account of the person who registered the website. That person was the defendant.

In so doing, the web hosting service sent the defendant an email on August 25, 2015—quoted in both the government's motion and the defendant's opposition—informing her that it could not do business with her because her account was "providing service to individuals or businesses specifically designated as blocked" by OFAC.[2] The defendant makes much of the fact that the email was sent to "contacto@jp-adv.com," presumably intending to suggest that the address seems generic and not necessarily tied to the defendant. Opp. at 10. But records from the web hosting company show that the registrant of the various websites—including BRIC Inmobiliaria as well as several of the entities whose designations underlie the five counts of the

---

[1] The defendant's brother is also alleged to have been a high-ranking leader of the CJNG, *see generally United States v. Oseguera Gonzalez*, No. 16-cr-229 (BAH) (D.D.C.), and her ex-husband, who was arrested alongside her brother in Mexico, has also been designated by OFAC for his connections to the CJNG. *See* "Treasury Sanctions Individuals Supporting Powerful Mexico-Based Drug Cartels," https://www.treasury.gov/press-center/press-releases/Pages/jl0596.aspx.

[2] The email itself did not specifically reference BRIC Inmobiliaria.

Superseding Indictment—identified her name as "jessica oseguera," and that she herself provided the "contacto@jp-adv.com" address.

When "jessica oseguera" registered an account with the web hosting service, records show that she also provided the telephone number 52-33-36-422-044.  52 is Mexico's country code; 33 is an area code for Guadalajara, Jalisco.  And not only was this the number provided by the defendant when she created her account with the web hosting service, but records show that it is the very number that called the web hosting service the day after it notified her that it was suspending her accounts on account of the OFAC sanctions, resulting in a 26-minute call with customer service.

The web hosting records show that the web hosting company initially agreed to reactivate the defendant's account with the exception of the BRIC Inmobiliaria website.  Following the September 17, 2015, designation of several additional entities whose websites were also managed by the defendant, however, including several of the entities whose designations are at issue here, the web hosting service again suspended her account on October 2, 2015.  Internal records of the web hosting service confirm that the suspension was due to the OFAC sanctions.  The records do not indicate that the web hosting service sent the defendant a second email detailing the OFAC sanctions—presumably because they had already sent one just over a month earlier.[3]

*   *   *

---

[3] Notably, the August 25, 2015 email sent to the defendant does not mention BRIC Inmobiliaria specifically, so it provided general notice to the defendant that the company would suspend her account on account of OFAC sanctions, not specific notice related to each and every OFAC sanctioned entity whose website she managed.

As the government explained in its motion, it submits that the proposed evidence of the defendant's relationship with BRIC Inmobiliaria, including and especially the evidence that the web hosting service communicated with her about OFAC sanctions, does not require a Rule 404(b) analysis at all.  Rule 404(b) is, fundamentally, a prohibition on "character" evidence used solely to show that on a particular occasion the defendant "acted in accordance with th[at] character."  Fed. R. Evid. 404(b)(1).  But here the government does not seek to introduce the proposed evidence to show that the defendant had a propensity for getting entangled with OFAC-designated entities, or for managing websites for OFAC-designated entities.  Rather, the government seeks to introduce the proposed evidence as part of its case that she acted "willfully," in that she had some awareness and knowledge of the OFAC sanctions regime and its general consequences even before the designation of the businesses underlying the Superseding Indictment.

In opposing the government's argument that this evidence is intrinsic and not subject to the Rule 404(b) analysis, the defendant relies primarily on *United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000).  Although the *Bowie* court was critical of some other circuits' more expansive views of "intrinsic" evidence, *see id.* at 928-29, it did not wholly reject the distinction between intrinsic and extrinsic evidence.  *See id.* at 929 ("We recognize that, at least in a narrow range of circumstances not implicated here, evidence can be 'intrinsic to' the charged crime.").  As the court explained, "if the evidence is of an act that is part of the charged offense, it is properly considered intrinsic.  In addition, some uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime." *Id.*

Unlike the simple counterfeit currency charges in *Bowie*, the evidence in cases where a particular state of mind must be shown is necessarily more complicated and nuanced.  Where the government must show that a defendant knew that her conduct was unlawful, some awareness of the statutory regime and its penalties—even if the defendant obtained that knowledge *prior* to the sanctions at issue—is highly relevant, because it goes to the state of mind.  *Cf. Screws v. United States*, 325 U.S. 91, 102 (1945) ("The requirement that the act must be willful . . . does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.").  In *Bowie*, by contrast, where the defendant was convicted of possession of counterfeit currency, the government needed only to prove just that:  the defendant's possession at the moment of arrest.  Any other instances of possession of counterfeit currency prior to that point, the D.C. Circuit reasoned, could not bear on the later crime.  *See* 232 F.3d at 929 ("As to Bowie's case, we do not see how his acts on April 17 constituted the same crime as that charged in the indictment.  The authorities seized the counterfeit bills he had in possession on April 17, so the bills he possessed on May 16 could not have been the same ones.").  But if, on the other hand, the crime of possession of counterfeit currency had a *willfulness* requirement, it is hard to see how an earlier arrest—or any evidence that a defendant had some existing understanding of the prohibition on counterfeit currency—wouldn't be probative of the later crime.

Here, if she was not already aware from the press coverage, blocking notices delivered to her family, and the designations related to her family members, the defendant received notice of the OFAC sanctions regime related to the Kingpin Act no later than when her web hosting service sent her an email explaining its deactivation of her account.  And with that notice, she experienced at least one of the practical consequences of OFAC designation when her U.S.-hosted websites were thereafter disabled.  Her receipt of the email is confirmed by her later

phone call to the web hosting service—a call made from the very number listed as the contact number for the account's owner when it was created in the name of "jessica oseguera." Although the account was briefly restored without the BRIC Inmobiliaria website, it was disabled again when the defendant's other businesses were designated by OFAC a month later. As this recounting shows, the narrative surrounding the web hosting evidence is a single, continuous story.  The evidence beginning with the BRIC Inmobiliaria website is "evidence [] of an act that is part of the charged offense," because it confirms her willfulness in continuing to transact and deal with other OFAC-designated entities thereafter.  *Bowie*, 232 F.3d at 929.  "[I]t is [therefore] properly considered intrinsic."  *Id.*[4]

Moreover, even the *Bowie* court explained that "evidence necessary to complete a story—for instance by furnishing a motive or establishing identity—typically has a non-propensity purpose and is admissible under Rule 404(b)."  *Id.*  And, as the government explained in its Omnibus Motion, Rule 404(b) is permissive and broadly inclusionary.  *See* Dkt. No. 63 at 11-12.  Indeed, "under Rule 404[b], *any* purpose for which bad acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character." *United States v. Cassell*, 292 F.3d 788, 795 (D.C. Cir. 2002) (internal citations and quotation marks omitted) (emphasis added).

Here, the fact that the defendant had a previous interaction with an OFAC-designated company and was notified by the web hosting service that it was unlawful to transact or deal with OFAC-designated entities is highly relevant to the willfulness inquiry.  *See* Omnibus

---

[4] *Bowie* also held that "some uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime."  232 F.3d at 929.

Motion, Dkt. No. 63 at 12-14.  The defendant tries to minimize the importance of this evidence by insisting, among other things, that the web hosting service's email did not notify her that BRIC Inmobiliaria "allegedly engaged in narcotics trafficking," that the email did not contain information "regarding the entity or entities that had been designated by OFAC," and that the email did not contain "statements that the entities listed in the Superseding Indictment had been designated by OFAC."  Opp. at 9.  This is all a red herring.  There is no requirement that the email from the web hosting service contain any particular individual detail, and the defendant will be free to argue that it was incomplete or not thorough enough and therefore undercuts the notice that it provided to the defendant.  But none of that renders the evidence *inadmissible* under Rule 404(b), because the evidence is being offered to show the defendant's awareness of the OFAC sanctions regime, not to show a character or propensity.  In short: the evidence is relevant to the defendant's willfulness in transacting with the entities alleged in the Superseding Indictment after their designations, and it is therefore relevant to "something other than the defendant's character or propensity."  *Bowie*, 232 F.3d at 930.

Finally, the defendant argues that the proposed evidence does not satisfy a Rule 403 balancing test, insisting that it is unfairly prejudicial.  *See* Opp. at 10.  But the only alleged unfair prejudice that the defendant identifies is a line in the email from the web hosting service that indicates that the defendant's account is being suspended because it "provide[d] service to individuals or businesses specifically designated as blocked, or who are located in Crimea, Sudan, Iran, Syria, Cuba, or North Korea."  In context, it is clear that the reason for the defendant's account suspension is the first clause, "individuals or businesses specifically designated as blocked," and not the second clause, which refers to the United States government's broad sanctions on various countries.  Because this language is describing the

possible underlying reasons for sanctions, and not the reasons applicable to the defendant, the government does not agree that it is unduly prejudicial if admitted in the defendant's case. Nonetheless, the government would be willing to redact the reference to "Crimea, Sudan, Iran, Syria, Cuba, or North Korea" at trial in order to obviate the defendant's Rule 403 concern.

For these reasons, and as explained at greater length in the government's Omnibus Motion, the proposed evidence related to the defendant's involvement with BRIC Inmobiliaria, including the evidence that her web hosting service told her that it was suspending her account because of OFAC sanctions, should be admitted.

**II.     The Court Should Reject the Defendant's Argument That Notice of Specific OFAC Designations is Required by the Kingpin Act**

As anticipated by the government in its Motion, the defendant argues that "notice" is an element of the offense. However, the defendant has failed to identify any statutory support for this argument. That is because no such support exists. The Court should reject the defendant's arguments and grant the government's motion.

The criminal provision of the Kingpin Act states, "[w]hoever *willfully* violates the provisions of this chapter, or any license rule, or regulation issued pursuant to this chapter, or *willfully* neglects or refuses to comply with any order of the President issued under this chapter shall be—(A) imprisoned for not more than 10 years, (B) fined in the amount provided in title 18 … or both." 21 U.S.C. § 1906(a)(1) (emphasis added). The defendant argues that the Court should apply the heightened willfulness standard from *Cheek v. United States*, 498 U.S. 192 (1991) and *Ratzlaf v. United States*, 510 U.S. 135 (1994), but does not identify any authority to support applying this heightened standard to Kingpin Act violations. As the D.C. Circuit explained in *United States v. Burden*, "the traditional rule [is] that ignorance of the law is no excuse." 934 F.3d 675, 691 (D.C. Cir. 2019) (quoting *United States v. Bryan*, 524 U.S. 184,

194-95 (1998)) (internal quotation marks omitted).  "The Court has developed an approach to 'willfulness' that is calibrated to the statutes in which it appears, consistently reading it to require proof that the defendant had a sufficiently culpable state of mind, but not to require proof so specific as to stymie the statute's enforcement.  It has required proof that a defendant know which law he was breaking in only two contexts: criminal tax evasion, and currency structuring."  *Id.* at 690-91.

As the government explained in its Omnibus Motion, this Court and other circuits have consistently declined to apply the heightened willfulness standard from *Cheek* and *Ratzlaf* to cases concerning sanctions arising out of the Department of the Treasury.  *See* Dkt. No. 63 at 19-21.  Despite the fact that the Kingpin Act is expressly modeled on the International Economic Powers Act ("IEEPA"), *see* 21 U.S.C. § 1901, the defendant asks this Court to cut new cloth and reject the IEEPA case law cited in the government's Motion.  *See* Dkt. No. 96 at 12-14.  In support, the defendant relies primarily on an unreported civil case from the Southern District of Florida, in which that court remanded the matter to OFAC for reconsideration of the plaintiff's request for a license to access the blocked assets of a third party in order to satisfy a writ of garnishment.  *World Fuel Corp. v. Paulson*, No. 07-CIV-20398, 2008 WL 11453699 (S.D. Fla. Mar. 31, 2008).  Specifically, the court found that OFAC could not deny the license in order to maintain the funds as a "bargaining chip," because "[w]hereas the IEEPA exists to put the President in superior bargaining position when dealing with foreign governments and international terrorist organizations, the Kingpin Act aims to disrupt and bankrupt foreign narco-trafficking organizations and their leadership."  *Id.* at 5.  But, as the quoted language makes clear, the purported difference in *purpose* in the two statutes motivated the outcome in *World Fuel*.  But the difference in purpose is not relevant to the issue presented here:  whether the

willfulness standard in IEEPA cases bears on the willfulness standard applicable to the Kingpin Act, which was expressly modeled on IEEPA.[5]

While the legislative and policy motivations in promulgating the Kingpin Act and IEEPA may differ, the mechanisms by which the statutes operate are the same. Both statutes allow the Treasury Department and OFAC to designate certain foreign persons and to block their assets, and both statutes make it a crime for a U.S. person willfully to engage in transactions or dealings with a designated foreign person. The defendant has failed to explain why the Kingpin Act should be considered a "highly technical" statute, when courts have consistently held that IEEPA is not a "highly technical" statute. *See Bryan*, 524 U.S. 194-95; *see also* Dkt. No. 63 at 19-21. The difference in purpose between the two sanctions regimes is irrelevant to the relative complexity of the statutes. The Kingpin Act, like IEEPA, requires only that the defendant know that her conduct was unlawful, not that she knew the precise details of the law being violated.

Finally, the defendant argues that the willfulness standard set forth in *Bryan* and *Burden* requires the government to prove that the defendant had "notice that the entities listed in the Superseding Indictment were designated by OFAC, because those entities were deemed by

---

[5] The defendant also cites *World Fuel*, which itself cites the legislative history of the Kingpin Act, for the proposition that Congress did not intend "that this legislation affect Americans who are not knowingly and willfully engaged in international narcotics trafficking." 2008 WL 11453699 at *5. The defendant goes on to argue that "there is no evidence whatsoever . . . that Ms. Gonzalez was involved in any sort of narcotics trafficking." Dkt. No. 96 at 17. This argument is a misunderstanding of the elements of a Kingpin Act criminal violation and the opinion in *World Fuel*. First, clearly Congress intended to make it a crime for U.S. persons to willfully engage in transactions or dealings with designated entities, based on the plain language of 21 U.S.C. §§ 1904 and 1906, regardless of whether the individual was directly involved in narcotics trafficking. Second, unlike the defendant, the plaintiff in *World Fuel* was following the procedures required by the Kingpin Act in requesting a license from OFAC in order to access the assets of a blocked third-party in order to satisfy a writ of garnishment. By contrast, the defendant is alleged to have engaged in transactions or dealings with designated entities *without* first seeking and obtaining a license from OFAC.

OFAC to have provided material assistance or goods or services to a specific Significant Foreign Narcotics Trafficker." Dkt. No. 96 at 17.  This is a misstatement of the *Bryan* standard, and an attempt to require notice of a level of specificity that the law does not require.  In *Bryan*, the Supreme Court specifically noted that the following jury instruction provided by the trial court was a "correct statement" of the law:  "A person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law.  Now, *the person need not be aware of the specific law or rule that his conduct may be violating*.  But he must act with the intent to do something that the law forbids."  524 U.S. at 199 and 190 (emphasis added).

Under the willfulness standard articulated by the *Bryan* court, the government does not need to prove that the defendant received, reviewed, or read OFAC notices to establish that the defendant willfully violated the Kingpin Act as to the specific entities detailed in the Superseding Indictment, and the government does not need to prove that the defendant knew why the businesses were designated in order to prove willfulness.  The government is free to rely on circumstantial evidence of subjective knowledge, including efforts to conceal conduct, and willful blindness to prove that the defendant acted "with the intent to do something that the law forbids."  *Id.*, *see also* Dkt. No. 63 at 21.

For these reasons, the government submits that any statements, questions and arguments that suggest that notice is an element of the offense would confuse the issues, mislead the jury, and result in unfair prejudice to the government.  *See* Fed. R. Evid. 403.  The Court should preclude the defendant from suggesting that the government must prove that the defendant received notice of the specific designations underlying the Superseding Indictment during jury addresses or the presentation of evidence in this case.

### III. The Court Should Preclude Argument and Elicitation of Testimony Designed to Challenge the Validity of the Underlying OFAC Designations

The defendant opposes the government's Motion to preclude argument and elicitation of testimony designed to challenge the validity of the OFAC designations underlying the six businesses named in the Superseding Indictment. But the charged offenses do not require the government to justify OFAC's designation of the named businesses, and a criminal proceeding is not the correct venue to challenge those designations. Therefore, any argument or questioning at trial that attempts to challenge the underlying designations is not probative of any material issue and carries substantial risk of confusing the issues and misleading the jury. *See* Fed. R. Evid. 403. Accordingly, the Court should preclude argument and elicitation of testimony designed to challenge the designations.

As explained in the government's Motion, well-settled law prohibits a criminal defendant from collaterally attacking an administrative designation at trial, since "the *fact* of an organization's designation … is an element of [the crime], but the *validity* of the designation is not." *United States v. Hammoud*, 381 F.3d 316, 331 (4th Cir. 2004) (emphasis in original), *cert. granted, judgment vacated*, 543 U.S. 1097 (2005), *opinion reinstated in part*, 405 F.3d 1034 (4th Cir. 2005) (rejecting the defendant's request to challenge Hizballah's designation as a Foreign Terrorist Organization ("FTO")).[6] Only after pursuing the claim within Treasury could the

---

[6] The government did not, as the defendant argues, misstate the holding in *Yakus v. United States*, 321 U.S. 414 (1944). In *Yakus,* the defendants declined to challenge the validity of a price regulation through administrative procedures established by the Emergency Price Control Act of 1942, but later attempted to challenge the regulation in criminal proceedings when they were prosecuted for violating it. *Id*. at 418-19. The Supreme Court held that "the provision of the Act, so construed as to deprive petitioners of opportunity to attack the [r]egulation in a prosecution for its violation," did not "deprive them of due process of law," because an administrative procedure existed that allowed for challenges to the regulation. *Id.* at 431-33. The Court expressly stated:

defendant bring to a federal district court a challenge alleging that the designation was improper. *See* Dkt. No. 85 at 5.  The defendant claims in her Response that designations under the Kingpin Act are somehow unique and should be subject to a different standard.  *See* Dkt. No 96 at 19-20.  But the defendant provides no explanation or justification for this position.

The defendant urges the Court to disregard clearly analogous cases involving administrative designations and instead apply *United States v. Mendoza-Lopez*, 481 U.S. 828, 837-39 (1987), in which criminal defendants were permitted to raise a due process challenge to the results of a deportation proceeding where the results of the administrative proceeding were needed to establish an element of the charged offense.  *Id.* at 20-21.  However, *Mendoza-Lopez* is distinguishable in several important respects.  First, *Mendoza-Lopez* affirmed a *pretrial* review of the underlying deportation proceedings by the trial court.  481 U.S. at 832-33.  Nothing in *Mendoza-Lopez* suggests that the validity of administrative proceedings is an issue for the jury or a defense at trial, as the defendant argues here.  Second, the defendants in *Mendoza-Flores* did not seek judicial review of the substance of the administrative decision; rather, they claimed that the immigration judge did not properly inform them of their rights and impermissibly accepted unknowing waivers of their right to apply for suspension of deportation and to appeal.  *Id.* at 831.  Here, by contrast, the defendant is attempting to bring a substantive challenge to OFAC's

---

> [W]e are pointed to no principle of law or provision of the Constitution which precludes Congress from making criminal the violation of an administrative regulation, by one who has failed to avail himself of an adequate separate procedure for the adjudication of its validity, or which precludes the practice, in many ways desirable, of splitting the trial for violations of an administrative regulation by committing the determination of the issue of its validity to the agency which created it, and the issue of violation to a court which is given jurisdiction to punish violations.  Such a requirement presents no novel constitutional issue.

*Id.* at 444.

designation without first availing herself of the administrative processes within the Department of Treasury.[7]  *See* Dkt. No. 85 at 5.  Therefore, *Mendoza-Lopez* is not controlling.

Contrary to the defendant's contention, there is no "missing" evidence that the entities identified in the Superseding Indictment have materially assisted, provided support to, or acted on behalf of the Cartel de Jalisco Nueva Generacion ("CJNG").  As explained in the government's Omnibus Motion and above, the charged offenses do not require the government to prove the validity of the designation of the six businesses named in the Superseding Indictment, and therefore the materials that OFAC used for its designation decision are not at issue here.  Moreover, such materials are in the possession of the Department of the Treasury, which has its own rules, regulations, and procedures by which designated persons may seek information related to their designation.  *See, e.g., Zevallos v. Obama*, 793 F.3d 106, 111 (D.C. Cir. 2015) ("Zevallos asked Treasury to remove him from the Specially Designated Nationals and Blocked Persons List and unblock his assets.  He submitted to Treasury a memorandum with exhibits in support of his request.  Treasury responded in June and September 2005 by disclosing non-sensitive material related to Zevallos's designation."); *id.* at 117 ("Treasury provided Zevallos several times with the unclassified evidence on which it relied to designate him.").

Finally, the Court should reject the defendant's attempt to present baseless claims of prosecutorial misconduct to this Court or the jury.  The Department of Justice charged the defendant based on evidence that she violated the criminal prohibitions of the Kingpin Act, and the government has produced ample evidence in Rule 16 discovery to support that charging

---

[7] The defendant has separately raised a due process challenge, arguing that she should have received both pre- and post-deprivation notice related to the designated businesses.  *See* Dkt. No. 67.  However, the desire to bring a due process challenge is not the defendant's asserted basis for opposing the government's motion to preclude argument and evidence designed to challenge the underlying designations.

decision.[8] The defendant's decision not to provide information to law enforcement when approached for a voluntary interview, a standard investigative technique, is not evidence of the defendant's guilt and was not the basis for the government's decision to bring charges. The defendant's conflation of the Department of Justice's decision to prosecute criminal violations of the Kingpin Act and the Department of Treasury's decision to designate foreign entities in relation to their support for the CJNG is not supported by the underlying facts, and should not be permitted to provide an avenue for the defendant to bypass the administrative process for challenging OFAC designations and to instead confuse the issues at trial by litigating those designations here.

## IV.    Conclusion

For the foregoing reasons, the Court should grant (1) the government's motion to admit other crimes evidence, (2) the government's motion to preclude evidence and argument intended to suggest that the government is required to prove that she received particularized notice of the OFAC designations of the entities named in the Superseding Indictment, and (3) the

---

[8] Since March 2, 2020, the government has made seven discovery productions consisting of over 45,000 pages of materials, including: corporate registration documents and trademark registrations for the businesses; social media posts, websites, and press related to the businesses; official OFAC designations and notices, as well as Mexican press reporting on the designations; business records from U.S.-based web hosting services that show that the defendant registered and managed the websites for the designated businesses and received notice that the websites were taken down; the defendant's U.S. passport application, in which the defendant lists her occupation and employer as manager of Kenzo Sushi; intercepts of phone conversations between the defendant and an individual who was managing one of the designated businesses; emails between the defendant and the Kenzo Sushi business email account, and other items. The government also intends to offer witness testimony at trial that further supports the charges.

government's motion to preclude evidence and argument designed to challenge the underlying OFAC designations in this criminal case.

Respectfully submitted this 9th day of September, 2020.

                              Marlon Cobar, Acting Chief
                              Narcotic and Dangerous Drug Section
                              Criminal Division
                              U.S. Department of Justice

By:      /s/
          Kaitlin Sahni, Trial Attorney
          Kate Naseef, Trial Attorney
          Brett Reynolds, Trial Attorney
          Narcotic and Dangerous Drug Section
          Criminal Division
          U.S. Department of Justice
          Washington, D.C. 20530
          Telephone: (202) 514-0917

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing (ECF) system with the United States District Court for the District of Columbia to counsel of record for the defendant, this 9th day of September, 2020.

By:  /s/
Kaitlin Sahni
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice