# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JESSICA JOHANNA OSEGUERA GONZALEZ,<br><br>　　　　　　　　Defendant. | Criminal Action No. 20-40 (BAH)<br><br>Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Having already resolved twelve of defendant Jessica Johanna Oseguera Gonzalez's

pretrial motions, *see United States v. Oseguera Gonzalez*, Crim. Action No. 20-40 (BAH), 2020

WL 6158246 (D.D.C. Oct. 21, 2020) and *United States v. Oseguera Gonzalez*, Crim. Action No.

20-40 (BAH), 2020 WL 6342948 (D.D.C. Oct. 29, 2020), this memorandum opinion resolves the

government's four pretrial motions, defendant's six pending motions to compel, and defendant's

pending motion to dismiss the Superseding Indictment.[1]

Specifically, the government seeks to preclude defendant from suggesting at trial,

through argument or testimony, (1) that the government must show defendant was given actual

contemporaneous notice that each of the five entities with which she is charged with engaging in

unlawful transactions had been designated as a Specially Designated Narcotics Trafficker by the

---

[1]　　One additional defense motion, Def.'s Mot. *in Limine* for Early Disclosure of *Jencks* Material and Timely Disclosure of *Giglio/Brady* Materials and Incorporated Mem. of Points and Auths., ECF No. 133, remains pending and will not be addressed in this memorandum opinion. In two prior opinions, the following eleven defense motions were denied: Defendant's Motions to Dismiss the Superseding Indictment for Lack of Venue, Based on Violations of Defendant's Due Process Rights, for Vagueness, and for Lack of Specificity, ECF Nos. 66, 67, 74, 76, respectively; Defendant's Motions to Dismiss Counts One through Five of the Superseding Indictment as Duplicitous, and to Strike Surplusage, ECF Nos. 68, 75; Defendant's Motion for a Bill of Particulars, ECF No. 69; Defendant's Motion for Notice by the Government Pursuant to Rule 12 of Intention to Use Specific Evidence Arguably Subject to Suppression, ECF No. 70; Defendant's Motion to Preserve Notes, Memoranda, and/or Reports, ECF No. 71; and Defendant's Motion for Leave to File Additional Pretrial Motions, ECF. No. 73. A twelfth defense motion, Defendant's Motion to Exclude Witness Prior to and During the Trial of this Case and to Disclose All Instances Where Witnesses Were Interviewed Jointly, ECF No. 72, was granted in part and denied in part.

U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC"), Gov't's Omnibus Set of Pretrial Mots. ("Gov't's Omnibus Mots.") at 18–21, ECF No. 63; and (2) that the underlying OFAC designations are invalid, *id*. at 22–23.  In addition, the government moves to admit at trial as "other crimes" evidence (3) defendant's association with a Mexico-based business not named in the Superseding Indictment that OFAC also designated as a Specially Designated Narcotics Trafficker, Gov't's Omnibus Mots. at 5–18; and (4) defendant's activity in keeping ledgers of the proceeds and expenses of certain narcotics trafficking activities for the drug trafficking organization ("DTO") based in Jalisco, Mexico, known as the Cartel de Jalisco Nueva Generacion ("CJNG"), of which her father, Nemesio Oseguera Cervantes ("Mencho") is the leader, Gov't's Mot. to Admit Other Crimes Evidence at Trial ("Gov't's 404(b) Mot.") at 1, ECF No. 139.

For her part, defendant's six motions to compel seek discovery from the government of any evidence (1) from OFAC related to the designations of the entities named in the Superseding Indictment, Def.'s Second Mot. to Compel Production of Evid. and Witnesses and Incorporated Mem. of Points and Auths. ("Def.'s 2nd Mot. to Compel"), ECF No. 102; (2) showing a loss relevant to sentencing under U.S.S.G. §2B1.1 or indicating the proceeds of the entities named in the Superseding Indictment, Def.'s Third Mot. to Compel Production of Evid. and Witnesses and Incorporated Mem. of Points and Auths. ("Def.'s 3rd Mot. to Compel"), ECF No. 105; (3) regarding government agents' knowledge of defendant's arrest warrant when she entered the United States from Mexico and then flew from Los Angeles to Washington, D.C., Def.'s Fourth Mot. to Compel Production of Evid. and Witnesses and Incorporated Mem. of Points and Auths. ("Def.'s 4th Mot. to Compel"), ECF No. 106; (4) indicating when the government first learned that defendant had engaged in transactions or dealings with the entities named in the Superseding

Indictment, Def.'s Fifth Mot. to Compel Production of Evid. and Witnesses and Incorporated Mem. of Points and Auths. ("Def.'s 5th Mot. to Compel"), ECF No. 110; (5) of requests made from the government to the Government of Mexico pursuant to the United States' mutual legal assistance treaty ("MLAT") with Mexico, Def.'s Sixth Mot. to Compel Production of Evid. and Witnesses and Incorporated Mem. of Points and Auths. ("Def.'s 6th Mot. to Compel"), ECF No. 125; and (6) of any transactions or dealing between the United States and the entities named in the Superseding Indictment, Def.'s Seventh Mot. to Compel Production of Evid. and Witnesses ("Def.'s 7th Mot. to Compel"), ECF No. 145.  Defendant has also filed a motion to dismiss the Superseding Indictment for vindictive prosecution.  Def.'s Mot. to Dismiss Superseding Indictment for Vindictive Prosecution and Incorporated Mem. of Points and Auths. ("Def.'s Mot. Dismiss"), ECF No. 160.

Following a brief description of the charges against defendant, the government's motions regarding the admissibility, or preclusion, of certain evidence at trial are addressed first before turning to discussion of defendant's motions to compel additional discovery and motion to dismiss.

## I.    BACKGROUND

As previously described, *see Oseguera Gonzalez,* 2020 WL 6342948, at *1–2, defendant is charged in a Superseding Indictment with violations of the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), Pub. L. No. 106-120, 113 Stat. 1606 (1999), codified at 21 U.S.C. §§ 1901–08.  The Kingpin Act allows "the Secretary of the Treasury—and by delegation the Office of Foreign Assets Control [("OFAC")] . . .—to deem foreign persons who 'materially assist[] in . . . international narcotics trafficking activities' as 'specially designated narcotics traffickers.'"  *Fares v. Smith*, 901 F.3d 315, 318 (D.C. Cir. 2018) (quoting first 21 U.S.C.

3

§ 1904(b)(2)–(4) and then 31 C.F.R. § 598.314; citing 31 C.F.R. § 598.803).[2]  The Kingpin Act, *inter alia*, prohibits "[a]ny transaction . . . in property or interests in property" of a designated entity and "[a]ny transaction or dealing . . . that evades or avoids, or has the effect of evading or avoiding, and any endeavor, attempt, or conspiracy to violate," the prohibitions of the statute.  21 U.S.C. § 1904(c)(1)–(2).  Criminal penalties are provided under the Kingpin Act for an individual who "willfully violates the provisions of [the Statute]," *id.* § 1906(a)(1) and for "[a]ny officer, director, or agent of any entity who knowingly participates in a violation [of the Statute]," *id.* § 1906(a)(2).

This case was initiated on February 13, 2020, when a grand jury returned a sealed indictment against defendant, alleging that "[b]eginning on or about September 17, 2015, and continuing to the present day," defendant engaged in transactions with five separate companies, each of which had been designated under the Kingpin Act.  *See* Indictment at 1–4, ECF No. 1.  A week later, on February 22, 2020, defendant entered the United States from Mexico and was arrested soon thereafter when, on February 26, 2020, she came to this Court to visit her brother, who is a detained defendant in a criminal case also pending in this Court.  *See United States v. Oseguera-Gonzalez*, Crim. Action. No. 16-229 (BAH) (D.D.C. Dec. 14, 2016).

On July 16, 2020, a grand jury returned a superseding indictment charging that defendant, over the same period as in the original indictment, beginning on about September 17, 2015, and continuing to the present day, "willfully": (1) engaged in transactions with the same five companies named in the original indictment, each of which had been designated under the Kingpin Act, "as materially assisting in, or providing support for or to, or providing goods or services in support of, the international narcotics trafficking activities of the significant foreign

---

[2]        For purposes of the Kingpin Act, "foreign person" is defined to include "any entity not organized under the laws of the United States."  21 U.S.C. § 1907(2).

narcotics trafficker known as [CJNG], and/or being controlled or directed by, or acting for or on behalf of, [CJNG]," without first obtaining the required license from OFAC; (2) "engaged in transactions or dealings to evade and avoid" the Kingpin Act's prohibitions on dealing with designated entities; and (3) aided, abetted, and caused others to engage in dealings to evade this Act's prohibitions. Superseding Indictment at 1–5, ECF No. 65. The Superseding Indictment also charged defendant with (4) "knowingly participa[ing]" in violations of the Act as an "officer, director, and/or agent" of each designated entity. *Id.* Each of the five counts make the same allegations with regard to one of the five designated entities. *See id.* These five entities are (1) J&P Advertising S.A. de C.V.; (2) JJGON S.P.R. de R.L. de C.V.; (3) Las Flores Cabanas (aka Cabanas Las Flores); (4) Mizu Sushi Lounge and Operadora Los Famosos, S.A. de C.V. (aka Kenzo Sushi and Operadora Los Famosos, S.A.P.I. de C.V.); and (5) Onze Black (aka Tequila Onze Black). *Id.*[3]

These charges were the culmination of a years-long investigation by the Drug Enforcement Agency ("DEA").[4] DEA began investigating defendant in November 2014 with the involvement of the Mexican Federal Police and the Guadalajara Resident Office. Def.'s Mot. Dismiss at 2. DEA then obtained information, on September 1, 2015, "allegedly connecting Ms. Gonzalez to certain businesses, including Mizu Sushi Lounge, Las Flores Cabanas, J&P Advertising, Tequila Onze Black, and JJGON S.P.R. de R.L. de C.V." *Id.* at 1. A DEA report, prepared in February 2018, further noted that defendant "had been 'previously identified as the

---

[3]     These five entities were designated by OFAC as entities with which U.S. persons are generally prohibited from dealing, effective September 17, 2015. *See* Additional Designations, Foreign Narcotics Kingpin Designation Act, 80 Fed. Reg. 57433 (September 23, 2015). The names of Las Flores Cabanas and Operadora Los Famosos S.A. de C.V. (operating as Mizu Sushi Lounge) were subsequently changed, and the OFAC blocking list was updated to reflect the new names. *See* Notice of OFAC Sanctions Actions, Foreign Narcotics Kingpin Designation Act, 85 Fed. Reg. 15034 (March 16, 2020).
[4]     Defendant has recently brought to the Court's attention several reports providing a broad overview of this investigation. *See* Def.'s Mot. Dismiss at 1–2.

administrative officer[]' of Cabanas Las Flores Tapalpa, Tequila Onze Black, and J&P Advertising." *Id.* at 2 (alteration in original). Defendant was also surveilled by DEA between July 31, 2019 and August 2, 2019 when she was in the Unites States. *Id.* DEA agents approached defendant twice "in an attempt to secure her cooperation," but she did not provide the information they sought. *Id.* at 2–3.

## II.   GOVERNMENT'S MOTIONS

The government's four pretrial motions seek to preclude defendant from making certain arguments or eliciting certain testimony at trial, and to admit certain evidence of defendant's other bad acts, under Federal Rules of Evidence 404(b) and 403. These motions are discussed *seriatim* after review of the applicable legal standards.

### A.   Applicable Legal Standards

#### 1.   *Rules 401 and 403*

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." FED. R. EVID. 401. While "[i]rrelevant evidence is not admissible," FED. R. EVID. 402, relevant evidence generally is. One exception to Rule 402's general rule of admissibility of relevant evidence is Rule 403, which provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Notably, Rule 403 renders relevant evidence inadmissible only upon a showing that it presents a risk of "unfair prejudice," *i.e.* prejudice that is "compelling or unique," *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995) (quoting *United States v. Washington*, 969 F.2d 1073, 1081 (D.C. Cir. 1992)), or has "an undue tendency to suggest decision on an improper basis," *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir.

2013) (quoting FED. R. EVID. 403 advisory committee's note to 1972 proposed rules).  Moreover, "Rule 403 establishes a high barrier to justify the exclusion of relevant evidence, by requiring that its probative value must be 'substantially' outweighed by considerations such as 'unfair' prejudice." *United States v. Lieu*, 963 F.3d 122, 128 (D.C. Cir. 2020); *see also United States v. Straker*, 800 F.3d 570, 589 (D.C. Cir. 2015) (noting that balancing under Rule 403 means that the court should lean towards admitting evidence "in close cases").

"[T]he burden is on the introducing party to establish relevancy," *Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990), as well as admissibility under other evidentiary rules. Further, "[i]n deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008); *see also United States v. Abel*, 469 U.S. 45, 54 (1984) ("Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

### 2. *Rule 404(b)*

Rule 404(b) provides that "[e]vidence of a crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1).  So-called "propensity" evidence is excluded not because it is irrelevant, but because "it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475–76 (1948). Rule 404(b) thus attempts to head off the risk that, presented with such evidence of a defendant's uncharged bad conduct, "a jury [might] convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment." *Old Chief*

*v. United States*, 519 U.S. 172, 181 (1997) (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)).  Nevertheless, although such propensity evidence may not be used to "prov[e] that a person's actions conformed to his character," *United States v. Douglas*, 482 F.3d 591, 596 (D.C. Cir. 2007) (quoting *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc)), it may be used for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," FED. R. EVID. 404(b)(2).  "In other words, under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character."  *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990).  As the rule merely prohibits evidence of a defendant's other acts "in but one circumstance," the D.C. Circuit has characterized it as "a rule of inclusion rather than exclusion."  *United States v. Machado-Erazo*, 901 F.3d 326, 333 (D.C. Cir. 2018) (first quoting *Crowder*, 141 F.3d at 1206, and then quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)).

The law is well-settled, however, that "other crimes and bad acts evidence properly admitted as relevant pursuant to Rule 404(b) may nonetheless be inadmissible [under Rule 403] because its 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'"  *United States v. Brown*, 597 F.3d 399, 406 (D.C. Cir. 2010) (quoting FED. R. EVID. 403).

Evidence that is "intrinsic" to the charged crimes is not subject to Rule 404(b) because, by its very nature, it does not involve *other* crimes and bad acts, and thus there is no concern that it might be used as improper character evidence.  *Machado-Erazo*, 901 F.3d at 334–35 (citing *Bowie*, 232 F.3d at 927).

**B.    Government's Motion to Preclude Argument and Testimony Suggesting that the Kingpin Act Requires Notice to Defendant of Specific OFAC Designations**

The Kingpin Act provides separate criminal penalties for (1) "[w]hoever willfully violates the provisions of this chapter, or any license rule, or regulation issued pursuant to [the Act]," 21 U.S.C. § 1906(a)(1), and (2) "[a]ny officer, director, or agent of any entity who knowingly participates in a violation of [the Act]," *id.* § 1906(a)(2).  In addition to fines, a violation of paragraph (1) is punishable by imprisonment "for not more than 10 years," and of paragraph (2) by imprisonment "for not more than 30 years." *Id.* § 1906(a)(1)–(2).  Recall that a person violates the Kingpin Act when, *inter alia*, she engages in "transaction[s] or dealing[s]" with designated entities or that "evade or avoid" the prohibition on dealing with such entities.  21 U.S.C. § 1904(c)(1)–(2).  Defendant is charged under both paragraphs of the penalty section for "willfully violating" the Act by engaging in prohibited transactions with, and for "knowingly participat[ing]" in violations of the Act as an "officer, director, and/or agent of," the five entities named in the five counts of the Superseding Indictment.  Superseding Indictment at 1–5.

The parties disagree over what it means to "willfully" violate the Kingpin Act.[5]  The government argues that the Kingpin Act's "willful" violation requirement requires the government to prove only that defendant knew her conduct was unlawful and not that she had received actual notice of the specific OFAC designations making the conduct unlawful.  Gov't's Omnibus Mots. at 18–21.  Clarification of this proof issue would be helpful since, as the government points out, "[o]n multiple occasions, orally and in pleadings, before this Court and

---

[5]    While disputing what the government must prove to establish defendant's willful violations of the Kingpin Act, the parties have not offered positions on what the government must prove at trial to establish that defendant "knowingly participated" in such violations, 21 U.S.C. § 1906(a)(2), or how the proof of the former may differ from the latter.  Regardless, no more could be necessary to meet a lower *mens rea* requirement of "knowingly."  *See United States v. Burden*, 934 F.3d 675, 690 (D.C. Cir. 2019) ("Most criminal prohibitions require only proof that the crime was committed 'knowingly,' meaning that the defendant knew of the facts that made his act illegal, even if he did not know the act was illegal.").

the D.C. Circuit, the defendant has argued that she did not receive, review, or read any blocking

notice for the five businesses named in the Indictment." *Id*. at 18 (citing Transcript of Hearing

(March 3, 2020) at 25:2–5, ECF No. 25 ("There is no evidence that . . . [defendant] read the

treasury press release, that she read the notice in the Federal Register or even accessed the

treasury department's website.")).  By way of background, on April 8, 2015, OFAC designated

Mexico's CJNG and its leader, Nemisio Oseguera Cervantes, and the Los Cuinis Drug

Trafficking Organization and its leader, Abigael Gonzales Valencia, as Specially Designated

Narcotics Traffickers, pursuant to the Kingpin Act.  Gov't's Reply Supp. Omnibus Mots. at 2.  In

addition to public announcements of these designations in the Federal Register and in news

media, blocking notice letters were "mailed to various known associates and affiliates of the

designees," *id*., as well as to relatives of the leaders, who, as noted, are defendant's father and

uncle, *id.* at 3.  The OFAC blocking notices were received by "various of [defendant's]

relatives," *id.*, but the notice mailed to an address in California previously used by defendant was

returned, *id*.

The government seeks to preclude defendant from arguing or eliciting testimony

suggesting that actual notice of specific OFAC designations is a required element of the charged

offense.  Defendant characterizes the government's position "that notice is not an element of the

Kingpin Act," as "incredibl[e]," Def.'s Opp'n Gov't's Omnibus Set of Pretrial Mots. ("Def.'s

Opp'n Gov't's Omnibus Mots.") at 12, ECF No. 96, and contends that the government must

prove more, namely, that she "must have understood that she was transacting with entities that

had been designated by OFAC, and that it was illegal to do so, because those entities were

deemed by OFAC to have provided material assistance or goods or services to a specific

Significant Foreign Narcotics Trafficker," *id*. at 15–16. "Without notice that the entities listed in

the Superseding Indictment were designated by OFAC," *id*. at 17, and the reason for their

designation, defendant argues she "would have absolutely no way of knowing that simply

engaging in business transactions with those entities would violate any law," *id*.  In her view,

"[t]his notice is even more important in this case, as there is no evidence whatsoever, because no

evidence exists, that [defendant] was involved in any sort of narcotics trafficking."  *Id*.[6]

   Neither the D.C. Circuit nor the Supreme Court has previously addressed the meaning, as

used in the Kingpin Act, of "willfully," a term that can have different meanings in different

contexts.  *See Bryan v. United States*, 524 U.S. 184, 191 (1998) ("Willfully is sometimes said to

be 'a word of many meanings' whose construction is often dependent on the context in which it

appears." (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)); *see also Safeco Ins. Co. of

Am. v. Burr*, 551 U.S. 47, 57 n.9 (2007) (discussing the meaning of "willful" in criminal law).

Generally, "in order to establish a 'willful' violation of a statute, 'the Government must prove

that the defendant acted with knowledge that his conduct was unlawful.'"  *Bryan*, 524 U.S. at

191–92 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).  The "conduct" that "the

jury must find the defendants to have willfully done [i]s the *actus reus* that violated" the relevant

statutory provision.  *Burden*, 934 F.3d at 692; *see also United States v. Zeese*, 437 F. Supp. 3d

86, 96 (D.D.C. 2020) ("[T]o prove willfulness, the government need only prove that defendants

knew that the charged conduct . . . was unlawful.").  Under this willfulness standard, the

government need not prove that the defendant had knowledge of the specific provision of law

that rendered his conduct unlawful.  *Bryan*, 524 U.S. at 190 (approving jury instruction that the

---

[6]   Contrary to this blanket denial of any evidence that defendant "was involved in any sort of narcotics trafficking," Def.'s Opp'n Gov't's Omnibus Mots. at 17, another pending government motion seeks to admit evidence showing just this, namely: defendant's involvement in the financial operations of the DTO controlled by her father and use of one of the OFAC-designated businesses to host meetings with her father to discuss matters related to drug trafficking.  *See infra* Part II.E.  As noted below, *see infra id.*, defendant may open the door to the government's use of such evidence if she presents argument before the jury denying her involvement "in any sort of narcotics trafficking."  Def.'s Opp'n Gov't's Omnibus Mots. at 17.

person "need not be aware of the specific law or rule that his conduct may be violating . . . [b]ut he must act with the intent to do something that the law forbids").

The Supreme Court has required more particularized "proof that a defendant know which law he was breaking" only in the "highly technical" contexts of criminal tax evasion and currency structuring. *Burden*, 934 F.3d at 690–91 (discussing *Ratzlaf*, 510 U.S. 135, and *Cheek v. United States*, 498 U.S. 192 (1991)).  In *Cheek*, the Supreme Court held that the "willfulness" *mens rea* requirement found in criminal provisions of the tax code required the government to prove the defendant specifically knew of the legal duty to file an income tax return and to treat his wages as income, such that even an objectively unreasonable "good faith misunderstanding" of the law would mean the defendant did not act with the required mental state.  498 U.S. at 201–03.  The Court noted, however, that the "jury would be free to consider any admissible evidence from any source" to show that the defendant was aware of this duty.  *Id.* at 202.  To show willfulness where this particularized knowledge requirement applied, "the Government [must] prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty."  *Id.* at 201; *see also Safeco Ins. Co. of Am.*, 551 U.S. at 58 n.9 (characterizing *Cheek* as requiring "specific intent to violate a known legal duty").

Likewise, in *Ratzlaf v. United States*, the Supreme Court held that the "willfulness" requirement in a prosecution for illegally structuring financial transactions required knowledge that the structuring itself was unlawful but noted that "[a] jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct."  510 U.S. at 149 & n.19.  In that case, the holding was not that the defendant had to know all of the details of the relevant criminal provision, but rather that the jury

instructions must make clear the defendant must have been aware of his own duty not to structure transactions in such a way as to avoid triggering a bank's duty to report cash transactions in excess of $10,000. *Id.* at 146–47. In other words, the defendant must know of his own duty to avoid structuring—knowledge of the bank's reporting duty alone is insufficient.[7]

Primarily relying on *Bryan*, the Second, Fifth, and Ninth Circuits, as well as another Judge on this Court, have interpreted the term "willfully" in the context of the International Economic Emergency Powers Act ("IEEPA"), 50 U.S.C. § 1705, and similar economic sanctions statutes analogous in structure to the Kingpin Act, to require the government to prove only that the defendant knew that the conduct made illegal by statute and regulation was, in fact, illegal. *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 & n.2 (2d Cir. 2004) (per curiam) (applying *Bryan* and approving IEEPA instruction indicating that the jury could not convict the defendant unless "the defendant knew that such transmission of funds was a violation of the Iranian embargo, and was, thus, illegal"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741–72 (5th Cir. 2001) (holding that the government must prove, under the Trading With the Enemy Act, 50 U.S.C. §§ 4301 *et seq.*, that "the defendants knew that their planned conduct was legally

---

[7]        The distinction between *Bryan,* on the one hand, and *Cheek* and *Ratzlaf,* on the other, appears to depend on the precision with which the relevant legal duty is defined. *See Bryan*, 524 U.S. at 193–95; *id.* at 200–03 (Scalia, J., dissenting). Courts applying *Bryan,* however, frequently require the government to prove that the defendant knew of the specific legal duty created by the relevant statute. *See, e.g., Burden*, 934 F.3d at 691–92. As the Ninth Circuit noted in *United States v. Mousavi*, "*Bryan* and *Safeco* both identify *Cheek* and *Ratzlaf* as examples of cases where the heightened burden of proof applied, [but neither case] required the government to prove the defendant's knowledge of a specific provision of law." 604 F.3d 1084, 1092 (9th Cir. 2010) (internal citations omitted). The "practical effect, if any, of this heightened standard" is thus unclear. *Id.* The D.C. Circuit also observed that its application of *Bryan* in interpreting the willfulness requirement of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, was "not materially different" than the Eleventh Circuit's application of *Ratzlaf* in a similar case. *Burden*, 934 F.3d at 692 (citing *United States v. Wenxia Man*, 891 F.3d 1253, 1268 (11th Cir 2018)).

Any distinction makes no difference in the resolution of this motion. Neither set of precedents remotely promotes the stringent conception of "willfulness" urged by defendant: namely, that the government must prove that she personally was given notice to enable her to consult or review the source of law creating the relevant legal obligation. Even in the case of tax evasion, the knowledge of the duty matters, not service with notice or knowledge of the intricate details of the law being violated, beyond the scope of the relevant legal duty. *United States v. Han*, 962 F.3d 568, 572 (D.C. Cir. 2020) (holding that to show willful violation in a tax-evasion case, prosecution must show "that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty" (quoting *Cheek*, 498 U.S. at 201)).

prohibited" but not that they "had knowledge of the specific regulations governing [the relevant] transactions"); *Mousavi*, 604 F.3d at 1094 (applying *Bryan* and holding that IEEPA "requires the government to prove beyond a reasonable doubt that the defendant acted with knowledge that his conduct was unlawful but not that the defendant was aware of a specific licensing requirement" (internal citation and quotation marks omitted)); *United States v. Quinn*, 403 F. Supp. 2d 57, 61–64 (D.D.C. 2005) (applying *Ratzlaf*, citing *Bryan*, and holding that the defendant must know that the *actus reus* of the offense was illegal but need not know of the IEEPA's licensing requirement). The Seventh Circuit has applied an arguably less strict standard, requiring only that the defendant intend to do *something* illegal. *United States v. Turner*, 836 F.3d 849, 860 (7th Cir. 2016) (applying *Bryan* and approving of a less specific jury instruction that the defendant "must act with the intent to do something the law forbids"), *as supplemented*, 840 F.3d 336 (7th Cir. 2016).

The same general interpretation of the term "willfully" has been used in the context of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, which designates certain defense articles for inclusion on the United States Munitions List and, with enumerated exceptions, forbids import or export items on the Munitions List without a license. *Burden*, 934 F.3d at 681 (citing 22 U.S.C. § 2778(a)(1), (b)(2)). Any person who "willfully violates any provision of [AECA and related statutes]" is subject to criminal liability and punishment. 22 U.S.C. § 2778(c). The D.C. Circuit and other courts of appeals have—regardless of whether *Bryan*, *Ratzlaf*, or *Cheek* is cited as providing the applicable legal standard—interpreted "willfully" in the context of AECA as requiring knowledge of the unlawfulness of the defendant's specific actions but not knowledge of the precise contents of the Munitions List. *Burden*, 934 F.3d at 692 (applying *Bryan*); *Wenxia Man*, 891 F.3d at 1268–69 (applying *Ratzlaf* and holding that AECA requires the

government to show more than that the defendant understood her actions to be "generally unlawful," but nevertheless holding that willfulness requirement is met when defendant "knew that it was unlawful to export the items and intentionally violated the known legal duty not to export them") (internal quotation marks and alterations omitted) (quoting *United States v. Adames* 878 F.2d 1374, 1377 (11th Cir. 1989))); *United States v. Henry*, 888 F.3d 589, 599 (2d Cir. 2018) (applying *Bryan* and holding that AECA "requires only that the defendant know that what he was doing was illegal, and not that he know that his conduct was prohibited under a specific AECA provision or related regulation"); *United States v. Dobek*, 789 F.3d 698, 701 (7th Cir. 2015) (applying *Cheek* and holding that proper jury instruction would read "the defendant acted willfully if he exported military aircraft parts to Venezuela knowing that the law forbade exporting those parts to that country"); *United States v. Bishop*, 740 F.3d 927, 933–34 (4th Cir. 2014) (applying *Bryan* and holding that "it would be unwarranted for courts to draw from the word 'willful' a desire on the part of Congress to require not simply general knowledge of an export's illegality, but specific knowledge of the particulars of a certain list"); *United States v. Chi Mak*, 683 F.3d 1126, 1138 (9th Cir. 2012) (applying *Cheek* and approving jury instruction that government had burden "to prove that [defendant] had acted 'willfully' 'with the purpose of violating a known legal duty'"); *United States v. Roth*, 628 F.3d 827, 835 (6th Cir. 2011) (applying *Bryan* and holding that willfulness "only requires knowledge that the underlying action is unlawful"); *United States v. Tsai*, 954 F.2d 155, 162  (3d Cir. 1992) ("If the defendant knew that the export was in violation of the law, we are hard pressed to say that it matters what the basis of that knowledge was."); *United States v. Murphy*, 852 F.2d 1, 6–7 (1st Cir. 1988) (holding that "it is sufficient that the government prove that [defendant] knew he had a legal duty not to export the weapons").  *But see United States v. Hernandez*, 662 F.2d 289, 292 (5th Cir.

1981) (pre-*Bryan* case holding that defendant must know that "he was unlawfully exporting weapons on the Munitions List").

In *Burden*, the D.C. Circuit held that the district court "correctly instructed that, if defendants knew exporting the charged items without a license was unlawful, they did not need specific knowledge of the Munitions List" and that "the government need not prove that a defendant had read, was aware of, or had consulted the licensing provisions of the [AECA, relevant regulations], or the Munitions List." 934 F.3d at 690. The court emphasized, however, that the jury instruction must make clear the *mens rea* relates to the specific *actus reus* of the offense. *Id.* at 692–93 ("On retrial, the instruction should make clear that an AECA conviction requires that defendants knew of the unlawfulness of the charged unlicensed export of the items from the United States . . . ."). When the object of the *mens rea* requirement is specified, as it must be, the jury instructions should indicate that the defendant must know that the specific conduct prescribed by the criminal prohibition is, in fact, illegal. *See id.* at 692 (characterizing the willfulness requirement in *Wenxia Man*, which held that "aware[ness] of the generally unlawful nature of [one's] actions is insufficient," as "not materially different" from the willfulness requirement adopted by the court (quoting *Wenxia Man*, 901 F.3d at 1268)).

Defendant rejects these lines of authority and argues that a higher willfulness standard ought to apply and require knowledge of the specific details of, and reasons for, the relevant OFAC designations. First, she rejects the analogy to the IEEPA line of cases that have required only knowledge of illegality. Defendant explains that the Kingpin Act is "wholly separate and independent from IEEPA" and that caselaw surrounding the latter should not be used to interpret the former. Def.'s Opp'n Gov't's Omnibus Mots. at 15. In relying solely on the purposes of the statutes, *id.* at 14, defendant fails to provide any compelling reason to distinguish between the

16

similar language in the statutes and their provisions defining violations thereof.  *See* 21 U.S.C. § 1906(a)(1) and 50 U.S.C. § 1705(c).  The kind of conduct prohibited by the Kingpin Act— dealings and transactions with OFAC-designated entities—is quite similar to the conduct that may be prohibited by regulation under the IEEPA—transactions with designated foreign countries or nationals found to pose unusual and extraordinary threat—leading naturally to the same understanding and application of the willfulness standard.  *Compare* 21 U.S.C. § 1904(c) *with* 50 U.S.C. § 1702(a)(1)(A), (B).

Second, defendant argues that the statute requires evidence of notice because "[w]ithout notice that the entities listed in the Superseding Indictment were designated by OFAC[ ] because those entities were deemed by OFAC to have provided material assistance or goods or services to a specific Significant Foreign Narcotics Trafficker, [defendant] would have no way of knowing that simply engaging in business transactions with those entities would violate any law. Def.'s Opp'n Omnibus Mots. at 17.  This argument incorrectly conflates the statutory *mens rea* requirement with the type of evidence necessary to meet that requirement.  Obviously, one way to show that defendant was aware of the relevant legal duty would be to prove she received a blocking notice or saw the relevant public notice in the Code of Federal Regulations or on OFAC's website.  Evidence that defendant acted with the requisite *mens rea* and knew about the relevant legal duty can take different forms, however, since, as the Supreme Court has noted even in those cases applying the most stringent version of the willfulness requirement, a jury is free to make "reasonable inferences from the evidence of defendant's conduct."  *Ratzlaf*, 510 U.S. at 663 n.19.

Under any existing interpretation of the willfulness standard in embargo or export-restriction statutes, the government need not prove, as defendant urges, "that a defendant had

read, was aware of, or had consulted the licensing provisions" of the relevant statute. *Burden,* 934 F.3d at 690–92. Nor does the government need to prove that defendant had knowledge of every detail of the regulatory regime established by Congress or the specific reasons underlying the decisions by OFAC to designate and block the businesses named in the Superseding Indictment. These facts are simply irrelevant to the charged conduct. The government must prove only that defendant knew her relevant conduct violated the legal duty created by the statute. *Id.*; *see also Quinn*, 403 F. Supp. 2d at 63–64. In the instant case, under the Kingpin Act, this means the government must prove that defendant knew the entities named in the Superseding Indictment had been blocked or designated and that it was therefore illegal for her to engage in any transactions or dealings with those entities. To be clear, proof of defendant's knowledge regarding the designations is not limited only by her receipt of actual notice of OFAC designations.

The government may have the law right, but to the extent it seeks to preclude testimony about defendant not receiving a blocking notice, its motion goes too far. The government has requested the Court—given legal principles articulated above—to "preclude the defendant from suggesting that the government must prove that the defendant received notice of the designations during jury addresses or the presentation of evidence in the case." Gov't's Omnibus Mots. at 21; *see also id.* at 1 (seeking "to preclude argument and elicitation of testimony at trial suggesting that the government is required to show that the defendant had actual contemporaneous notice of the specific . . . [Kingpin Act] designations underlying the indictment"). To support this position, the government cites Rule 403 of the Federal Rules of Evidence, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a

danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." FED. R. EVID. 403.

The government is correct that defendant should not elicit testimony or present argument at trial amounting to a legal instruction that the government is required to prove defendant was provided actual notice of the OFAC designations, and such evidence or argument would likely prompt a request for, and issuance of, a curative instruction on the law. To the extent, however, that the government is trying to exclude or limit testimony and restrict defendant's line of defense about her lack of knowledge due to her not receiving, reviewing, or reading any blocking notice, as a factual matter, this would impair her ability to mount a defense. Evidence that she did not personally receive notice of the OFAC designations is relevant to the determination that must be made by the jury as to whether she acted with the required *mens rea*. The Court will instruct the jury on the law and give any instructions that might be necessary, given the evidence presented at trial, to ensure that the jury understands the law, but will not preclude defendant from making arguments that may form part of her defense at trial regarding her lack of knowledge of the OFAC designations for the entities named in the Superseding Indictment. The government's motion is therefore granted in part and denied in part.

### C.   Government's Motion to Preclude Argument and Elicitation of Testimony Designed to Challenge the Validity of the Underlying OFAC Designations

The government next argues that defendant should be precluded from challenging the validity of the OFAC designations on which the criminal charges against her are predicated. Gov't's Omnibus Mots. at 22–23. The Court agrees that the reasons underlying the designations are irrelevant to the elements of the offense and bringing those reasons into the case would confuse the issues. *See* FED R. EVID. 402 ("Irrelevant evidence is not admissible."); FED. R. EVID. 403.

The Kingpin Act authorizes the President to designate and block "significant foreign narcotics traffickers," 21 U.S.C. §§ 1903(b), 1904(b)(1), and then the Secretary of the Treasury to designate and block the assets of foreign persons who "materially assist[] in, or provid[e] financial or technological support for or to, or provid[e] goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker," *id.* § 1904(b)(2).  As already noted, the Act prohibits transactions and dealings with these designated entities, *id.* at § 1904(c), and provides criminal penalties for willfully violating that prohibition, *id.* § 1906(a)(1).

The government argues that because only the designation itself is an element of the crime, and not the validity of the underlying designation, defendant should not be permitted to attack at trial the evidence underlying the OFAC's designation of the businesses named in the Superseding Indictment.  Gov't's Omnibus Mots. at 22.  In making this argument, the government relies on a series of cases holding that defendants' due process rights are not violated when criminal statutes explicitly foreclose collateral attack, or judicial review more generally, of the administrative classifications underlying the relevant criminal offenses.  *Id.* (citing *United States v. Hammoud*, 381 F.3d 316, 331 (4th Cir. 2004) (en banc) (holding that statutory bar to challenge validity of terrorist organization designation does not violate due process), *vacated*, 543 U.S. 1097 (2005), *reinstated in part*, 405 F.3d 1034 (4th Cir. 2005); *United States v. Bozarov*, 974 F.2d 1037, 1045–46 (9th Cir. 1992) (holding that criminal defendant's inability to challenge administrative classification under export restriction statute did not violate due process because the validity of the classification was not an element of the offense); *Yakus v. United States*, 321 U.S. 414, 447 (1944) (holding that provision of Emergency

Price Control Act preventing criminal defendant from collaterally attacking validity of regulations that the government accused him of violating did not violate due process).[8]

Defendant responds that the proper designation of the entities is directly relevant to her defense because "OFAC's designations of the entities listed in the Superseding Indictment will play a critical role in the imposition of any criminal sanction against Ms. Gonzalez, as [she] would not be charged with any criminal violations but for the OFAC[] designations."  Def.'s Opp'n Gov't's Omnibus Mots. at 21.  Defendant does not suggest that the validity of the designations is an element of the offense.  Instead, defendant relies solely on *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987), for the proposition that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding."  Def.'s Opp'n Gov't's Omnibus Mots. at 20 (quoting *Mendoza-Lopez*, 481 U.S. at 837–38).  Defendant, however, mischaracterizes the narrow holding of that case, which does not help her here.

---

[8]      The government cites *Hammoud* and *Bozarov* for the proposition that "[w]ell-settled law specifically prohibits a criminal defendant from collaterally attacking an administrative designation at trial."  Gov't's Omnibus Mots. at 22.  That reading ignores the fact that the statutes at issue in those cases expressly preclude either collateral attack or judicial review and thus the holdings are far narrower than the government asserts.  Simply put, those cases hold only that a criminal prohibition predicated on a non-reviewable executive or agency determination does not violate due process.

By contrast to the statutes considered in *Hammoud, Bozarov*, and *Yakus,* the Kingpin Act currently contains no such provision precluding judicial review of a designation, although as originally enacted, it did.  *See* Foreign Narcotics Kingpin Designation Act, § 805(f), 113 Stat. 1626, 1631 (1999) ("The determinations, identifications, findings, and designations made pursuant to section 1903 of this title and subsection (b) of this section shall not be subject to judicial review.").  That provision, however, was struck from the statute soon after its enactment.  *See* Intelligence Authorization Act for Fiscal Year 2002, § 307, 115 Stat. 1394, 1399 (2001).  The legislative history contains no indication that the elimination of this provision contemplated collateral attack of blocking designations by defendants charged in criminal proceedings, however.  *See, generally,* JUDICIAL REVIEW COMM'N ON FOREIGN ASSET CONTROL, FINAL REPORT TO CONGRESS (Jan. 2001).  This change had been recommended by the Judicial Review Commission—created by the Kingpin Act, *see* 21 U.S.C. § 1908, to review the operation of programs relating to the blocking of assets of foreign persons—due to Commission concern over the complete lack of judicial review of Treasury designations in the original statute.  *Id.* at 125–35.  The Commission recommended eliminating the preclusion provision so that "judicial review would be available under the Kingpin Act to the same extent" as in similar sanctions statutes, in which "persons adversely affected by OFAC decisions may petition for review of final agency actions under the APA and, in addition, may pursue such constitutional claims as they have standing to raise."  *Id.* at 127.

In *Mendoza-Lopez*, an immigration judge did not properly advise aliens of their rights when conducting deportation hearings, such that the aliens' waivers of their appellate rights could not be considered informed or intelligent, and the proceedings were determined to have violated their due process rights. *Id.* at 840. In these exceptional circumstances, where the deportation proceedings were "fundamentally unfair," violating due process and wrongfully depriving individuals of the opportunity for judicial review, the Supreme Court held that the government could not rely on the resulting deportation orders "as reliable proof of an element of a criminal offense." *Id.* at 839–40.[9]

Here, the law provides ample avenue for administrative and judicial review of the administrative designations with which defendant takes issue. Regulations promulgated under the Kingpin Act provide that any designated person—including a specially designated narcotics trafficker—may "'seek administrative reconsideration' of his designation and request to be removed, or 'delist[ed].'" *Zevallos v. Obama*, 793 F.3d 106, 110 (D.C. Cir. 2015) (quoting 31 C.F.R. § 501.807). The designated person can "assert that the circumstances resulting in the designation no longer apply," present evidence "that the person believes establishes [an] insufficient basis for the designation," and may "propose remedial steps . . . to negate the basis for designation." 31 C.F.R. § 501.807. A designated person may also bring a claim under the Administrative Procedure Act ("APA") to challenge the Department of the Treasury's denial of reconsideration. *Zevallos*, 793 F.3d at 112 (citing 5 U.S.C. § 706(2)(A)). The availability of an alternative avenue for challenging the OFAC designation renders *Mendoza-Lopez* inapplicable

---

[9] Illustrating the limited holding and exceptional circumstances of *Mendoza-Lopez*, Congress subsequently amended the relevant criminal statute to reflect the holding of *Mendoza-Lopez* and prohibit collateral attack except where (1) the alien had exhausted administrative remedies, (2) deportation proceedings improperly denied the alien of the opportunity for judicial review, and (3) the deportation order was "fundamentally unfair." 8 U.S.C. § 1326(d)(1)–(3); *see also United States v. Moreno-Tapia*, 848 F.3d 162, 166 (4th Cir. 2017) (describing 8 U.S.C. § 1326(d) as "codifying the principle of *Mendoza-Lopez*")

here.  Furthermore, defendant provides no evidence to suggest that the OFAC designation violated anyone's due process rights or was "fundamentally unfair."  Indeed, given that defendant has not admitted any association with the five entities named in the Superseding Indictment, *see* Def.'s Omnibus Reply Supp. Pretrial Mots. and Incorporated Mem. of Points and Auths. ("Def.'s Omnibus Reply Supp. Pretrial Mots.") at 5, ECF No. 98, she cannot plausibly claim that the Secretary's determination was fundamentally unfair to her or violated her constitutional rights.  The absence of any admitted association of defendant with the designated entities renders the *Mendoza-Lopez* framework—which is predicated on a prior adjudication of a defendant's rights—wholly inapposite.

If defendant were concerned about the financial ramifications of having her businesses blocked by OFAC, she could follow the established administrative procedures to obtain delisting, *see* 31 C.F.R § 501.807, and even bring an APA claim to challenge any adverse agency action, *see Zevallos*, 793 F.3d at 112.  These procedures provide what the due process clause requires. *See Yakus*, 321 U.S. at 444 ("[W]e are pointed to no principle of law or provision of the Constitution which precludes Congress from making criminal the violation of an administrative regulation, by one who has failed to avail himself of an adequate separate procedure for the adjudication of its validity . . . .").[10]

With defendant's due process concerns addressed, the Court is left with the fact that the validity of the underlying designations is not an element of the relevant offenses and that the statute provides no indication that a defendant may question the validity of the underlying

---

[10]    Defendant argues that *Yakus* is inapposite because the Supreme Court left open the possibility that collateral attack of a regulation could be appropriate if the regulation were facially unconstitutional, if a defendant were deprived of the opportunity to challenge the regulation outside of the criminal proceeding, or if the defendant were "diligently seeking determination of its validity" at the time of the offense.  Def.'s Opp'n Gov't's Omnibus Mots. at 19 n.7 (quoting *Yakus*, 321 U.S. at 446–47).  None of these circumstances apply here, however, and defendant does not argue otherwise.

designation as a defense to criminal charges.  *Accord Lewis v. United States*, 445 U.S. 55, 62–65 (1980) (holding the validity of a prior conviction is irrelevant under the federal statute that bars felons from possessing firearms, even though conviction under that statute rests solely upon the fact of the prior felony); *U.S. v. Straker*, 800 F.3d 570, 585 (D.C. Cir. 2015) (discussing *Lewis*). The criminal law does not generally allow a defendant collaterally to attack the policy reasons behind an administrative designation relevant to a criminal offense. *See, e.g., Liparota v. United States*, 471 U.S. 419, 424 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.").  In criminal drug prosecutions, for example, multiple courts of appeals have held that a defendant may not mount a collateral attack on the substantive basis for the permanent scheduling order of the controlled substance relevant to the charges precisely because direct review of the administrative decision to place a drug on a controlled substance schedule is available.  *United States v. Forrester*, 616 F.3d 929, 936 (9th Cir. 2010); *United States v. Carlson*, 87 F.3d 440, 446 (11th Cir. 1996); *cf. Touby v. United States*, 500 U.S. 160 (1991) (interpreting the temporary scheduling statute, which expressly precludes judicial review, to allow for collateral attack in criminal proceedings).[11]  The court in *Forrester* concluded that the *Touby* holding allowing for collateral attack of temporary scheduling orders did not apply because permanent scheduling orders were "thoroughly vetted and allow for direct attacks through 21 U.S.C. § 877."  616 F.3d at 936.  Collateral attack was deemed inappropriate because (1) scheduling decisions are complex policy matters; (2) the agency responsible for the scheduling decision was not a party to the case; and (3) allowing defendants to collaterally attack

---

[11]     To the extent courts have occasionally evaluated final scheduling rules in criminal cases, they have addressed procedural defects in scheduling rather than the substantive bases for scheduling and have merely assumed, without holding, that evaluating final scheduling rules in criminal proceedings is appropriate. *See United States v. Springer*, 354 F.3d 772, 775 (8th Cir. 2004) (collecting cases).

scheduling orders would "potentially place a continuing, onerous burden on district courts to constantly re-litigate the same issue." *Id.* (citing *Carlson*, 87 F.3d at 440).[12]  The same reasoning counsels against allowing collateral attacks of designations under the Kingpin Act.

In sum, the government need not justify in this criminal case the policy determinations underlying the OFAC designations, and absent any basis in the statute or the Constitution, defendant may not collaterally attack in this case the designation of the entities named in the superseding indictment.  *See Lewis*, 445 U.S. at 62–65; *Forrester*, 616 F.3d at 936.  The validity of the underlying designations is therefore not relevant to these proceedings.  *See* FED. R. EVID. 402.[13]  The government's motion to preclude argument and testimony challenging the OFAC designations of the entities named in the Superseding Indictment is therefore granted.

### D.   Government's Motion to Admit Evidence of Web Delisting of an OFAC–Designated Entity

The government seeks to admit, pursuant to Federal Rule of Evidence 404(b), evidence of defendant's association with a sixth company, BRIC Inmobiliaria, which was designated by OFAC pursuant to the Kingpin Act in August 2015, four months after OFAC designated CJNG and its leader, *see* Gov't's Reply Supp. Omnibus Mots. at 2; and one month before the five companies named in the Superseding Indictment were designated, Gov't's Omnibus Mots. at 2;

---

[12]    In *Spawr Optical Research, Inc. v. Baldrige*, another Judge on this Court presented another analogy to controlled substances law to explain why an export licensing statute did not violate due process by precluding judicial review of the designation of goods subject to licensing.  649 F. Supp. 1366, 1372 n.10 (D.D.C. 1986).  The federal controlled substances laws contain the following finding by Congress: "The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2).  This does not mean, however that the "substantial and detrimental effect" of a controlled substance is an element to the crime of manufacturing or distributing a controlled substance, or even relevant to a criminal prosecution for a criminal offense involving a controlled substance. *See* 21 U.S.C. § 841.  One cannot defend against a drug crime prosecution by challenging the relevant finding of Congress.

[13]    If defendant believes that the entities named in the Superseding Indictment were improperly designated, she may, if she has standing, request that the Department of Treasury delist the entities, 31 C.F.R. § 501.807, and bring a challenge under the APA, 5 U.S.C. § 702.  *See, e.g., Zevallos*, 793 F.3d 106 (addressing APA challenge to designation under the Kingpin Act by designated person who had been indicted in the Southern District of Florida for violating Kingpin Act and was serving prison sentence on narcotics conviction in Peru).

Additional Designations, Foreign Narcotics Kingpin Designation Act, 80 Fed. Reg. 51351 (Aug. 24, 2015). After OFAC designated BRIC Inmobiliaria, the company's web hosting service, Bluehost, deactivated that company's web hosting account. Gov't's Omnibus Mots. at 5–6. The government proffers evidence that defendant was, through J&P Advertising, the "listed registrant for BRIC Inmobiliaria's web address," and used the same email account, "contacto@jp-adv.com," to register domains for BRIC Inmobiliaria and the OFAC-designated businesses named in the Superseding Indictment. *Id.*; Gov't's Reply Supp. Omnibus Mots. at 3–4. J&P Advertising's email address, "contacto@jp-adv.com," was provided to the web hosting company by a person identifying herself as "jessica oseguera," along with a telephone number with an area code in Guadalajara, Jalisco. *Id.* at 4. An email sent by the web hosting service, on August 23, 2015, to J&P Advertising's email address, "contacto@jp-adv.com," and addressed to "Jessica" indicated that "a package under your control is providing service to individuals or businesses specifically designated as blocked" by OFAC. Gov't's Omnibus Mots. at 6; Def.'s Opp'n Gov't's Omnibus Mots. at 2. A 26-minute phone call to the web host's customer service line was made the next day from the same telephone phone number "jessica oseguera" provided when registering the entities' websites, and the web host subsequently reactivated the account, "with the exception of the BRIC Inmobiliaria website." Gov't's Omnibus Mots. at 6; Gov't's Reply Supp. Omnibus Mots. at 1, 4. After OFAC designated, on September 17, 2015, the five entities named in the Superseding Indictment, records indicate that "defendant's domain registration account was again deactivated, and that the domain registrations for J&P Advertising, Mizu Sushi, Tequila Onze Black, and Las Flores Cabanas, among others, were specifically banned on account of the OFAC designations." Gov't's Omnibus Mots. at 7; *see also* Gov't's Reply Supp. Omnibus Mots. at 4. "The government anticipates introducing this

documentary evidence at trial, as well as related testimony, possibly to include testimony from investigative agents, representatives of the web hosting service, associates of the defendant who were aware of her activities vis-à-vis BRIC Inmobiliaria, associates of the defendant who were aware of her involvement in registering websites and domain names for various businesses, and others."  Gov't's Omnibus Mots. at 7.

The government contends that its evidence related to the BRIC Inmobiliaria website deactivation is admissible as intrinsic to the charged conduct and therefore not subject to the requirements of Federal Rule of Evidence 404(b).  Gov't's Omnibus Mots. at 8–9.  Though expressing "dissatisfaction with the extrinsic-intrinsic distinction," *United States v. Alexander*, 331 F.3d 116, 125 (D.C. Cir. 2003), the D.C. Circuit has identified two narrow circumstances encompassing intrinsic evidence: the evidence "is either 'of an act that is part of the charged offense' or is of 'acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime.'"  *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) (omission in original) (quoting *Bowie*, 232 F.3d at 929); *see also Alexander*, 331 F.3d at 126 (describing as "example," that "if evidence is offered as direct evidence of a fact in issue, not as circumstantial evidence requiring an inference regarding the character of the accused, 'it is properly considered intrinsic'" (quoting *Bowie*, 232 F.3d. at 929)).

The evidence proffered by the government does not fit neatly into either of these narrow intrinsic evidence categories, however, since the OFAC designation of BRIC Inmobiliaria and the resulting blocking notice and take down of that entity's website are not "so indistinguishable from the charged crime" to be "entirely removed from Rule 404(b)[.]"  *Bowie*, 232 F.3d at 928.  Plus, the deactivation notice and termination of BRIC Inmobiliaria's account one month before, rather than contemporaneously with, the OFAC designations of the named entities at issue here,

with no suggestion that BRIC Inmobiliaria "facilitate[d]" the charged conduct.  As defendant points out, this evidence is not intrinsic because "proffered evidence can properly be considered 'intrinsic' only if it 'is of an act that is part of the charged offense' and, therefore, immune to Rule 404(b)'s limitations on evidence of criminal propensity," and BRIC Inmobiliaria is not part of the charges.  Def.'s Opp'n Gov't's Omnibus Mots. at 3 (quoting *Bowie*, 232 F.3d at 929).

The government presses the argument that the BRIC Inmobiliaria evidence is intrinsic by overstating the two circumstances in this Circuit when such uncharged conduct may be admitted without Rule 404(b)'s "attendant notice requirement" and "the defense's entitlement, upon request, to a jury instruction." *Bowie*, 232 F.3d at 928 (citing FED. R. EVID. 105).  Relying on a non-binding Eleventh Circuit case, the government suggests that uncharged crime evidence is admissible as intrinsic "if it 'arose out of the same series of transactions as the charged offense . . . or it is necessary to complete the story of the crime on trial.'"  Gov't's Omnibus Mots. at 9 (omission in original) (quoting *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983).  The government asserts that this standard for intrinsic evidence is met here and that "the defendant's involvement with registering BRIC Inmobiliaria's web domain—and, as a result, receiving notification from the web host that it was shutting down her account because of the OFAC sanctions—should be admitted as inextricably intertwined and intrinsic to the charged conduct." *Id*.[14]  The D.C. Circuit, however, has been skeptical of this "inextricably intertwined" test for intrinsic evidence as not "particularly helpful," *Bowie*, 232 F.3d at 928, and rejected broad exclusions for a "general 'complete the story' or 'explain the circumstances' exception to Rule

---

[14] The government also cites *United States v. Gray*, 292 F. Supp. 2d 71, 77–78 (D.D.C. 2003), in which uncharged conduct by the defendants was admitted as intrinsic evidence, rather than under Rule 404(b), but this case is weak support.  On appeal, the D.C. Circuit found that the defendants "are likely correct that the district court erred by permitting the government to introduce the evidence of uncharged conduct at issue," *Moore*, 651 F.3d at 63–64, though "[i]n light of the amount and strength of the evidence the government presented of the charged crimes, . . . any potential error was harmless," *id*. at 64.

404(b)," *id*. at 929, as "hav[ing] no discernible grounding in the 'other crimes, wrongs. or acts' language of the rule," *id*.  *See also United States v. McGill*, 815 F.3d 846, 879–80 (D.C. Cir. 2016) (rejecting proposition that evidence is intrinsic if it "completes the story" and identifying "no reason to relieve the government and the district court from the obligation of selecting from the myriad of non-propensity purposes available to complete most any story" (quoting *Bowie*, 232 F.3d at 929)).  Instead, the reasons given by the government for why the BRIC Inmobiliaria evidence, including that defendant "received a notice from the web hosting service related to the OFAC sanctions," Gov't's Omnibus Mots. at 10, is "intertwined" and "intrinsic" by showing "the willfulness of her conduct," *id*., is an argument that the evidence falls into one of the permitted uses of extrinsic evidence under Rule 404(b)(2).

On firmer ground, the government also argues that evidence of defendant's association with and role in trying to preserve the BRIC Inmobiliaria website after the OFAC designation, should be admitted pursuant to Rule 404(b) "as evidence that demonstrates a common scheme or plan, as well as the defendant's intent, knowledge, and lack of mistake . . . in continuing to transact and deal with the designated businesses that underlie the indictment."  Gov't's Omnibus Mots. at 12.  More specifically, the government asserts that "the evidence of the defendant's connection to BRIC Inmobiliaria and the communication from the web hosting service detailing the OFAC violation make it substantially more probable that the defendant knew of the OFAC sanctions regime, knew that it was unlawful to transact or deal with designated entities, and yet continued to operate the entities that are the subject of the indictment."  *Id.* at 14–15.  The government expects that defendant will argue in her defense that she "had no knowledge of the OFAC designations or the unlawfulness of her conduct" and views "evidence of similar prior dealings with a designated entity and, in particular, evidence of her receiving notice that it was

unlawful to deal with that entity on account of the designation," as critical in confronting that

argument. *Id.* at 15. Rather than being offered as "character evidence," this evidence shows

"that she had some awareness and knowledge of the OFAC sanctions regime and its general

consequences even before the designation of the businesses underlying the Superseding

Indictment." Gov't's Reply Supp. Omnibus Mots. at 5.

Defendant responds that the August 23, 2015 email from the web-hosting service "cannot

be used to infer any intent, knowledge, or lack of mistake" on defendant's part because it "did

not contain any statements that the entities listed in the Superseding Indictment had been

designated by OFAC." Def.'s Opp'n Gov't's Omnibus Mots. at 9. [15] Moreover, defendant

argues that the email provides no notice of BRIC Inmobiliaria's OFAC designation and, even if

it did provide such notice, the email "cannot be connected with [her] knowledge of OFAC

designations that had not yet happened." *Id.* at 10. Defendant's characterization of the email

skips over text that expressly references "Jessica['s]" "control" of "a package" that "is providing

service to individuals or businesses specifically designated as blocked," as well as the

notification that the web hosting company was not allowed "to do business with persons or

entities on the blocked list," pursuant to OFAC directives, and that consequently, "the account or

accounts in question have been suspended and disabled." Gov't's Omnibus Mots. at 6 (quoting

August 23, 2015 email).

The Court agrees with the government that the proffered evidence is relevant to the

willfulness inquiry, is not propensity evidence forbidden by Rule 404(b)(1), and may be offered

---

[15]    Defendant also argues that the BRIC Inmobiliaria-related evidence cannot be used to show intent,
knowledge, or lack of mistake because the email from the web hosting company does not indicate "with which
OFAC-designated entities BRIC Inmobiliaria had allegedly transacted business, or any information whatsoever that
either BRIC Inmobiliaria or any other entity was allegedly engaged in narcotics trafficking." Def.'s Opp'n Gov't's
Omnibus Mots. at 9. These facts are irrelevant to the case, however, because the "willfulness" requirement of the
statute requires only that defendant knew that her conduct violated the legal duty provided by the statute, not that
she knew the basis for the underlying OFAC designations. *See supra* Part II.B.

to show defendant's knowledge of the OFAC sanctioning regime and, by extension, defendant's willfulness in transacting with the entities named in the Superseding Indictment. *See* Gov't's Reply Supp. Omnibus Mots. at 8. Defendant has challenged the government's proof as to *mens rea*, suggesting that the government's lack of evidence showing defendant's actual receipt of a blocking notice as to the named entities is fatal to its case. *See, e.g.,* Def.'s 2nd Mot. to Compel at 12 ("[T]he government cannot fairly claim that it can prove *mens rea*[ ] without proving that Ms. Gonzalez had actual notice of the OFAC designations."). A jury may find, however, that defendant knew that her conduct was unlawful, supporting a finding of willfulness, by "drawing reasonable inferences from the evidence of defendant's conduct." *Ratzlaf*, 510 U.S. at 149 n.19. The government's proffered evidence makes more probable that defendant knew of the OFAC sanctioning regime and its consequences, so the evidence is relevant to the issue of defendant's willfulness. Defendant may believe that the evidence is unconvincing or insufficient, but that is an issue for the jury to assess at trial. Evidence of other acts is admissible "in but one circumstance," amounting to "a rule of inclusion rather than exclusion," *Machado-Erazo*, 901 F.3d at 333 (first quoting *Crowder*, 141 F.3d at 1206, and then quoting *Bowie*, 232 F.3d at 929), and defendant has presented no real reason to believe that this evidence is irrelevant or is being offered for the sole prohibited purpose of showing character or propensity. This evidence is therefore admissible under Rule 404(b).

This conclusion is bolstered by the D.C. Circuit's analysis in *United States v. Sang Han*, 962 F.3d 568 (D.C. Cir. 2020), which is particularly instructive on this issue. There, the Court affirmed the admission, under Rule 404(b), in defendant's criminal tax evasion trial of his past expenditures and personal tax returns in years 2004–09, which were filed roughly contemporaneously with the charged offense conduct in 2010–11. *Id.* at 572–73. The Court

deemed this evidence "central" to the government's "steep" *mens rea* burden "to demonstrate

beyond a reasonable doubt that [defendant] acted *willfully*—'that the law imposed a duty on the

defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated

that duty.'" *Id*. at 572 (quoting *Cheek*, 498 U.S. at 201, and citing *United States v. Khanu*, 662

F.3d 1226, 1229 (D.C. Cir. 2011)). Echoing the government's argument, the Court explained, "it

was in the process of characterizing his 2004–2009 expenditures for those other returns . . . that

[defendant] learned he could not defensibly characterize splurges on flashy cars (and other items)

as business expenditures: It gave him sort of a tutorial, [an] education session" such that he

"learned that he would have to find a different characterization if he wanted to avoid paying

taxes on that and similar spending going forward. In other words, he developed knowledge of

[his] tax obligations and began willfully planning to defy them." *Id.* at 572–73 (quotation marks

and citations omitted; second and third alterations in original). In this context, the Court

concluded "the 2004–09 evidence was both relevant to the 2010–11 charges under Rule 402 and

admissible under Rule 404(b)," to show defendant's knowledge and intent. *Id*. at 573. Likewise,

here, the BRIC Inmobiliaria-related evidence is highly probative of defendant's knowledge of

OFAC designations and the consequences thereof and therefore relevant to establishing her

awareness of the legal duties imposed by such a designation.

Defendant argues that the evidence nevertheless should be excluded under Rule 403 as

unfairly prejudicial, *see* FED. R. EVID. 403, but that argument is unavailing. Defendant does not

suggest that the evidence might be unfairly considered as propensity evidence. Instead,

defendant notes that the email references a "package under [Ms. Gonzalez's] control [as]

providing service to individuals or businesses specifically designated as blocked, or who are

located in Crimea, Sudan, Iran, Syria, Cuba, or North Korea." Def.'s Opp'n Gov't's Omnibus

Mots. at 11 (alterations in original).  According to defendant, this reference to embargoed or sanctioned countries is prejudicial because it might "inflame the jury against Ms. Gonzalez for providing services to these countries," which she is not accused of doing.  *Id.*  No reasonable juror would interpret the email that way.  After all, the letter refers to "businesses specifically designated as blocked, *or* who are located in Crimea, Sudan, Iran, Syria, Cuba, or North Korea," *id.* at 2 (emphasis added), and the government plans to argue that the business was "specifically designated as blocked."  Moreover, the government has agreed to redact the reference to "Crimea, Sudan, Iran, Syria, Cuba, or North Korea" at trial, Gov't's Reply Supp. Omnibus Mots. at 9, so the issue is also moot.[16]

The government's evidence related to BRIC Inmobiliaria is admissible under Rule 404(b)(2) and not subject to exclusion under Rule 403.  Accordingly, the government's motion to admit this evidence is granted.

### E.  Government's Motion to Admit Evidence of Defendant's Involvement in the Financial Operations of the CJNG

The government also seeks to admit testimony "that the defendant was responsible for keeping ledgers of certain proceeds and expenses of narcotics trafficking activities for her father," who is "the leader of the CJNG."  Gov't's 404(b) Mot. at 5.  This evidence also includes descriptions of meetings at Las Flores Cabanas between defendant and her father that pertained to drug trafficking activities and took place, approximately, in 2011 and 2013 to 2014, before

---

[16]     Defendant also objects to the admissibility of the email because a heading in the discovered document indicates that the "current template . . . might not match what customer actually received" and because "there is no evidence that Ms. Gonzalez received or read this email."  Def.'s Opp'n Gov't's Omnibus Mots. at 10.  These are not sources of prejudice under Rule 403, however, and are not grounds for finding this evidence inadmissible under Federal Rules of Evidence 404(b) or 403.

OFAC designated Las Flores Cabanas.  Gov't's Reply Supp. Mot. to Introduce Other Crimes

Evidence at Trial ("Gov't's Reply Supp. 404(b) Mot.") at 6, ECF No. 155.[17]

The government first argues that the proposed evidence is not subject to Rule 404(b) of

the Federal Rules of Evidence because it is "inextricably intertwined and intrinsic to the charged

conduct."  *Id.* at 8.  The government presents no real argument, however, that the evidence is

"part of the charged offense" or of "some uncharged acts performed contemporaneously with the

charged crime . . . [that] facilitate[d] the commission of the charged crime."  *Bowie*, 232 F.3d at

929.[18]  The conduct described by the proposed evidence is quite distinct from the charged

offense, as defendant points out in opposing the government's motion.  Def.'s Opp'n Gov't's

404(b) Mot. at 6.  The government has not alleged that the alleged bookkeeping for CJNG was

related to defendant's dealings with the designated entities named in the Superseding Indictment

beyond the fact that one of the meetings took place at one of the designated businesses.  *See*

Gov't's 404(b) Mot. at 8.[19]  Nor has the government alleged that the alleged bookkeeping

facilitated the dealings with the designated businesses named in the Superseding Indictment.

Instead, the government's arguments for admissibility—even when framed as intrinsic evidence

---

[17]    Defendant contends that this motion should be denied as untimely.  Def.'s Opp'n Gov't's Mot. to Introduce Other Crimes Evidence at Trial ("Def.'s Opp'n Gov't's 404(b) Mot.") at 1–2, ECF No. 149.  The government has represented that this motion was filed "as soon as the evidence that it seeks to admit became available to the government."  Gov't's Reply Supp. 404(b) Mot. at 1.  Since the late filing of this motion poses no prejudice to defendant, any untimeliness is excused.

[18]    The government, again, relies on caselaw from outside the circuit to suggest evidence that "complete[s] the story of the crime" is intrinsic evidence. Gov't's 404(b) Mot. at 6–7 (quoting *United States v. Badru*, 97 F.3d 1471, 1474 (D.C. Cir. 1996) (quoting, in turn, *Weeks*, 716 F.2d at 83)).  Citing *Badru* as evidence of how "[t]his Circuit has defined intrinsic 'other crimes' evidence," *id.,* is misleading.  In *Badru*, the D.C. Circuit quoted *Weeks* as an example of how *another* circuit "ha[d] reached similar results," but did not adopt the test from *Weeks* nor did it refer anywhere else to "complete the story" evidence.  As noted *supra*, in Part II.D, the D.C. Circuit has expressly rejected this more capacious approach to evaluating other crimes evidence, *see Bowie*, 232 F.3d at 929; *Alexander*, 331 F.3d at 126.

[19]    The Court's denial of the government's motion does not reach the issue of whether other evidence that may directly show financial transfers or other ties between defendant's businesses and the CJNG is admissible.  The government's motion references such information but does not specifically seek its admission.  Gov't's 404(b) Mot. at 5.

arguments—go more towards showing that the evidence is admissible under Rule 404(b)(2). *See id.* at 8 ("The defendant's involvement in the financial operations of the CJNG through maintaining the ledgers of drug proceeds bears directly on her willfulness in continuing to transact and deal with the designated entities.").

The government argues in the alternative that the proffered evidence is admissible under Rule 404(b)(2) "to show a common scheme or plan, as well as the defendant's intent, knowledge, and lack of mistake," *id.* at 1 (citing FED. R. EVID. 404(b)(2)); in other words, that it is "probative of an issue other than character," *id.* at 10 (quoting *Miller*, 895 F.2d at 1435).[20]

The government formulates its argument several different ways, but the fundamental point is that "evidence that the defendant had a role in maintaining the ledgers for the CJNG is evidence that the defendant engaged in a pattern of assisting the CJNG with its financial operations and undermines any 'innocent' explanation for why she continued to own and operate the businesses named in the Superseding Indictment after they were designated." *Id.* at 11–12. The government develops this point more precisely in its reply, asserting that the proposed evidence "makes it substantially more likely that the defendant knew that the six designated businesses were a part of the larger CJNG drug trafficking enterprise, that she would have been aware of legal sanctions relating to drug trafficking including OFAC designations, and that her involvement with those businesses was therefore unlawful." Gov't 404(b) Reply at 3–4. Defendant's "innocent" explanation would, it seems, be that she did not know that the

---

[20]    In its reply, the government also proposes that it "seeks to introduce the proposed evidence to show . . . that she was 'an officer, director, and/or agent of Las Flores Cabanas,' as charged in the Superseding Indictment." Gov't's Reply Supp. 404(b) Mot. at 2.  The government does not explain, however, how the proposed evidence indicates that she was an "officer director, and/or agent" of the business, beyond referencing her "management and use of Las Flores Cabanas as a location to host meetings about the DTO's business." *Id.*; *see also id.* at 6 (referencing without elaboration "[e]vidence that the defendant owned Las Flores Cabanas").  In any event, the government does not suggest that the only proof of defendant's ownership of the businesses involves evidence of other crimes and thus such proof may be presented without also presenting evidence of other crimes.

organizations had been designated, did not know that dealing with them was unlawful, and, therefore, was not willfully breaking the law.

Defendant argues that the alleged evidence "has nothing to do with the allegations that [defendant] *willfully* engaged in transactions or dealings . . . with the entities named in the Superseding Indictment." Def.'s Opp'n Gov't's 404(b) Mot. at 4. Consequently, defendant reasons, this proffered evidence about defendant's bookkeeping for CJNG is not relevant for any of the purposes of Rule 404(b) because "the government's proffered evidence mentions only one of the entities in the Superseding Indictment and offers no insight as to whether [defendant] knew that the entity was designated by OFAC," *id.* at 10, and because the events at issue took place at least a year before such designation occurred, Def.'s Surreply Supp. Opp'n Gov't's Mot. to Introduce Other Crimes Evidence at Trial at 2, ECF No. 158. Further, even if admissible under Rule 404(b), defendant argues that this evidence should be excluded as unfairly prejudicial under Rule 403. Def.'s Opp'n Gov't's 404(b) Mot. at 12.

The proffered evidence of defendant's CJNG bookkeeping activities and the meetings with her father, the CJNG leader, at Las Flores Cabanas fall short of linking the named entities' business operations to the CJNG. Nor is this evidence probative of the key issue of defendant's knowledge of the relevant OFAC designations. The government argues that the evidence "makes it substantially more probable that the defendant knew that the businesses were materially supporting the CJNG or were controlled by CJNG," Gov't's 404(b) Mot. at 12–13, but the only link the evidence could establish is more between defendant herself and the CJNG than between the named businesses and the CJNG. To be found guilty under the Kingpin Act, defendant must have known that it was illegal to deal with the designated entities, but the proposed evidence could only help show that defendant herself had ties to a drug trafficking

organization such that if she owned the businesses, those businesses might be tied to the drug trafficking organization through her.  The proposed evidence does not take the step, however, of linking defendant's alleged bookkeeping work for the CJNG to her alleged management of or affiliation with the OFAC-designated businesses.  More fundamentally, evidence of ties to a drug trafficking organization does little to show that defendant knew that the businesses had been designated and blocked by OFAC.  Since designation by OFAC, and not the activities of the businesses, makes dealing with the businesses illegal, *see supra* Part II.C, knowledge of these underlying relationships is not particularly probative of defendant's knowledge of their OFAC status.  The government's hypothesis that defendant would have learned of the blocking and sanctioning provisions of the Kingpin Act through any contact with drug traffickers is similarly tenuous.

This use of other crimes evidence is easily distinguishable from the cases cited by the government, Gov't's 404(b) Mot. at 9–12, for the simple reason that the proffered evidence does not "bear[] a close relation to the offense charged," *United States v. Brown*, 597 F.3d 399, 404 (D.C. Cir. 2010) (quoting *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984), and citing *United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003)), and does not make more probable that defendant acted with the required mental state.  Any use of the evidence is far more attenuated from the relevant facts than, for example, using evidence that a defendant previously possessed and distributed crack cocaine to help establish that he knew the nature of the substance that he was charged with possessing and that he intended to distribute it.  Gov't's 404(b) Mot. at 11 (citing *United States v. Douglas*, 482 F.3d 591, 596–97 (D.C. Cir. 2007)).

The government further argues that the evidence is admissible to show a "pattern" of assisting the CJNG that tends to undermine any "'innocent' explanation for why she continued to

own and operate the businesses" after they were designated.  Gov't's Reply Supp. 404(b) at 5–6.

Here, the government contemplates that a jury, presented with evidence that defendant owned

and operated the businesses after their OFAC designations, would have to determine whether she

did so out of ignorance of the OFAC designations or willfully did so in violation of the law, and

that evidence of her prior relationship with the CJNG would help the jury find that the latter was

more likely true.  Used in the way, however, the proposed evidence is inadmissible character

evidence because it relies on past bad acts to suggest a willingness to act in violation of the law.

*See* FED. R. EVID. 404(a)(1) ("Evidence of a person's character or character trait is not admissible

to prove that on a particular occasion the person acted in accordance with the character or trait.").

Thus, this evidence, as currently proffered, is not admissible under Rule 404(b).

Even if the evidence were admissible under Rule 404(b), the risk of unfair prejudice to

defendant would weigh heavily against the slightly probative value of the proposed evidence and

would warrant exclusion under Rule 403.  This evidence presents a substantial risk that a jury

would focus on perceived culpability for keeping ledgers for a drug trafficking organization and

other uncharged personal involvement with the CJNG rather than on the relevant issues at trial

pertaining to defendant's transactions and dealings with the designated businesses.  The risk that

a jury would "convict for crimes other than those charged—or that, uncertain of guilt, it will

convict anyway because a bad person deserves punishment," *Old Chief*, 519 U.S. at 181 (quoting

*Moccia*, 681 F.2d at 63), is too great relative to what would only be minimal probative value, so

the evidence would be excluded under Rule 403 as well.  *See* Def.'s Opp'n Gov't's 404(b) Mot.

at 11–14.

That being said, should defendant open the door to evidence of her CJNG bookkeeping

activities and her meetings with her father, the CJNG leader, at Las Flores Cabanas by arguing

that neither she nor the designated entities had any connection to drug trafficking or to the

CJNG, *see* Def.'s Opp'n Gov't's Omnibus Mots. at 17, the government's proffered evidence

may become relevant on rebuttal. *See United States v. Antonakeas*, 255 F.3d 714, 724 (9th Cir.

2001); *United States v. Sitzmann*, 856 F. Supp. 2d 55, 62 (D.D.C. 2012).

***

For the reasons stated above, the government's motion to preclude argument and

elicitation of testimony that notice of the relevant OFAC designations is needed for conviction is

granted in part and denied in part; the government's motion to preclude argument and elicitation

of testimony on the validity of the underlying OFAC designations is granted; the government's

motion to admit evidence related to the web-delisting of BRIC Inmobiliaria is granted; and the

government's motion to admit evidence of defendant's involvement in some bookkeeping for,

and meeting with the leader of, CJNG is denied.

## III.   DEFENDANT'S MOTIONS TO COMPEL

Defendant has filed seven motions to compel the government to produce discovery under

Rule 16 of the Federal Rules of Criminal Procedure and pursuant to its obligation to turn over

exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), six of which motions

remain pending.[21]  At the outset, the government has produced over 50,000 of pages of

discovery, Def.'s 2nd Mot. to Compel at 13, including defendant's emails and emails concerning

the designated entities; audio recordings and transcripts, including of defendant's phone calls

while in custody; financial documents, including tax and bank records; various documents

related to the designated entities; and documents obtained from the web hosting services used by

---

[21]     Defendant's first motion to compel, Def.'s Mot. to Compel Production of Evid. and Witnesses and
Incorporated Mem. of Points and Auths., ECF No. 13, was filed leading up to her pretrial detention hearing and was
denied.  *United States v. Oseguera Gonzalez*, Crim. Action No. 20-40 (BAH), 2020 WL 1065448 (D.D.C. March 5,
2020).

defendant, Def.'s Response to Order to Show Cause at 6–9, ECF No. 122, but defendant seeks

additional material and information.  Defendant's second, third, fourth, fifth motions, sixth, and

seventh to compel are addressed, in turn, after brief review of the government's discovery

obligations under Rule 16.[22]  Defendant's pending motion to dismiss addresses the same issues

as her fourth and fifth motions to compel and, consequently, is addressed with those motions.

### A.    Discovery Obligations

"Rule 16 is a discovery rule designed to protect defendants by compelling the prosecution

to turn over to the defense evidence material to the charges at issue."  *Yates v. United States*,

574 U.S. 528, 539 (2015).  This rule sets out five types of evidence that the government must

turn over, upon defendant's request: (1) the defendant's oral, written, or recorded statements,

FED. R. CRIM. P. 16(a)(1)(A)–(B); (2) the defendant's prior criminal record, *id*. 16(a)(1)(D); (3)

documents and objects material to preparing the defense, intended for use in the government's

case-in-chief, or obtained from or belonging to defendant, "if the item is within the government's

possession, custody, or control," *id*. 16(a)(1)(E); (4) the results or reports of physical or mental

examination, test, or experiment under specified circumstances, *id*. 16(a)(1)(F); and (5) a written

summary of any expert testimony that the government intends to use during its case-in-chief at

---

[22] The government argues that each of these motions is untimely.  *See* Gov't's Opp'n Def.'s Second Mot. to Compel Production of Evid. and Witnesses ("Gov't's Opp'n Def.'s 2nd Mot. to Compel") at 7–8, ECF No. 108; Gov't's Opp'n Def.'s Third Mot. to Compel Production of Evid. and Witnesses ("Gov't's Opp'n Def.'s 3rd Mot. to Compel") at 9–10, ECF No. 114; Gov't's Opp'n Def.'s Fourth Mot. to Compel Production of Evid. and Witnesses ("Gov't's Opp'n Def.'s 4th Mot. to Compel") at 8–9, ECF No. 121; Gov't's Opp'n Def.'s Fifth Mot. to Compel Production of Evid. and Witnesses ("Gov't's Opp'n Def.'s 5th Mot. to Compel") at 6–7, ECF No. 123; Gov't's Consolidated Opp'n Def.'s Sixth and Seventh Mots. to Compel Production of Evid. and Witnesses ("Gov't's Opp'n Def.'s 6th and 7th Mots. to Compel") at 6, ECF No. 144.  Per the Court's scheduling order, all pretrial motions were to be filed by July 13, 2020.  Minute Order (May 26, 2020).  After filing her pending motions to compel, defendant was ordered to show cause for filing these motions after the pretrial motion filing deadline.  *Oseguera Gonzalez*, 2020 WL 6158246, at 8.  Defendant responded by describing the voluminous discovery received from the government, including tens of thousands of pages before the deadline and thousands of pages in the months after the deadline, as well as the COVID-19-related visitation restrictions that have hampered defendant's ability to review the "voluminous, technical documents."  Def.'s Response to Order to Show Cause at 6–10.  In light of the volume of discovery and difficulty reviewing documents before pretrial motion filing deadline, defendant has shown good cause for her untimely filing of these motions, which will be considered on the merits.

trial, *id*. 16(a)(1)(G).  The defendant's instant motions to compel hinge on the third category of evidence.  *See id*. 16(a)(1)(E).

Under Rule 16(a)(1)(E), "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and," the item falls into one of three categories, including that "the item is material to preparing the defense" or "the government intends to use the item in its case-in-chief at trial."  FED. R. CRIM. P. 16(a)(1)(E)(i)–(ii); *see also United States v. Thompson*, 562 F.3d 387, 396 (D.C. Cir. 2009).  If the government does not plan to rely on evidence in its case-in-chief, then to be entitled to access requested items, a defendant must show that the items are "material to preparing the defense."  FED. R. CRIM. P. 16(a)(1)(E)(i).  "[I]n the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief."  *United States v. Armstrong*, 517 U.S. 456, 462 (1996).  To qualify as "material for preparing the defense," the D.C. Circuit has explained that the discovery sought must be related "to refutation of the government's case in chief," and not "to establishment of an independent . . . bar to the prosecution."  *United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000); *see also United States v. Marshall*, 132 F.3d 63, 67 n.1 (D.C. Cir. 1998).

Rule 16(a)(1)(E) applies equally to exculpatory and inculpatory evidence, since "it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths." *Marshall*, 132 F.3d at 67.  At the same time, "Rule 16 does not authorize a blanket request to see the prosecution's file." *United States v. Maranzino*, 860 F.2d 981, 985–86 (10th Cir. 1988) (citing FED. R. CRIM. P. 16(a)(2) and *Jencks v. United States*, 353 U.S. 657, 667 (1957)).

### B.    Defendant's Second Motion to Compel

Defendant seeks to compel the government to produce three classes of documents she believes were not produced in discovery: (1) documents supporting OFAC's designation of the entities in the Superseding Indictment under the Kingpin Act as "materially assisting in, or providing support for or to, or providing goods or services in support of, the international narcotics trafficking activities of [CJNG]," Def.'s 2nd Mot. to Compel at 8–9; (2) exculpatory evidence "tending to show that she did not have actual notice that the entities identified in the [Superseding Indictment] were designated by OFAC," *id.* at 12; and (3) any evidence that "tends to cast doubt on the allegation that Ms. Gonzalez changed the names of the businesses referenced in [the Superseding Indictment] in order to obstruct the government's investigation," *id.* at 13.

As to the first request, the documents underlying the OFAC designations are not subject to discovery under Rule 16 of the Federal Rules of Criminal Procedure because they are not "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). To qualify as "material to preparing the defense," the discovery sought must be related "to refutation of the government's case in chief." *Rashed*, 234 F.3d at 1285. Here, the bases for the OFAC designations of the entities in the Superseding Indictment are not relevant because they do not bear on any elements of the relevant offenses, or any defense, and cannot be collaterally attacked in a criminal proceeding under the Kingpin Act. *See supra* Part II.C. While these materials may be relevant in a civil proceeding seeking de-listing and challenging the OFAC designations of the businesses named in the Superseding Indictment, *see Zevallos*, 793 F.3d at 112, the government has no obligation to produce these materials here. Since defendant presents no compelling reason to

think that the materials would be relevant to an issue at trial, the materials would not be

admissible at trial and are not exculpatory.  *See* FED. R. EVID. 402.[23]

     As to the second request for exculpatory evidence that defendant had no actual notice of

the OFAC designations for the named entities, defendant has already received extensive

discovery from the government, including discovery relevant to the issue of notice.  Specifically,

the government has summarized the discovery on this issue as follows:

> corporate registration documents and trademark registrations for the businesses;
> social media posts, websites, and press related to the businesses; official OFAC
> designations and notices, as well as Mexican press reporting on the designations;
> business records from U.S.-based web hosting services that show that the
> defendant registered and managed the websites for the designated businesses and
> received notice that the websites were taken down; the defendant's U.S. passport
> application, in which the defendant lists her occupation and employer as manager
> of Kenzo Sushi; intercepts of phone conversations between the defendant and an
> individual who was managing one of the designated businesses; emails between
> the defendant and the Kenzo Sushi business email account, and other items.

Gov't's Reply Supp. Omnibus Mots. at 16 n.8.  Moreover, the government has represented that it

"has not identified any affirmative evidence" that defendant did not have actual notice of

relevant OFAC designations, Gov't's Opp'n Def.'s 2nd Mot. to Compel at 6, and that it will

produce such evidence if it is ever identified, *id.* at 6 n.5.[24]

---

[23]    Defendant also seeks to discover "[a]ll documents identifying all business entities and persons who have
been sanctioned for providing material support to the narcotics trafficking activities of the CJNG, Los Cuinis,
Nemesio Oseguera-Cervantes or Abigail Gonzalez-Valencia."  Def.'s 2nd Mot. to Compel. at 8.  This information is
not relevant and not subject to discovery under Rule 16 or *Brady* for the reasons given above, and this request is
therefore denied.

[24]    Defendant speculates that it is "difficult to imagine that there is no evidence that tends to show that Ms.
Gonzalez did not have actual knowledge of the OFAC designations."  Def.'s 2nd Mot. to Compel at 12.  To the
contrary, as the government notes, defendant is seeking proof of a negative proposition, and *any* evidence other than
affirmative proof of actual notice might qualify as "tend[ing] to show" lack of actual notice.  Gov't's Opp'n Def.'s
2nd Mot. to Compel at 6 n.5.  Indeed, defendant fills much space in her motion describing how the documents
produced by the government and inferences drawn from evidence that the government has *not* presented support the
inference that she did not have actual notice.  Def.'s 2nd Mot. to Compel at 12–13.  The Court concludes that the
government's assurances are sufficient and has no reason to believe, given the government's representations and the
evidence so far produced, that any material or exculpatory evidence is being withheld.

As to the third request for information that "tends to cast doubt on the allegation that Ms. Gonzalez changed the names of the businesses . . . in order to obstruct the government's investigation," Def.'s 2nd Mot. to Compel at 13, the government represents that it "is aware of its obligations to disclose exculpatory and impeachment evidence and the government continues to review records from a variety of sources, including OFAC, to determine whether there are discoverable materials that should be provided to the defendant . . . [and] will continue to disclose discoverable evidence if located."  Gov't's Opp'n Def.'s 2nd Mot. to Compel at 7.  The government has also already made a *Brady* disclosure on this issue, *see* Def.'s 2nd Mot. to Compel at 13, and "produced discovery containing evidence of the defendant changing the names of some of the businesses, and will continue to produce such information to the extent that it is uncovered," Gov't's Opp'n Def.'s 2nd Mot. to Compel at 7 n.6.[25]

In her reply, defendant asserts that the government's assurances that it has turned over all relevant and exculpatory information are insufficient because "[t]he government has not certified or even suggested that it has reviewed the OFAC files for Rule 16 or *Brady* information" and has therefore not "discharged its obligations."  Def.'s Reply Supp. Second Mot. to Compel Production of Evid. and Witnesses and Incorporated Mem. of Points and Auths. at 1–2, ECF No. 113.  The government clarified in its surreply that, to the contrary, it "*has* reviewed OFAC records related to the defendant to determine whether they contained any evidence that would be discoverable under Rule 16 or as impeachment or exculpatory material . . . includ[ing] classified and privileged material to the extent that they exist . . . [and] has produced documents to the

---

[25] Defendant speculates again that the government is withholding exculpatory evidence based on a "vague *Brady* disclosure" and a "lack of affirmative proof."  Def.'s 2d Mot. to Compel at 13.  Defendant does not explain, however, how the *Brady* disclosure—a statement from an informant suggesting that Mizu Sushi "was not doing well because of its location" and that successor Mizu Sushi was opened in a new location—or what it views as a dearth of evidence could support the inference that the government is failing to meet its discovery obligations.  Def.'s 2nd Mot. to Compel at 13.

defendant in discovery that the government obtained through that review."  Gov't's Surreply

Supp. Opp'n Def.'s Second Mot. to Compel Production of Evid. and Witnesses at 3, ECF No.

120.  The government's discovery responses confirm that defendant has been provided "with

various documents from OFAC that are otherwise discoverable pursuant to Rule 16(a)(1) (for

instance, documents that the government intends to use in its case-in-chief at trial, or which may

be material to the preparation of a defense) . . . [and the government] will continue to produce

such documents to you to the extent that they have not already been produced."  Def.'s 2nd Mot.

to Compel at 11 (quoting *id.*, Ex. 2, Dep't of Justice Letter to Def. (June 5, 2020) at 3, ECF No.

102-2).

Defendant's second motion to compel is therefore denied as to the request for

information relevant to OFAC designations and denied as moot to the extent that she requests the

government be ordered to review its own files, including OFAC files, and produce material

discoverable under Rule 16 and *Brady*, *see Pinson v. United States Dep't of Justice*, Civil Action

No. 12-1872 (RC), 2017 WL 6883924, at *1 (D.D.C. June 26, 2017) (denying motion to compel

as moot where party has agreed to produce responsive materials); *Fin. Guar. Ins. Co. v. Putnam

Advisory Co.*, LLC, 314 F.R.D. 85, 88 (S.D.N.Y. 2016) ("Where the party responding to the

motion agrees to provide the discovery requested, a motion to compel becomes moot.").

## C.    Defendant's Third Motion to Compel

Defendant's next motion to compel pertains to loss information relevant to sentencing

and implicates the parties' dispute over the applicable sentencing guideline.  By way of

background, the parties disagree over which guideline from the U.S. Sentencing Commission

GUIDELINES MANUAL would apply to convictions under the Kingpin Act, with the government

pointing to U.S.S.G. §2M5.1 ("Evasion of Export Controls; Financial Transactions with

Countries Supporting International Terrorism") or U.S.S.G. §2M5.3 ("Providing Material

45

Support or Resources to Designated Foreign Terrorist Organizations"), and defendant to

U.S.S.G. §2S1.1 (Money Laundering and Transactions in Property Derived From Unlawful

Activity), which sets the base offense level at 8 "plus the number of offense levels from the table

in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered

funds."  *See* U.S. Probation Mem. Regarding Pre-Plea Guideline and Criminal History

Calculation (Aug. 12, 2020) (sealed) ("Probation Report") at 3, ECF No. 81; Gov't's Opp'n

Def.'s 3rd Mot. to Compel at 3–8 (positing use of U.S.S.G. §2M5.1 or U.S.S.G. §2M5.3).  In

light of this dispute, at defendant's request, the Court directed the Probation Office to prepare a

preliminary guideline application summary.  Minute Order (July 8, 2020).

The GUIDELINES MANUAL does not prescribe a specific guideline for the Kingpin Act,

and thus the "most analogous" guideline would have to be identified to apply.  U.S.S.G. §2X5.1

("If the offense is a felony for which no guideline expressly has been promulgated, apply the

most analogous offense guideline.").  Absent "a sufficiently analogous guideline, the provisions

of 18 U.S.C. § 3553 shall control, except that any guidelines and policy statements that can be

applied meaningfully in the absence of a Chapter Two offense guideline shall remain

applicable."  *Id.*  The Probation Office concluded that no sufficiently analogous guideline for the

Kingpin Act is provided in the Guidelines Manual.  Probation Report at 4; *see also* Transcript of

Hearing (September 11, 2020) at 3:18–22, ECF No. 99.[26]

Notwithstanding that no conviction has occurred in this case and that the Probation

Report eschewed application of both parties' suggested guideline, defendant's third motion to

---

[26]     The Court also relayed information received from the United States Sentencing Commission indicating
that, in the last five years, two individuals were convicted under 21 U.S.C. § 1904(c)(2), with one sentenced
pursuant to U.S.S.G. §2S1.1, which defendant urges would apply here, *see* Probation Report at 3, and the second
pursuant to U.S.S.G. §2D1.1 because of an additional controlled substance conviction.  Transcript of Hearing
(September 11, 2020) at 3:22–4:11.

compel pursues information relevant to a guideline offense level determination under U.S.S.G. §2S1.1 by seeking documents "showing a loss under U.S.S.G. §2B1.1"; "documents reflecting the gross proceeds" of the five entities named in the Superseding Indictment; and "documents reflecting the net proceeds" of the five entities named in the Superseding Indictment. Def.'s 3rd Mot. to Compel at 6 (quoting *id.*, Ex. 1, Def.'s Letter to Dep't of Justice (May 8, 2020) at 5–6, ECF No. 105-1).

Defendant's motion is both premature and moot. As defendant concedes, documents showing a "loss amount" and "proceeds realized by the entities identified in the Superseding Indictment" are relevant primarily because of their application at sentencing. *Id.* at 7–8.[27] Defendant also argues that this information might be relevant in considering the sentencing factors "the nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* at 9 (quoting 18 U.S.C. § 3553(a)(1)); *see also* Def.'s Reply Supp. Third Motion to Compel Production of Evid. and Witnesses and Incorporated Mem. of Points and Auths ("Def. Reply Supp 3rd Mot. to Compel") at 2, ECF No. 124. To the extent that defendant seeks information relevant to sentencing, that date, if it comes, must await a conviction. Moreover, the government has represented that it has "already disclosed to defense counsel all evidence in the government's possession related to financial transactions between the defendant and the designated businesses named in the Superseding Indictment, including records in the government's possession from the defendant's Mexico-based accountant." Gov't's Opp'n Def.'s 3rd Mot. to Compel at 8–9. Furthermore, the government "has not withheld any amount of loss

---

[27] Defendant briefly suggests that the business proceeds might be relevant to determining whether defendant "in fact provide[d] material support to a narcotics trafficker," Def.'s 3rd Mot. to Compel at 10, but "material support" is relevant only to the administrative designation determination made by OFAC and is not an element of the offense with which defendant has been charged, *see supra* Part II.C.

information from the defendant, and the defendant has not presented any reason to believe the government possesses the additional information she seeks to compel." *Id.* at 9.

Defendant counters that "the government cannot shoulder its burden of providing the evidence sought by Ms. Gonzalez under Rule 16 and *Brady* simply by stating that it has produced" evidence relating to certain financial transactions.  Def.'s Reply Supp. 3rd Mot. to Compel at 4.  The government has done more than that, however, by indicating that it has "not withheld any amount of loss information" and turned over all responsive documents.  Gov't's Opp'n Def.'s 3rd Mot. to Compel at 8–9.  Moreover, the government alleges that defendant is the "owner and/or manager of the entities named in the Superseding Indictment," and "is likely in the best position to possess full and complete financial data related to those entities."  *Id.* at 9 n.4.

The government has represented that it has fully complied with defendant's discovery requests and defendant presents to reason to believe otherwise.  Thus, defendant's third motion to compel is denied as moot.  *Pinson*, 2017 WL 6883924, at *1; *Fin. Guar. Ins*., 314 F.R.D. at 88.

### D.    Defendant's Fourth and Fifth Motions to Compel and Motion to Dismiss for Vindictive Prosecution

Defendant next makes two discovery requests centering on the government's awareness of her alleged criminal activity, and law enforcement's response to that activity by letting her freely enter the country, in order to obtain potentially exculpatory information and bolster her vindictive prosecution defense.  Specifically, the fourth motion to compel seeks production of "all information showing that [defendant] was detained by government agents for inspection in San Diego," "any information indicating government agents in San Diego knew that a warrant had been issued for [defendant's] arrest," and "any information indicating government agents in at the Los Angeles International Airport knew that a warrant had been issued for [defendant's]

arrest." Def.'s 4th Mot. to Compel at 5 (quoting *id*, Ex. 1, Def.'s Letter to Dep't of Justice

(August 28, 2020) at 1, ECF No. 106-1). She contends that the requested documents are

"material to Ms. Gonzalez's defense that she was indicted because she exercised her right not to

speak with government agents in August of 2019." *Id.* at 8.[28] The government disputes that

such records are either relevant or material to the Superseding Indictment or any possible

defenses in this case. Gov't Opp'n Def.'s 4th Mot. to Compel at 2. [29]

Relatedly, in her fifth motion to compel, defendant seeks to compel the government to

produce any document that indicates the date on which the government "became aware" of

various facts relevant to the offenses with which she has been charged. Def.'s 5th Mot. to

Compel at 9–11 (citing *id*, Ex. 2, Def.'s Letter to Dep't of Justice (October 1, 2020) at 1–3, ECF

No. 110-2). In defendant's view, "[i]f the government believed it had probable cause that Ms.

Gonzalez was engaging in illegal activity, but still allowed her to travel freely in and out of the

United States from 2015 to 2020, this is material to the integrity of the government's

investigation." Def.'s 5th Mot. to Compel at 12. More precisely, defendant argues that "if the

information requested by Ms. Gonzalez shows that the government had knowledge that she was

allegedly engaging in the conduct referenced in the Superseding Indictment [during the eight

times she entered the United States between 2015 and 2017], a presumption that Ms. Gonzalez

was indicted because she refused to cooperate with law enforcement would arise." Def.'s Reply

---

[28]     Defendant also asserts that the requested documents are material to her argument that venue in the District
of Columbia is improper, Def.'s 4th Mot. to Compel at 2 (citing Def.'s Mot. to Dismiss the Superseding Indictment
for Lack of Venue, ECF No. 66), but this argument has already been rejected, *see Oseguera Gonzalez*, 2020 WL
6342948, at 3–4 (denying defendant's motion to dismiss for improper venue and finding venue proper in the District
of Columbia regardless of what happened when defendant entered the country). The requested documents thus
cannot be material on this ground.
[29]     The government also opposes defendant's motion on the grounds that the requested documents from the
United States Customs and Border Patrol and Transportation Security Administration would shed no light on the
government's charging decisions and the evidence is not "within the government's possession, custody, or control,"
Gov't Opp'n Def.'s 4th Mot. to Compel at 4 (quoting FED. R. CRIM. P. 16(a)(1)(E)(i)), but since this motion is
resolved on an alternative basis, these grounds need not be addressed.

Supp. Fifth Mot. to Compel Production of Evid. and Witnesses and Incorporated Mem. of Points

and Auths. ("Def's Reply Supp. 5th Mot. to Compel") at 2, ECF No. 141.[30]

Defendant argues that the evidence she seeks to discover in both motions to compel is

material and potentially exculpatory because it could provide the basis of a vindictive

prosecution defense.  Def.'s Reply Supp. 4th Mot. to Compel at 3; Def.'s 5th Mot. to Compel at

12; Def.'s Reply Supp. 5th Mot. to Compel at 4.

Defendant's motion to dismiss the charges provides additional information recently

disclosed by the government relating to the government's investigation.  Def.'s Mot. Dismiss.

As described earlier, *see supra* Part I, this information includes (1) a September 29, 2015 DEA

report "allegedly connecting Ms. Gonzalez to certain businesses, including Mizu Sushi Lounge,

Las Flores Cabanas, J&P Advertising, Tequila Onze Black, and JJGON S.P.R. de R.L. de C.V,"

Def.'s Mot. Dismiss at 1; (2) an October 29, 2015 DEA report "alleging a connection between

Ms. Gonzalez and Tequila Onze Black," *id.* at 2; (3) a February 15, 2018 DEA report

"referencing a joint investigation by the Mexican Federal Police and the Guadalajara Resident

Office that had started in November 2014 . . .. and not[ing] that Ms. Gonzalez had been

'previously identified as the administrative officer[]' of Cabanas Las Flores Tapalpa, Tequila

Onze Black, and J&P Advertising," *id* (second alteration in original); and (4) evidence that DEA

conduct surveillance of defendant between July 31, 2019 and August 2, 2019, and "twice

approached Ms. Gonzalez in an attempt to secure her cooperation," *id.*  Defendant argues that the

---

[30] Defendant further argues that this requested "information is also directly relevant to the government's ability to prove Ms. Gonzalez had the requisite *mens rea* to commit the charged offenses, as any lack of knowledge on the part of the U.S. government of the conduct alleged in the Superseding Indictment cuts against any knowledge the government would be able to impute to Ms. Gonzalez."  Def.'s Reply Supp. 5th Mot. to Compel at 3.  This argument makes little sense: the government's knowledge of defendant's criminal conduct is not at all relevant to defendant's *mens rea*.  In other words, when the government became aware of defendant's alleged criminal conduct has no bearing on when she began to be engaged in such conduct or whether she acted willfully or knowingly in so doing.  The requested information is not discoverable on this ground.

timeline of the government's investigation and prosecution provide a "realistic likelihood of vindictiveness," that is, that she was prosecuted purely because she refused to cooperate with law enforcement.  Def.'s Mot. Dismiss 4–5.

The applicable legal principles to guide resolution of the motion to dismiss and motions to compel are reviewed first before turning to analysis of the parties' arguments.

### 1. Applicable Legal Principles

"The Due Process Clause prohibits prosecutors from 'upping the ante' by filing increased charges in order to retaliate against a defendant for exercising a legal right."  *United States v. Slatten*, 865 F.3d 767, 798–99 (D.C. Cir. 2017) (quoting *Blackledge v. Perry*, 417 U.S. 21, 27–28 (1974)).  Prosecutors, however, generally have broad discretion in enforcing the law, and their decisions are presumed to be proper absent clear evidence to the contrary.  *United States v. Armstrong*, 517 U.S. 456, 464 (1996).  "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."  *Wayte v. United States*, 470 U.S. 598, 607 (1985).  "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  *United States v. Meadows*, 867 F.3d 1305, 1313 (D.C. Cir. 2017) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

"To succeed on a claim of vindictive prosecution, a defendant must establish that the increased charge was 'brought *solely* to "penalize" [him] and could not be justified as a proper exercise of prosecutorial discretion.'"  *Slatten*, 865 F.3d at 799 (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.12 (1982)).  This can be accomplished either (1) directly with

"objective evidence that a prosecutor acted in order to punish him for standing on his legal rights" or (2) indirectly with evidence showing "realistic likelihood of vindictiveness," which gives rise to a presumption that the government must then attempt to rebut with objective evidence justifying its action.  *Meyer*, 810 F.2d at 1245 (quoting *Blackledge*, 417 U.S. at 27).  A "realistic likelihood of vindictiveness" exists when the relevant action by the prosecution "was 'more likely than not attributable to the vindictiveness on the part of' the government." *Meadows*, 867 F.3d at 1311 (quoting *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002)). Critically, to establish a realistic likelihood of vindictiveness in the pretrial context, a defendant must present more than "proof of a prosecutorial decision to increase charges after a defendant has exercised a legal right."  *Meyer*, 810 F.2d at 1246 (citing *Goodwin*, 457 U.S. at 381–84). Nor does a presumption of vindictiveness arise merely because of a long delay between the relevant criminal conduct and the prosecution for that conduct.  *Gary*, 291 F.3d at 35.[31]

To obtain discovery relevant to a vindictive prosecution claim, defendant states merely that the evidence must be "material to the integrity of the government's investigation," without citing legal authority.  Def.'s 5th Mot. to Compel at 12; *see also* Def.'s Reply Supp. 5th Mot. to Compel at 4 (asserting simply that information relevant to her proposed vindictive prosecution claim is "discoverable under both Rule 16 and *Brady*").  The government, for its part, argues that the requested information is not subject to discovery under Rule 16 because the purported use to establish "an independent constitutional bar to prosecution," rather than a refutation of the

---

[31]       The government initially argues that the Court should apply the test traditionally used for selective prosecutions claims because "[n]either the Supreme Court nor the D.C. Circuit has ever held that the government's initial charging decision amounted to prosecutorial vindictiveness."  Gov't's Opp'n Def.'s 5th Mot. to Compel at 4 n.3 (collecting cases).  Selective prosecution, the government argues, is the proper framework for claims that "assert that a defendant is being prosecuted in the first instance for exercising protected rights."  *Id.*  The Court is unconvinced.  The framework is not necessarily inapplicable simply because courts have not addressed similar claims in the past.  The Court agrees with defendant that the vindictive prosecution framework is appropriate when a defendant argues that charges were brought in retaliation for exercising constitutional rights.

government case in chief, falls outside Rule 16's purview.  Gov't's Opp'n Def.'s 5th Mot. to Compel at 3 (citing *Rashed*, 234 F.3d at 1285, and *Armstrong*, 517 U.S. at 462–63).  According to the government, "[b]efore being permitted to pursue discovery related to a selective prosecution claim, the defendant must provide 'some evidence tending to show the existence' of a discriminatory purpose and a discriminatory effect." *Id.* at 5 (quoting *Armstrong*, 517 U.S. at 469).  This is the standard for selective prosecution claims.

Of course, a claim of selective prosecution differs from a claim of vindictive prosecution, but no Supreme Court or D.C. Circuit precedent sets out the standard for ordering discovery on a vindictive prosecution claim.  Other courts to address this issue have adopted the standard articulated in *Armstrong* for selective prosecution claims, holding that a defendant must provide some objective evidence tending to establish the vindictive prosecution defense in order to obtain discovery.  *See, e.g., United States v. Bucci*, 582 F.3d 108, 113 (1st Cir. 2009); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000); *United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001).  This approach is sensible.  The presumption of regularity applied to prosecutorial judgments applies equally in both contexts, as do the concerns about "divert[ing] prosecutors' resources and . . . disclos[ing] the Government's prosecutorial strategy." *Armstrong*, 517 U.S. at 468.

### 2. Analysis

Applying that standard to the facts here, defendant has presented no evidence even tending to show vindictive prosecution, let alone establishing a presumption of vindictiveness, warranting the evidentiary hearing she requests.  *See* Def.'s Reply Supp. Mot. to Dismiss for Vindictive Prosecution and Incorporated Mem. of Points and Auths. ("Def.'s Reply Supp. Mot. Dismiss") at 1, ECF No. 162.  In her fifth motion to compel, defendant argues that "the record

53

establishes a presumption of vindictiveness if, as expected, the government had evidence in its possession that it believed amounted to probable cause to arrest Ms. Gonzalez before she refused to speak with Drug Enforcement Agency agents, in August of 2019." Def.'s 5th Mot. to Compel at 1. This is merely an assertion that she *expects* evidence in the government's possession to support her claim of vindictive prosecution, but defendant does not herself present any evidence to support her allegation that the government had probable cause to arrest her before the agents tried to interview her. *See* Gov't's Opp'n Def.'s 5th Mot. to Compel at 5.

In her motion to dismiss, plaintiff presents evidence that the government believed her to be associated with the businesses named in the Superseding Indictment beginning in September 2015, around the time of their designation by OFAC and more than four years before the charges against her were brought. Def.'s Mot. Dismiss at 2–5. Defendant argues that the delay between the government's knowledge of her alleged connection with the designated entities and the fact that she was only charged after she refused to cooperate with law enforcement suggests that she was charged solely because she refused to cooperate. *Id.* at 5.[32] The government's motivations are particularly suspect, she argues, because between September 2015 and her arrest she "voluntarily traveled to the United States eight times without being arrested or charged with any crimes." *Id.*

The government responds that this timeline is not enough to establish a realistic likelihood of vindictiveness because "[i]t is neither uncommon nor impermissible for government agents to approach or speak with suspects before they have been indicted, nor is it

---

[32] Certainly, this information shows that the government was investigating defendant in the years leading up to her indictment and had at least some information tying defendant to businesses that had been designated by OFAC. Yet, defendant does not suggest this evidence demonstrates that the government had probable cause to arrest her before or at the time she was approached about cooperating and repeatedly argues that the government still lacks sufficient evidence to prove that she acted "willfully" in dealing with the designated entities. *See, e.g.,* Def.'s Opp'n Gov't's Omnibus Mots. at 13–17. In other words, defendant claims simultaneously that the government lacks sufficient evidence of willfulness and that it could have charged and arrested her earlier in its investigation.

uncommon for suspects to decline to be interviewed."  Gov't's Opp'n Def.'s Mot. to Dismiss for

Vindictive Prosecution ("Gov't's Opp'n Def.'s Mot. Dismiss") at 4, ECF No. 161 (citing *Meyer*,

810 F.2d at 1247 (D.C. Cir. 1987)).  The government observes that "[t]he fact that the

investigation of the defendant's transactions and dealings with those entities lasted for over four

years after that date is not unusual[, n]or is it indicative of anything other than a thorough

investigation to gather evidence sufficient to meet the government's burden of proof at trial—

which requires proving more than just a 'connection' between the defendant and the entities

named in the Superseding Indictment."  *Id.*  The government further observes, correctly, that

defendant has not cited a single case applying the vindictive prosecution framework to an initial

prosecution decision rather than to an increase in charges after a defendant exercised a legal right

or refused a plea offer.  *Id.* at 2–4.[33]

Defendant's evidence does not establish a "realistic likelihood" of vindictiveness, nor

does it even tend to establish a vindictive prosecution defense.  Prosecutorial actions following

"routine invocations of procedural rights" do not normally give rise to presumptions of

vindictiveness.  *Meadows*, 867 F.3d at 1313 (quoting *Meyer*, 810 F.2d at 1247).  Something

more is necessary.  *Id.*  Interviewing a person whom the government suspects of committing a

crime, or even has probable cause to arrest, and then subsequently arresting that individual after

she refuses to cooperate does not raise a "realistic likelihood" that the prosecution was motivated

---

[33] The government also provides a factual proffer to explain its charging decision, stating:
> In the course of their investigation of the defendant and related targets and subjects of an ongoing, long-running investigation, Drug Enforcement Administration agents presented facts and evidence related to the defendant to Department of Justice prosecutors. Consistent with their ordinary course of operation, those prosecutors conducted their own evaluation of the facts, evidence, and applicable law, and after determining that there was probable cause to seek charges, sought approval from supervisors to recommend charges to a grand jury sitting in this district. Multiple layers of Department supervisors then reviewed the prosecutors' recommendations and approved the case to be presented to a grand jury.

Gov't's Opp'n Def.'s Mot. Dismiss at 5. Defendant has fallen so short of showing any realistic likelihood of vindictiveness, however, the Court need not take the intrusive step of evaluating the government's justification for its charging decision.

*solely* to punish defendant for her lack of cooperation.  The government's forbearance in prosecuting her, even for a lengthy time period, would not provide a "realistic likelihood of vindictiveness."  This is a permissible practice involving nothing more than a "run-of-the-mill pretrial situation."  *Id.* at 1312 (quoting *Meyer*, 810 F.2d at 1247); *see also* Gov't's Opp'n Def.'s Mot. Dismiss at 4 (noting that "it is neither uncommon nor impermissible for government agents to approach or speak with suspects before they have been indicted, nor is it uncommon for suspects to decline to be interviewed").  Holding to the contrary would suggest, absurdly, that the government is presumed to act vindictively whenever it chooses to prosecute individuals after investigating their criminal conduct and, after some period of time, unsuccessfully seeking their cooperation.

In other words, the decision by the government to forbear prosecution over a period of several years—until after defendant was given an opportunity to assist the government and refused to cooperate—is evidence only of restraint and careful pursuit of potential investigative leads, not vindictive prosecution, when probable cause is subsequently found by a grand jury for indictment.  *See United States v. Williams*, 47 F.3d 658, 662–63 (4th Cir. 1995) ("Just as a prosecutor may forego legitimate charges in an effort to obtain the defendant's cooperation, a prosecutor may seek a more severe indictment if an initial expectation that the defendant would cooperate proves unfounded[, so] a court should not presume vindictiveness where a prosecutor decides to bring more severe charges against a defendant who has refused to cooperate . . . ." (internal citation omitted)); *United States v. Long*, 823 F.2d 1209, 1211 (7th Cir. 1987) (noting that government may penalize a refusal to cooperate and that "it is difficult to see how the mere allegation that [defendant] was disadvantaged by refusing to cooperate could, without more, suffice to show 'vindictiveness'"); *United States v. Boss*, 652 F.2d 36, 38 (10th Cir. 1981)

("When the party refuses to cooperate, prosecution, based upon probable cause to believe the defendant committed the crime charged, does not present [a] likelihood of vindictiveness."); *United States v. Peters*, 625 F.2d 366, 369 (10th Cir. 1980) (holding that defendant's refusal to cooperate during an investigation was insufficient to establish vindictiveness where there was probable cause to charge the defendant); *United States v. Davis*, 854 F.3d 1276, 1291–92 (11th Cir. 2017) ("[Defendant] cites no authority suggesting that the government cannot use the threat of prosecution to encourage cooperation, and courts that have considered this issue have concluded otherwise." (citing *Williams*, *Long*, and *Boss*)).

 The decision to bring charges, and to consider a defendant's cooperation in making that decision, is at the core of prosecutorial discretion.  *See, e.g.*, *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 738 (D.C. Cir. 2016) (discussing non-prosecutions agreements) (citing U.S. Attorney's Manual § 9–28.1000); *see also* U.S. Attorney's Manual § 9–27.230 ("A person's willingness to cooperate in the investigation or prosecution of others is another appropriate consideration in the determination whether a federal prosecution should be undertaken."). Defendant presents no authority for the proposition that the government acts improperly in considering a defendant's cooperation when deciding whether and what charges to bring.  Even if the government had considered her lack of cooperation in its charging decision, or would have considered not bringing charges had she cooperated, defendant provides no reason to believe that this would constitute an impermissible punishment for exercising a constitutional right rather than a legitimate exercise of prosecutorial discretion.

 Defendant frames the government's argument as one that "as long as there was probable cause to prosecute Ms. Gonzalez, the decision to charge her could not be considered vindictive." Def.'s Reply Supp. Mot. Dismiss at 2.  This is not what the government argues, however, and is

certainly not a view one must embrace to reject outright defendant's vindictive prosecution theory. The relevant principle is that the charging decision *generally* lies in the discretion of the prosecutor, *see* Gov't's Opp'n Def.'s Mot. Dismiss at 2 (citing *Bordenkircher*, 434 U.S. at 364), and that a defendant must show more than a sequence of events in which a defendant invoked a right and then faced an adverse charging decision. Defendant's theory does not fail because it is predicated on an initial charging decision, but because defendant fails to present *any* evidence tending anything more than the "run-of-the-mill pretrial situation," *See Meadows*, 867 F.3d at 1312–13.

Any delay by the government in bringing charges until defendant chose not to cooperate does not establish a "realistic likelihood of vindictiveness." *See* Def.'s Mot. Dismiss 4 (quoting *Meadows*, 867 F.3d at 1312). Accordingly, defendant's motion to dismiss is denied. [34] Nor does defendant's evidence tend to establish the elements of a vindictive prosecution defense, so defendant's fourth and fifth motions to compel are denied.

### E.    Defendant's Sixth and Seventh Motions to Compel

Defendant's sixth and seventh motions to compel pertain to (1) requests for documents made by the United States government to the Government of Mexico, and (2) any documents showing any transactions or dealings between the United States and the designated entities named in the Superseding Indictment. Each is addressed, briefly, in turn.

Defendant's sixth motion to compel seeks all requests made from the United States government to the Government of Mexico pursuant to the United States' mutual legal assistance

---

[34]    As noted, defendant "requests that the Court hold an evidentiary hearing prior to ruling on this motion, as the factual proffer set forth in the government's response is insufficient to rebut the presumption of vindictiveness and requires further examination." Def.'s Reply Supp. Mot. Dismiss at 1 (citation omitted). Defendant has not presented any evidence to establish a presumption of vindictiveness and thus a hearing to evaluate the sufficiency of the government's proffer in justifying its charging decision is unnecessary.

treaty ("MLAT") with Mexico.  Def.'s 6th Mot. to Compel at 1.  The government has already

produced hundreds of pages of documents and over 100 audio recording obtained from the

Government of Mexico, pursuant to the MLAT, but defendant wants the requests themselves.  *Id.*

at 5–6.  Defendant believes that the MLAT requests are discoverable under *Brady* "if they show

that the government has received less than it expected from the Government of Mexico."  *Id.*

Defendant also argues that "the lack of evidence from the other foreign counties receiving

MLAT requests from the United States are similarly exculpatory and discoverable under *Brady*"

in response to the government's statement that it submitted MLAT requests to "various foreign

countries."  Def.'s Reply Supp. Sixth and Seventh Mots. to Compel ("Def.'s Reply Supp. 6th and

7th Mots. to Compel") at 2 n.3, ECF No. 154.

Defendant does not adequately explain how the MLAT requests would be either material

under Rule 16 or exculpatory under *Brady*, and defendant cites no authority for the position that

MLAT *requests* are subject to discovery.  After all, as the government observes, the treaty with

Mexico is "permissive, indicating only that the country receiving a request 'may' provide records

in the possession of a government office or agency."  Gov't's Opp'n Def.'s 6th and 7th Mots. to

Compel at 3 (quoting Treaty on Cooperation between the United States of America and the

United Mexican States for Mutual Legal Assistance, art. 10, ¶ 2, Dec. 9, 1987, S. Treaty Doc.

No. 100-13 (1988)).  The government further represents that "the treaty imposes no firm time

limits for a response, and responses provided are often partial and incomplete," so little can be

inferred from a foreign government's lack of response to a request.  *Id.*  Moreover, the

government has already provided thousands of pages of documents and over a hundred audio

recordings obtained from the Mexican government in response to the MLAT requests.  Def.'s 6th

Mot. to Compel at 5–6.  Defendant's request is purely speculative and is better understood as an

attempt to gain information to understand the government's theory of the case than to obtain information relevant to the defense under Rule 16 or *Brady*.  Evidence that the government may have received less than it requested in an MLAT request to another country is not exculpatory.[35]

Defendant's seventh motion to compel seeks evidence "regarding any transactions or dealings between the United States government and the entities identified in the Superseding Indictment," Def.'s 7th Mot. to Compel at 1, including "all information showing that the United States government has engaged in any transactions, dealings or any other activity with a property or property interest allegedly associated with [defendant]," *id.* at 8 (quoting *id.*, Ex. 1, Def.'s Letter to Dep't of Justice (Sept. 17, 2020) at 1, ECF No. 126-1).  The government responded that such documents were neither "relevant nor material" to the charges or any defense.  *Id.* (quoting *id.*, Ex. 2, Dep't of Justice Letter to Def. (Sept. 17, 2020) at 1, ECF No. 126-2).  Defendant has identified a document, obtained in discovery, indicating that someone associated with the United States Embassy engaged in a transaction with Operadora Los Famosos (the operating company for the Kenzo Sushi restaurant in Guadalajara) before that business was designated by OFAC. *Id.* at 9.

Defendant argues that any evidence that government personnel engaged in transactions with the designated entities named in the Superseding Indictment is material to her defense. Such evidence would, she argues, "cut directly against the government's argument that Ms. Gonzalez had any notice that these entities were designated by OFAC . . . because the government would

---

[35]     Defendant's also argues that the MLAT requests are material under Rule 16 because they "would bear directly on reviewing the documents provided by the Government of Mexico, uncovering admissible evidence, and assisting in the preparation of impeachment or rebuttal evidence."  Def.'s Reply Supp. 6th and 7th Mots. to Compel at 2 (internal quotation marks and citation omitted); *see also* Def.'s 6th Mot. to Compel at 8.  Certainly, the responsive material produced as a result of the MLAT requests may constitute, uncover, or lead to admissible impeachment or rebuttal evidence, but the government's existing discovery obligations already require disclosure of any material information turned over pursuant to the MLAT.  Defendant offers no compelling explanation of how the requests themselves would be helpful.

not be able to credibly claim that Ms. Gonzalez's knowledge of OFAC designations should somehow have been broader than that of the U.S. government." *Id.* at 9–10. The premise of defendant's argument is fatally flawed, however, for at least two reasons. First, the document produced in discovery, as described, indicates an embassy employee had a transaction at one of the named businesses *before*, not after, it was OFAC designated, when no transaction bar applied. Second, while an employee of the United States embassy may not know about or stay abreast of a relevant OFAC designation, the owner and operator of an OFAC-designated business could reasonably be expected to know about such designation. As the government points out, this evidence has nothing to do with defendant's knowledge of the illegality of her actions and her culpability under the Kingpin Act. Gov't's Opp'n Def.'s 6th and 7th Mots. to Compel at 6; *see also supra* Part II.B. In sum, evidence that other people made purchases from the businesses named in the Superseding Indictment, with or without the requisite statutory *mens rea*, is simply irrelevant to the charges against defendant.

***

Accordingly, defendant's six motions to compel discovery addressed in this Memorandum Opinion and defendant's motion to dismiss for vindictive prosecution are denied.

## III.   CONCLUSION

For the foregoing reasons, the government's (1) Motion to Preclude Argument and Elicitation of Testimony Suggesting that Notice of Specific OFAC Designations is Required by the Kingpin Act IS GRANTED IN PART AND DENIED IN PART; (2) Motion to Preclude Argument and Elicitation of Testimony Designed to Challenge the Validity of the Underlying OFAC Designations is GRANTED; (3) Motion to Admit Evidence of Defendant's Association with an OFAC-Designated Entity Not Named in the Superseding Indictment is GRANTED; (4) Motion to Admit Evidence of Defendant's Involvement in the Financial Operations of the Cartel

de Jalisco Nueva Generacion is DENIED.  Defendant's Second, Third, Fourth, Fifth, Sixth, and Seventh Motions to Compel are DENIED and her Motion to Dismiss the Superseding Indictment for Vindictive Prosecution is DENIED.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: December 11, 2020

_____
BERYL A. HOWELL
Chief Judge