**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal No. 20-cr-00040 (BAH)** |
| **JESSICA JOHANNA OSEGUERA** | ) | **The Honorable Beryl A. Howell** |
| **GONZALEZ,** | ) | **Sentencing Hearing:  June 11, 2021** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**JESSICA JOHANNA OSEGUERA GONZALEZ'S**
**MEMORANDUM IN AID OF SENTENCING AND**
**INCORPORATED POSITION REGARDING SENTENCING FACTORS**

In accordance with Rule 32(i)(1)(C) of the Federal Rules of Criminal Procedure and

Section 6A1.2 of the United States Sentencing Guidelines and Policy Statements ("USSG" or

"Guidelines"), Jessica Johanna Oseguera Gonzalez, through counsel, respectfully submits this

memorandum to aid the Court in determining an appropriate sentence in this case.[1]

## I.  INTRODUCTION

On March 12, 2021, pursuant to a written plea agreement, Ms. Gonzalez entered a plea of

guilty before this Court to Counts One through Five of the Superseding Indictment, charging Ms.

Gonzalez with Engaging in Transactions or Dealings in Properties of a Designated Foreign

Person, in violation of 21 U.S.C. §§ 1904 and 1906.

Neither counsel nor Ms. Gonzalez offers any excuse for her wrongdoing.  However, an

appraisal of the factors set forth in 18 U.S.C. § 3553, including Ms. Gonzalez's complete lack of

---

[1] Counsel has reviewed the Court's Standing Order for Criminal Cases (ECF 16), as well as the Local Rules for the United States District Court for the District of Columbia, and has not located a page limit for sentencing memoranda.  If such a page limit exists, and if this filing exceeds that page limit, Ms. Gonzalez respectfully requests the Court's leave to file her Memorandum in Aid of Sentencing and Incorporated Position Regarding Sentencing Factors in excess of the page limit, so that she is able to fully present her position on sentencing to the Court.

criminal history, her dedication to her children, service to disadvantaged communities, empathy

towards complete strangers, active service to her religious community,[2] as well as the sentences

imposed in similar cases leads to the conclusion, we respectfully submit, that a sentence of time

served would promote respect for the law, afford adequate deterrence, and would, most

importantly, represent a just punishment.  A sentence of time served would also take into account

the severe conditions of incarceration to which Ms. Gonzalez has been subjected since her arrest

in February 2020, due to the COVID-19 pandemic.

## II.   LEGAL STANDARD

Section 3553 of Title 18 of the United States Code is the statutory basis of the Federal

sentencing structure.   Section 3553(a) requires sentencing courts "to impose a sentence

sufficient, but not greater than necessary, to comply with the purposes set forth" in the

Sentencing Reform Act of 1984 ("SRA" or "Sentencing Reform Act") (emphasis added).  Those

purposes are:

>  (A) to reflect the seriousness of the offense, to promote respect for the law, and to
> provide just punishment;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2) (emphasis added).

---

[2] Pursuant to Rule 49.1 of the Federal Rules of Criminal Procedure, all personal identifiers, as well as the names of any minor children, in the letters attached as Exhibits 1 through 47 and 49 have been redacted.  In many instances, the letters written in support of Ms. Gonzalez were submitted in Spanish. For these Spanish letters, counsel for Ms. Gonzalez has included a translation behind the original letter in each letter's respective Exhibit.

In determining the sentence minimally sufficient to comply with Section 3553(a)(2), the sentencing court must consider several factors listed in Section 3553(a).  These are:  (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the kinds of sentences available"; (3) the Guidelines and policy statements issued by the Sentencing Commission, including the Guidelines range; (4) "the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct"; and (5) "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(1), (a)(3)-(a)(7).

In *United States v. Booker,* 543 U.S. 220, 226-27 (2005), the Supreme Court ruled that the Sixth Amendment, as interpreted by the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), mandates that the Guidelines can no longer operate as mandatory sentencing rules.  The *Booker* Court held that two provisions of the Sentencing Reform Act, 18 U.S.C. § 3553(b)(1) (the provision of the federal sentencing statute that requires sentencing courts to impose a sentence within the applicable Guidelines range, absent a basis for departure) and 18 U.S.C. § 3742(e) (the provision that establishes standards for appellate review), must be severed and excised.  *Booker,* 543 U.S. 220 at 259.

Thus, after *Booker*, the Guidelines have only advisory force.  *United States v. McKeever,* 824 F.3d 1113, 1119 (D.C. Cir. 2016).  Subsequent cases decided by the Supreme Court have affirmed the authority of the district courts to sentence defendants within the range of choice dictated by the facts and circumstances of the case before the Court.  In *Rita v. United States*, 551 U.S. 338, 351 (2007), the Supreme Court made clear that a district court may consider arguments that a "Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a)'s

3

considerations."  While the Court must give respectful consideration to the Guidelines in determining a sufficient sentence, *Gall v. United States,* 552 U.S. 38, 49-50 (2007), it may not presume that a Guidelines sentence is a correct one.  *Rita,* 551 U.S. at 351.  *See also Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (noting that sentencing courts may vary from the advisory Guidelines range based solely on policy considerations, including disagreement with the policy underlying the Guidelines in a case); *United States v. Terrell*, 696 F.3d 1257, 1261 (D.C. Cir. 2012) ("A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence.") (quoting *Unites States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007)).

The result of this change in the Federal sentencing scheme is that district courts may "take account of" the advisory Guidelines range as part of all the sentencing goals and factors enumerated in 18 U.S.C. § 3553(a), but are no longer bound by the sentencing range indicated by the applicable range in the case.  *Cunningham v. California,* 549 U.S. 270, 286 (2007).  The advisory Guidelines are, therefore, only "the starting point and the initial benchmark" in determining a sentence and not the only consideration.  *Gall,* 552 U.S. at 49.  Sentencing judges "must make an individualized assessment based on the facts presented." *Id.* at 50.

## III.   DISCUSSION

In accordance with the direction provided by the Supreme Court in *Gall* and the United States Court of Appeals for the District of Columbia Circuit in *Akhigbe*,[3] we will first address the appropriate Guidelines range, recognizing, again, that the Supreme Court has made clear that a district court may not presume that a Guidelines sentence is substantively reasonable.  *Rita*, 551

---

[3] *United States v. Akhigbe*, 642 F.3d 1078, 1084 (D.C. Cir. 2011) ("A district court begins by calculating the appropriate Guidelines range, which it treats as 'the starting point and the initial benchmark' for sentencing.'") (quoting *Gall*, 552 U.S. at 49).

U.S. at 351; *Terrell*, 696 F.3d at 1261.  We will then discuss the remaining sentencing factors set forth in § 3553(a).  After examining the facts in this case and applying all of the Section 3553(a) factors, we ask the Court to impose a sentence of time served.  Such a sentence is not greater than necessary to achieve the goals of the SRA.

### A.      Guidelines Range (18 U.S.C. § 3553(a)(4) & (a)(5)).

The United States Probation Office ("USPO") calculates Ms. Gonzalez's base offense level at twenty-six.  *See* Jessica Johanna Oseguera Gonzalez Presentence Investigation Report ("PSR") at ¶ 39.  The USPO proposes that the offense level be decreased by 2 levels, under USSG § 3E1.1(a), due to the fact that Ms. Gonzalez has "clearly demonstrated acceptance of responsibility for the offense."  *Id.* at ¶ 46.  Thus, the USPO recommends a total offense level of 24, with a Criminal History Category I.  *Id.* at ¶ 47.[4]  The applicable Guidelines range, according to the USPO, is 51 to 63 months.  *Id.* at ¶ 88.

Importantly, the government affirmatively stated in Ms. Gonzalez's Plea Agreement that it "is not seeking an aggravating role enhancement pursuant to § 3B1.1 of the Sentencing Guidelines," and "is also not seeking an adjustment for obstructing or impeding the administration of justice pursuant to § 3C1.1 of the Sentencing Guidelines" as the government "does not believe that such an adjustment is warranted by the facts and circumstances of this case."  *See* ECF 213, at 3 n.1.  The USPO agreed with the government and did not recommend any adjustments to Ms. Gonzalez's offense level.  *See* PSR, at ¶¶ 40-45.  Finally, and also importantly, the government will affirmatively recommend a sentence of 51 months.

---

[4] "[A] district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category I, in its § 3553(a) analysis."  *United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008).

**B.**     **History and Characteristics of Ms. Gonzalez (18 U.S.C. § 3553(a)(1)).**

Under Section 3553(a)(1), a sentencing judge must consider the "history and characteristics of the defendant." Ms. Gonzalez understands and accepts that her crimes are serious. She has no prior arrests or convictions. Ms. Gonzalez has always been a strong woman who overcame challenges to provide the best possible life for herself and her children. She is also a woman of faith who has dedicated her life to serving people in need. The letters of support written by Ms. Gonzalez's family, friends, and members of her religious community demonstrate Ms. Gonzalez's true character and support a sentence of time served.

Jessica Johanna Oseguera Gonzalez was born in 1986 in San Francisco, California, and is the second of four siblings. *See* PSR at ¶¶ 55-56.[5] When Ms. Gonzalez was approximately 11 years old, her parents separated, after her father was deported to Mexico. *Id.* at ¶ 55.

Ms. Gonzalez's mother started working when she was 14 years old and did not have the opportunity to attain a college education. *See* Exh. 1 (Letter from Rosalinda Gonzalez). Ms. Gonzalez's mother worked multiple jobs, including working as a hay baler, cleaning houses, babysitting, and in restaurants to provide for her children. *See* Exh. 1 (Letter from Rosalinda Gonzalez). Thanks to their mother's tireless work ethic, Ms. Gonzalez and her siblings grew up with "basic material necessities." *See* PSR at ¶ 57.

Ms. Gonzalez spent the majority of her childhood in California, where Ms. Gonzalez and her siblings enjoyed the fortune of having a loving extended family. *See* PSR at ¶ 59. Sundays in particular were an opportunity for the family to congregate around food and music, to spend time with one another. Guadalupe Cornejos, Ms. Gonzalez's aunt, took care of Ms. Gonzalez

---

[5] Ms. Gonzalez also has two older step-siblings, with whom she does not have a relationship.

6

when she was a child.  *See* Exh. 2 (Letter from Guadalupe Cornejos).  Ms. Cornejos remembers

Ms. Gonzalez as a "happy baby and well-behaved child as she got older," who enjoyed "sleeping

over [Ms. Cornejos's] house to play with her cousins."  *See* Exh. 2 (Letter from Guadalupe

Cornejos).  Growing up, Ms. Gonzalez enjoyed all school subjects, but preferred "reading and

science like hands on projects."  *See* Exh. 2 (Letter from Guadalupe Cornejos).  Indeed, Ms.

Gonzalez's aunt describes her as being an outspoken child who enjoyed sharing her opinions in

class.  *See* Exh. 2 (Letter from Guadalupe Cornejos).  Ms. Cornejos describes Ms. Gonzalez as a

generous child, constantly aware of the impact showing empathy could have on the lives of

others:

> She did not like when kids bullied other kids, she would stand up for them. She
> wanted to do many things when she grew up. She sometimes said she wanted to
> be a doctor to be able to help people. She was always helpful and caring. And
> sometimes she would say she wanted to be a lawyer to be able to stand up for
> people and fight for their rights. She was just so intelligent at such a young age.
> Johanna wanted to also be her own boss and have a business of some sort like
> clothing line she loved to dress in style and was like "my clothes will be for
> everyone and they will look great."

*See* Exh. 2 (Letter from Guadalupe Cornejos).

Melissa Ruiz Oseguera, Ms. Gonzalez's cousin, remembers her childhood with Ms.

Gonzalez as one full of games and sleepovers.  *See* Exh. 3 (Letter from Melissa Ruiz Oseguera).

Melissa suffers from dyslexia and recalls that Ms. Gonzalez would "help [her] with homework

and reading."  *See* Exh. 3 (Letter from Melissa Ruiz Oseguera).  Ms. Gonzalez used to encourage

Melissa to be an ambitious person and not to allow her dyslexia to "defeat [her] from getting

ahead in life."  *See* Exh. 3 (Letter from Melissa Ruiz Oseguera).  Ms. Gonzalez applied this same

fervor to her own academic pursuits.  Indeed, while attending a year of school in Michoacán,

Mexico when she was approximately 11 or 12 years old, Ms. Gonzalez was recognized for her

excellent behavior, and maintained a 9.6 (out of 10) grade point average.  *See* Exh. 4, at 1
(Certificates and Grades).[6]

Early on, Ms. Gonzalez demonstrated an interest in helping others and in building
relationships.  In her letter to the Court, Ms. Gonzalez's aunt, Marcela Becerra, shares that
"when Jessica was young, she used to help her siblings with their homework every day after
school, she was and still is a second mother for them.  [S]he is responsible for instilling in them
the love for books and reading."  *See* Exh. 5 (Letter from Marcela Becerra).  Still, now, Ms.
Gonzalez enjoys helping her nieces and nephews with their education.  As Ms. Becerra explains
in her letter:

> [Ms. Gonzalez] has the strength to help others regardless of the situation in which
> she is at, she is on top of everything related to her children, she tries to call us
> every day, a couple of months ago my son had to do a project about the solar
> system, [i]n fifteen minutes of the call, she gave him many ideas, [s]he guided
> him and supported him to do something different, the result was incredible.

*See* Exh. 5 (Letter from Marcela Becerra).

At her middle school in California, Ms. Gonzalez received the School Service Award for
her "outstanding service to the Staff and Students of Castle Park Middle School."  *See* Exh. 4, at
2 (Certificates and Grades).  Mireya Villa, who has known Ms. Gonzalez for twenty-five years,
highlights that Ms. Gonzalez was always a "very good student," and that her grades led her to
become part of the Associated Student Body ("ASB"), which only admitted "the best students."
*See* Exh. 6 (Letter from Mireya Villa).  Ms. Villa describes Ms. Gonzalez as "a girl who always
liked to turn in her homework and work clean and above all well done to earn good grades,"

---

[6] When she was 11 or 12 years old, Ms. Gonzalez attended one year of middle school in
Michoacán, Mexico, while living with her maternal aunt.  *See* PSR at ¶ 59.  Following the end of the
academic year, Ms. Gonzalez returned to the United States and continued her education in California,
before relocating to Mexico when she was approximately fifteen years old.  *Id.*

states that Ms. Gonzalez "received awards and recognitions [that] made her a better student," and recalls that Ms. Gonzalez "always like[d] school." *See* Exh. 6 (Letter from Mireya Villa). Ms. Gonzalez was also recognized by the ASB for her service and her performance as the ASB's Business Manager. *See* Exh. 4, at 3 (Certificates and Grades). Her leadership led ASB to recognize her once again for being meticulous, an exemplary leader, and a student with ethics. *See* Exh. 4, at 4 (Certificates and Grades). Castle Park Middle School also recognized Ms. Gonzalez's outstanding citizenship. *See* Exh. 4, at 5 (Certificates and Grades). Ms. Gonzalez's dedication and discipline earned her excellent grades, finishing eighth grade with a 3.97 grade point average. *See* Exh. 4, at 6 (Certificates and Grades).

Ms. Gonzalez knew that achieving an education would open many doors for her and would provide her with opportunities to improve her life and the life of her loved ones. When Ms. Gonzalez was approximately 15 years old, she moved to Mexico to live with her maternal grandparents and attend school. *See* PSR at ¶ 59. Even though she had moved to Mexico, Ms. Gonzalez continued to visit her family in California. During her visits to California, Ms. Gonzalez would visit with her aunt, Azucena Oseguera, who describes Ms. Gonzalez as hardworking, independent, and "extremely family-oriented." *See* Exh. 7 (Letter from Azucena Oseguera). In Mexico, Ms. Gonzalez attended Colegio Ingles and Instituto Ausubel in Michoacán, where she continued her dream of attaining higher education. *See* Exh. 4, at 7-24 (Certificates and Grades).

In 2004, Ms. Gonzalez graduated and received her diploma from Thomas Jefferson High School in Guadalajara, Jalisco, Mexico. *See* PSR at ¶ 66. While a student at Thomas Jefferson High School, Ms. Gonzalez achieved third place in the Finance Director category for the

school's business competition.  *See* Exh. 4, at 25 (Certificates and Grades).  Ms. Gonzalez and

her team also earned third place in the Best Finances Team category.  *See* Exh. 4, at 26

(Certificates and Grades).

After graduating from high school, Ms. Gonzalez was admitted to the Instituto

Tecnológico y de Estudios Superiores de Occidente ("ITESO"), where she pursued a degree in

Marketing.  *See* PSR at ¶ 66.  Ms. Gonzalez's college friend, Ernesto Romero Lopez, describes

Ms. Gonzalez as "a very nice and respectable person[,] excellent as a human being, very

intelligent, tenacious in her studies, disciplined, honest, humble, [and] charismatic."  *See* Exh. 8

(Letter from Ernesto Romero Lopez).

Ms. Gonzalez was 17 years old when she began dating Julio Alberto Castillo, the father

of Ms. Gonzalez's two children.  *See* PSR at ¶ 58.  While a college student at ITESO, Ms.

Gonzalez got pregnant with her first child.  Her friend Alejandra Canseco Villegard describes her

friendship with Ms. Gonzalez, and Ms. Gonzalez's first pregnancy in her letter to the Court:

> I [have been] friends with [Ms. Gonzalez] for fifteen years, we met through a
> friend on common and we became friends since then[.]  [S]he was just starting
> college and I was still in High School . . . when she became pregnant with her first
> [child.]  I was with her through the process, even though she was very young, I
> could tell she was dying to be a mother and I thought she had made a bad decision
> becoming pregnant at the time since it would made it more difficult for her to
> finish her college career, but she was a role model for me because she persevered
> and she is dedicated, although she was young, she showed me that you can do
> everything you set your mind to and when people are disciplined, they can attain
> anything.   To me she is an exemplary mother, responsible, sweet, and
> understanding.

*See* Exh. 9 (Letter from Alejandra Canseco Villegard).   "Even through pregnancy, [Ms.

Gonzalez] continued to work on her degree and finish college."   *See* Exh. 10 (Letter from

Guadalupe Oseguera).  Indeed, Ms. Gonzalez was the first woman in her family to earn a college

degree.  *See* Exh. 11 (Letter from Deyanira Gonzalez).   Ms. Gonzalez's cousin, Arlette Oseguera, who now works as an administrative assistant at the Hilltop School for teenage mothers after starting at the facility as a security guard, states that Ms. Gonzalez "got educated really young and has always been a person that wants more out of life."  *See* Exh. 12 (Letter from Arlette Oseguera).  Arlette recalls the impact Ms. Gonzalez has had on her personal life, as well as on the development of her own work ethic:

> I lived with [Ms. Gonzalez] for some time in Mexico and she helped me lose weight when I was struggling really bad.  She always made sure that I didn't lose focus on my goal and keep pushing.  I reached my goal and lost all the weight.  I was very happy that I didn't lose sight of my goal with her help of course.  She also helped me get a job while living with her and I was very thankful.  I worked at a beauty salon.  It was my first job and I learned a lot.  I also made sure to strive for more there starting as a person who cleans to being in charge of the register and making sure the employees get paid and also pay our vendors.  This is why I have a great work ethic.

*See* Exh. 12 (Letter from Arlette Oseguera).

Ms. Gonzalez's educational achievements have positively impacted her family.   Ms. Gonzalez's aunt, Azucena Oseguera, shared that Ms. Gonzalez "motivated [her] three girls to get an education and go to college."  *See* Exh. 7 (Letter from Azucena Oseguera).  In their letters of support, Ms. Gonzalez's cousins explain how she has impacted their lives.   Ms. Gonzalez's cousin, Guadalupe Oseguera, shares:

> Through my cousin, I was inspired to make teaching my career choice. She has told me to live in service of others and help others to grow; to give back to the community and help society. As a hardworking woman, she has been an incredible role model for me and everyone.

*See* Exh. 10 (Letter from Guadalupe Oseguera).  Ms. Gonzalez's cousin, Yadira Campos, graduated from medical school in 2011, and is currently employed by the County of Riverside for the County Hospital and Clinics.  *See* Exh. 13 (Letter from Yadira J. Campos).  In her letter

to the Court, Ms. Campos shares that Ms. Gonzalez inspired her to continue working in her

nursing career, even after becoming a mother at a young age, and also inspires Ms. Campos's

children:

> Jessica has always been my motivation, due to her continuing her education as she takes care of herself and her family. Jessica has always encouraged my kids to focus on school and get the career they wish for. Jessica has been a great role model for my daughter, and my daughter always looks forward to [Jessica] visiting California to have conversations about educations and careers.

> Jessica is a very respectful, loving, and caring wom[a]n. Jessica is loved by all of us younger cousins, nieces, and nephews. When Jessica comes to California to visit her priority is to spend family time with all of us. [That] I now have the career in nursing is due to her great examples. She was my motivation to continue my career even when I had my daughter at a young age.

*See* Exh. 13 (Letter from Yadira J. Campos). Ms. Gonzalez also inspired her cousin Veyra

Rangel, who is currently studying architecture at ITESO:

> [Jessica] was one of my biggest examples to follow, and for all the upcoming generations in my family, because she was the first woman in our household to finish a college career even while she was pregnant of her first child, which could not have been easy.

> I highly value [Jessica's] personality because both in her professional and personal life she is a responsible woman, honest, creative, positive. Strong, full of faith. In difficult times she has always been of great support for our family.

*See* Exh. 14 (Letter from Veyra Rangel).

Although Ms. Gonzalez lives far away from her family in California, she has cultivated

and maintained strong ties and relationships with her family there. Ms. Gonzalez's cousin

Arlette explains that "[w]hen [Ms. Gonzalez] comes to California, she always lets [her family]

know she is coming ahead of time so [they] can get together." *See* Exh. 12 (Letter from Arlette

Oseguera). Arlette states: "We usually do like [a] family BBQ and just hang out and also make

sure that our kids also get together and have the same connection that we have.  *See* Exh. 12

(Letter from Arlette Oseguera).

Humberto López, Ms. Gonzalez's uncle who has worked in the architecture design and

construction industry for over twenty years, recalls meeting Ms. Gonzalez fourteen years ago,

when he was dating Ms. Gonzalez's aunt, his now wife.  *See* Exh. 15 (Letter from Humberto

López).  In his letter to the Court, Mr. López shares how Ms. Gonzalez's perseverance has set an

example for his children:

> Around the time I met Jessica, she was pregnant with her first child[.]  She was
> about to finish college and being pregnant was never an obstacle for her.  Jessica
> finished her degree and set an example for my children that when you are
> determined and work hard you can always achieve your goals.
>
> For all these years that I have known Jessica, she has been nothing else but joy
> and love; always loved and respected by all her cousins and nephews. Although I
> only see Jessica when she visits California once or twice a year, we always have
> family gatherings and try to keep each other up to date with our family. Jessica is
> family oriented. My daughters call her "auntie" and love having her around. The
> last time we saw each other, Jessica gave ten dollars to each of my children so
> they could go buy sweets at the corner store.

*See* Exh. 15 (Letter from Humberto López).

Ms. Gonzalez's godson C.C.A. shares his special bond with Ms. Gonzalez in his letter to

the Court:

> I address you with all due respect to tell you that my godmother is a good person
> and she has always taken care of me and has taught me to value what I have and
> has always supported me in everything she always sent to my tennis tournaments.
>
> She has taken care of me as her own son and has always supported me and help
> me with school and to believe in god she is a very good person and has always
> help people in need with gifts and foods and she also takes care of me and my
> siblings.

*See* Exh. 16 (Letter from C.C.A.).   Ms. Gonzalez's nephew, Emiliano Chaidez Alvarado,

explains that Ms. Gonzalez has always taken care of him, "she was like a second mother to me,

and the aunt that I love the most, and I miss her very much."   *See* Exh. 17 (Letter from Emiliano

Chaidez Alvarado).   Ms. Gonzalez's niece, J.M.O.G., expresses:

> I know [Ms. Gonzalez] because we are related she is my aunt and I have known
> her my whole life what I can say is that she a good person she is sweet with me
> and my siblings and she loves us very much and we love her back [she] always
> treats her children well and is very sweet with them since she has been gone my
> cousins have been sad and we are too we miss her a lot too she used to work so
> much for the comfort of her children [she] is very happy, attentive and friendly
> with others [she] always treated us well and her children cannot be happy without
> her.

*See* Exh. 18 (Letter from J.M.O.G.).

In 2019, Ms. Gonzalez's marriage came to an end, due in part to the verbal abuse she

suffered from her husband.   *See* PSR at ¶ 58.   Before her arrest in 2020, Ms. Gonzalez worked as

a self-employed event planner.   *See* PSR at ¶ 69.   In her letter to the Court, Alma Ruiz Velasco, a

homemaker from Guadalajara, shares that she met Ms. Gonzalez when she and her family hired

Ms. Gonzalez to host events.   Ms. Velasco had a good impression of Ms. Gonzalez's work ethic

during Ms. Velasco's family's events:

> [Ms. Gonzalez] would personally go to the events to supervise the work and make
> sure that everything ran smoothly.   She was always very pleasant and respectful
> with us as her clients as well as her employees.   I could tell that there was a good
> work environment between her, and her employees and it was reflected in their
> great customer service and the way they treated others.

*See* Exh. 19 (Letter from Alma Ruiz Velasco).   In her letter to the Court, Ms. Velasco also shares

Ms. Gonzalez's dedication to her children:

> If I had to describe Mrs. Jessica Johanna Oseguera Gonzalez I would like to say
> that she is a good person, punctual, ambitious, helpful, follows through and very
> humble.   But above all she is an excellent mother of two children, that I have also

14

had the pleasure to meet.  I could tell that she was not only good in her career, but she was even a better person as a mother.  Her children reflect her excellent upbringing by being well educated and respectful.  This can only be the result of an education of a great woman.  On one occasion she told me the following words I will never forget, "I work every day of my life for my children.  I work so I can give them the tools so that they can be good people and live their lives happy and in peace."

*See* Exh. 19 (Letter from Alma Ruiz Velasco).

Ms. Gonzalez is a very caring and kind person, which has resulted in many of her event planning clients becoming her friends.  Anahi Zamora Robles is a nutritionist and mother and describes her experience with Ms. Gonzalez as an event planner, and later as a friend, in her letter to the Court:

I met Ms. Jessica Johanna Oseguera Gonzalez when I hired her for my child's party two years ago. Since the beginning she showed me that she was extremely responsible, dedicated to her work, punctual, very positive and humble.

She was very organized in her work. On the day of the event, you could see she was a humanist and she was very respectful towards her employees. From that day onward our friendship started, and I had the opportunity to get to know her.

I remember particularly, one day on January 6th, she invited me to an event to help some underprivileged people in a regional public hospital. We brought them blankets, food and we comforted the families who had loved ones at the hospital.

*See* Exh. 20 (Letter from Anahi Zamora Robles).

Bianca Correa Ibarra met Ms. Gonzalez through common friends and through their children's mutual friendship.  *See* Exh. 21 (Letter from Bianca Correa).  Ms. Correa describes Ms. Gonzalez as "an excellent mother and human being, she is a person that worries about the well-being of others, always trying to help others when she can."  *See* Exh. 21 (Letter from Bianca Correa).  Ms. Correa "hired [Ms. Gonzalez's] event planning services for certain occasions and her employees and herself had impeccable service and were very responsible,

observing the way [Ms. Gonzalez] treated her employees she was always cordial and respectful."

*See* Exh. 21 (Letter from Bianca Correa).

Ana Elizabeth Cruz, the owner of a beauty salon and single mother of two children,

describes her relationship with Ms. Gonzalez, which grew from professional to personal:

> I met [Ms. Gonzalez] when she came to my business to ask about certain up dos and see some of our work to see I she liked it. We exchanged numbers and I let her know I would send her some photos of our work. This is how we started to speak and eventually with time started to develop a more personal relationship. She has always been a very nice and friendly person that radiates a very positive energy. Thanks to these qualities we were able to develop a friendship and today I consider her a friend.
>
> As I got to know more [about Ms. Gonzalez] personally and became closer to her, I started to learn that she is a person that always lends a hand to anyone in need, whether that person is friend or stranger. With me, she was always helpful. Due to my job and responsibilities as a business owner, I suffer from a lot of stress. When I was going through a hard time, I knew I could count on Jessica to speak about my problems and she was always able to cheer me up and make me feel better. She was always very good at helping me solve my problems, whether those were personal problems or problems in my career. Her words would motivate me to keep pushing.

*See* Exh. 22 (Letter from Ana Elizabeth Cruz).

Ms. Gonzalez's respect towards others extended beyond her work as an event planner.

Her kindness and ability to listen are characteristics that stand out in the letters written by the

employees and entrepreneurs of the local businesses Ms. Gonzalez frequented. Rafael Olivares

Rodriguez opened his own butcher shop in Tlaquepaque, Jalisco when he was only 19 years old.

*See* Exh. 23 (Letter from Rafael Olivarez Rodriguez). Ms. Gonzalez has been a patron of his

store for more than eight years. *See* Exh. 23 (Letter from Rafael Olivarez Rodriguez). Mr.

Rodriguez describes Ms. Gonzalez as "a kind person, attentive, patient, educated and caring for

others, acts that she portrayed upon arrival to my establishment, where she always waited for her

turn, greeted everyone and addressed everyone with respect." *See* Exh. 23 (Letter from Rafael

Olivarez Rodriguez).  Mr. Rodriguez adds:

> The employees at my establishment always wanted to serve her because of her
> courtesy and because she always tipped the dispatchers, always talked with the
> employees and greeted them, [she] knew all the employees by name and in many
> occasions supported more than one, she would do that because in conversations
> with them they would express a need, an example is when one of them told her
> [the employee] had a newborn and did not have many resources to dress the
> newborn, in her next visit Ms. Jessica gifted [the employee] objects and her
> children's belongings as a gesture of support.

*See* Exh. 23 (Letter from Rafael Olivarez Rodriguez).  Itzel del Carmen Olivares Rodriguez, a

social worker and Mr. Rodriguez's sister, who has also been helping at Mr. Rodriguez's shop as

a cashier for over six years, shares her positive experiences with Ms. Gonzalez:

> I met Mrs. Jessica Johanna Oseguera Gonzalez in my place of work [she is] a very
> friendly, educated, down to earth, and respectful person, she has been our client
> for as long as I have been helping my brother with his business. When she came
> to the business, she would always have a positive attitude greeting all the
> employees in a respectful and friendly manner.  Throughout the years I have been
> able to have many conversations with her, and I have seen her empathy and
> solidarity towards others, she even participated in different activities related to
> charity in a parish that is located a few blocks away from the business, [I]
> remember on one occasion one of our clients expressed to us that they were
> collecting funds to give to people in need and [Jessica] immediately registered to
> donate food and other products that were on the list.  It is those actions that allow
> me to express and refer to [Jessica] as a generous person and with a moral
> compass.

*See* Exh. 24 (Letter from Itzel del Carmen Olivares Rodriguez).

Like the Rodríguezes, Luis Edgar Diaz Lara met Ms. Gonzalez because she was a patron

at his place of work.  *See* Exh. 25 (Letter from Luis Edgar Diaz Lara).  Mr. Lara's job was "to

serve [Ms. Gonzalez] and take her orders at the restaurant."   *See* Exh. 25 (Letter from Luis

Edgar Diaz Lara).  From their interactions, Mr. Lara emphasizes that Ms. Gonzalez "is an

excellent person, always pleasant, smiling and that motivated us to continue working in the best

way since it was a pleasure to serve her." *See* Exh. 25 (Letter from Luis Edgar Diaz Lara).  Mr. Lara also shares a memory of Ms. Gonzalez that has stuck with him through the years:  "[O]n one occasion a low income family arrived at the restaurant [and] Ms. Jessica invited them to have food and at the end she let them know if they needed anything they could look her up, these details and memories will always be on my mind." *See* Exh. 25 (Letter from Luis Edgar Diaz Lara).

An account of Ms. Gonzalez's background and characteristics would be incomplete without sharing how impactful Ms. Gonzalez's friendship has been to many of her friends. Thanks to Ms. Gonzalez's support, her friends have overcome several challenges.  For example, Alejandra Rodriguez, a pediatric dentist in Jalisco, Mexico, had a dentist-patient relationship with Ms. Gonzalez, which grew into a friendship.  *See* Exh. 26 (Letter from Alejandra Rodriguez).  Ms. Rodriguez has known Ms. Gonzalez since 2006 and shares her impressions of Ms. Gonzalez as a patient, but also as a friend:

> As a dentist on a professional level, I can attest that Jessica is an honest person, punctual, responsible, friendly, easygoing, disciplined and always follows the written recommendations. As a friend I describe Jessica as having two big passions: her children and her career. As a mother she is completely independent, respectable, structured and organized. She has to be these things to be able to juggle between being a mom and a professional.
>
> Her most important value is to raise her children with love, discipline and respect. These can be reflected in the son's personalities, in their academic achievements, her athletic achievements but more importantly they are kind, respectful and educated.  Professionally, she is an entrepreneur, unstoppable and her own critic.

*See* Exh. 26 (Letter from Alejandra Rodriguez).  Also in her letter to the Court, Ms. Rodriguez recounts a difficult moment in her life and how meaningful and impactful Ms. Gonzalez was during that time:

> I had a very big loss. I lost my first baby when I was 27 weeks pregnant. Jessica without having strong friendship ties at the time, visited me at the hospital. She was so moved for what happened and what I was going through. To me that was an invaluable moral and spiritual support. She was always there showing me empathy and worry not only for my loss but also because my life was also at risk. To me these actions are invaluable, and she earned all of my love and respect as a person.

*See* Exh. 26 (Letter from Alejandra Rodriguez).

Ms. Gonzalez also provided invaluable emotional support to Ismael Gutierrez, a cattle rancher who met Ms. Gonzalez at one of his grandson's birthday parties, as his grandchildren are friends with Ms. Gonzalez's children. *See* Exh. 27 (Letter from Ismael Olivares Gutierrez). Mr. Gutierrez recalls the "first time [Ms. Gonzalez] visited [Mr. Guetierrez's family at his ranch she was] a very friendly and attentive person. [She] would always bring something to share to [Mr. Gutierrez's] family gatherings, she has an ability to socialize easily, and she is always eager to help others, therefore she has gained the esteem of [Mr. Gutierrez's] entire family." *See* Exh. 27 (Letter from Ismael Olivares Gutierrez). After Mr. Gutierrez and Ms. Gonzalez met, Mr. Gutierrez's health deteriorated, and Ms. Gonzalez accompanied his family through the process. *See* Exh. 27 (Letter from Ismael Olivares Gutierrez). Mr. Gutierrez recounts this difficult time in his letter to the Court:

> [Jessica] would always talk to everyone with respect, she is very empathetic and shares her feelings with others, she is very attentive towards others, I remember when I had some heart issues and I had to be hospitalized for several weeks, it was during that time that Mrs. Jessica was attentive with my family, showing solidarity and companionship, I remember on several occasions she went with my wife to the hospital, she offered to help me pay for some medicine I needed, thus I reiterate her affection and care towards my family, as well as her good intentions and generosity.

*See* Exh. 27 (Letter from Ismael Olivares Gutierrez). Another friend of Ms. Gonzalez, Judith Rodriguez, recounts in her letter that Ms. Gonzalez was by her side during Judith's mother's

illness.  *See* Exh. 28 (Letter from Judith Rodriguez).  Ms. Rodriguez shares:  "[T]o comment on one of many recent experiences I have with Jessica, the day my mom got ill until the day my mom died she was always by my side and looking after my children supporting me like the good friend, of noble heart, and humble that is Jessica."  *See* Exh. 28 (Letter from Judith Rodriguez). Ms. Gonzalez's mother recalls similar altruistic and supportive behavior from her daughter:

> I remember that one Christmas Jessica led a fund collection between her friends to buy bicycles and toys for the children of an impoverished neighborhood and it was very emotional to see the children's happy faces, as they said they would have never imagined receiving a gift for Christmas. Other times various families got together, Jessica's friends would make tamales and delivered them to people who were sleeping at hospitals taking care of their ill at the hospital, because they were people of scarce resources and did not have money to buy food every day.

*See* Exh. 1 (Letter from Rosalinda Gonzalez Valencia).

Ms. Gonzalez has also maintained strong friendships across geographical distances. Gabriela Canseco, a mother and homemaker, has known Ms. Gonzalez since the early 2000's and currently lives in Canada.  *See* Exh. 29 (Letter from Gabriela Canseco).  Ms. Canseco states that "[d]uring the years [she and Ms. Gonzalez] have been friends, Jessica has been nothing but a positive influence in both my sister's life and mine . . . . She conducts herself in a polite and considerate manner, her humbleness reaches out to the most in need and she genuinely cares for the collective well-being."  *See* Exh. 29 (Letter from Gabriela Canseco).  Ms. Canseco describes several occasions on which Ms. Gonzalez has supported her in her letter to the Court:

> A few years ago, [Jessica] helped organize my daughter's birthday party and she was focused, respectful and detail[] oriented.  She helped make everyone feel taken care of.  The kids had a great time and were very thankful.  While celebrating the party, Jessica was always calm[] and attentive, she would laugh with everyone and helped with the kids beyond expectation.

Jessica likes to socialize, and her altruism always comes to show.  I can honestly say that Jessica holds one of the best hearts out there and that everything she does comes from love.

Jessica has always been there for whoever is in need, speaking for myself I can recall a few times when I felt devastated because of the distance and living in a different country.  She would always listen to me and offer me a shoulder to cry.  When in Mexico she would organize get togethers and surprise us in order to cheer me up.  She often goes out of the way to make sure everyone is happy.

*See* Exh. 29 (Letter from Gabriela Canseco).

Ms. Gonzalez's faith has been a cornerstone of her life, and a guidepost for how she has handled difficult personal and family situations.  Father Jose Aguayo met Ms. Gonzalez five years ago, while her family was going through a challenging experience with her seven-year-old niece.  *See* Exh. 30 (Letter from Father José Aguayo).  Father Aguayo recalls the beginning of his relationship with Ms. Gonzalez, and how Ms. Gonzalez has grown in faith in his letter to the Court:

I have known Mrs. Jessica Johanna for five years the relationship started due to a mass celebration that her friends asked about the health of a young family member [of Jessica] that has suffered an accident, it was an anguish[ing] situation due to the dangerous situation that the little girl was going through, right then I had the time to speak a lot with [Jessica] about topics such as faith, our purpose in life, [Jessica] opened her heart and I believe I have necessary arguments to give my opinion about a person outside of the legal judgment she had received, please I ask you to accept these words kindly.

During the time that I have known [her] I invited her to participate in a group to learn the word of God where they discuss topics about faith, [she] has always shown interest, [she] is a very nice person, an excellent mother, a philanthropist woman, I had to participate with her in one of her initiatives that was to bring food to families of people who were hospitalized in the Hospital Civil de Guadalajara, where you can find people who are in so much pain; [she] supported any initiative in favor of others like a retreat for girls with terminal cancer that it was a whole human and spiritual experience; I am convinced that your family ties do not define you, and we all have the opportunity to change, Jessica Johanna has been transformed a lot as a person, it has been an spiritual process, she has never been a bad person, but she has grown a lot spiritually and humanely, if you give

21

her the opportunity to show you the person she truly is she will not let you or myself your servant who believes in it firmly and that's why I write it down.

*See* Exh. 30 (Letter from Father José Aguayo).  Angelica Zamora, one of Ms. Gonzalez's friends from the Bible Study group described by Father Aguayo, recalls Ms. Gonzalez "participat[ing] in charitable work that the bible study organized such as helping girls with terminal cancer, bringing food to people in need and other charities," and describes Ms. Gonzalez as "a woman who is thirsty to learn God's word and to help others."  *See* Exh. 31 (Letter from Angelica Zamora).  Fray Jose Daniel Acosta Flores is a member of the Franciscan Missionaries of the Good Shepherd in Jalisco, Mexico.  *See* Exh. 32 (Letter from Fray Jose Daniel Acosta Flores). Mr. Flores describes Ms. Gonzalez as "a positive person for our congregation because she spends most of her time, with her two children, participating in all of our events for people in need and supporting disaster relief events."  *See* Exh. 32 (Letter from Fray Jose Daniel Acosta Flores). Mr. Flores goes on to describe Ms. Gonzalez's dedication to her faith:

> She has always demonstrated our congregation a great affection, and she is an example of family union. I must emphasize that she is a very responsible sister of the Church, committed to her ideals and purposes, of right intentions, available and [with a] persevering spirit. The search for truth, the community's wellness, and serving the Kingdom of God have led her to continue preparing herself with determination, dedication, generosity, and good spirit.

*See* Exh. 32 (Letter from Fray Jose Daniel Acosta Flores).

Ms. Gonzalez's sister, Laisha Michelle Oseguera Gonzalez, also emphasizes Ms. Gonzalez's faith and her work for those in need in her letter to the Court:

> I consider my sister is a great woman, mother, sister and a great human being because I remember she has worried for all the people around her and not only for her family or those she knows she has always liked to share what she has with those who have nothing and she is someone very close to God, every Sunday she went to mass and has always been a person of faith.  Jessica is like my second mom because all of my life she has been present and has unconditionally

22

supported me and cared for me, she is a mother close to her children and completely committed to them [she] has known how to educate them and guided them through a good path just like her, she is a very hardworking person in whatever she is doing or whatever her goal is.

It is important for you to know that Jessica has always love helping those in needs I have assisted many times with her at hospitals or very poor colonies and help those along with others to collect food, toys for kids, or blankets during the cold weather season, even during Christmas or Child's Day [she] has instilled in her children, nieces, and family that you do not need to worry about yourself and your needs that you need to open your eyes and see how you can help those around you even a little, a grain of salt helps more than doing nothing.

*See* Exh. 33 (Letter from Laisha Michelle Oseguera Gonzalez).

Salvador Llamas, a medical school student and family friend, recalls that he met Ms. Gonzalez "during difficult times for [Ms. Gonzalez's family], a seven-year old cousin of Jessica was in an induced coma because she was in an accident, the girl was in a critical state."  *See* Exh. 34 (Letter from Salvador Llamas).  Mr. Llamas describes Ms. Gonzalez's strong support of her family, as well as other families in need, in his letter to the Court:

Personally, [I] perceived Johanna was a strong woman, she was one of the only persons capable of holding her tears and confront the doctors, she is very formal when she speaks, she likes to research about topics unknown to her to be able to speak with good reason. Durant that period in the hospital she was always there accompanying her uncles, cousins, and friends, always looked for time to be present besides being a mother and a professional. I know she is a very positive a person and can transmit that happiness to other people, she likes doing social work because in the hospital she learned of a family that needed to liquidate their account and she and many others supported the cause.

*See* Exh. 34 (Letter from Salvador Llamas).   It was also at the hospital that Ms. Gonzalez's met José Manuel Nunez Yepez, who works as a nurse.  *See* Exh. 35 (Letter from Jose Manuel Nunez Yepez).  Mr. Yepez has known Ms. Gonzalez for over seven years, and, though they met when Mr. Yepez treated one of Ms. Gonzalez's friends at the hospital, their friendship grew.  *See* Exh. 35 (Letter from Jose Manuel Nunez Yepez).  Mr. Yepez describes Ms. Gonzalez has a "very

friendly person" who has supported him when he most needed it, and who "deserves the best." *See* Exh. 35 (Letter from Jose Manuel Nunez Yepez).

As demonstrated above, the letters submitted to the Court are replete with descriptions of Ms. Gonzalez's service to others. Esteban Joel Ramirez, an accountant who has known Ms. Gonzalez for over seven years, reflects on how anyone who crossed Ms. Gonzalez's path benefitted from her empathy:

> On one occasion we were driving around, I was driving, she was the passenger, at a red light I realized that she was looking at less fortunate children and all of the sudden she told me to stop the vehicle and to wait, she got off the car and went to the children then she got them inside my truck, and we took them to a store to buy them some clothes and shoes. It was then when I realized how wonderful she is and what great human being [she is] to me.

*See* Exh. 36 (Letter from Esteban Joel Ramirez). Mr. Ramirez describes Ms. Gonzalez as "a friend, an excellent human being, nice, always with a smile on her face and in a good mood." *See* Exh. 36 (Letter from Esteban Joel Ramirez). Blanca Estela Reyes, a homemaker and mother of three children, met Ms. Gonzalez seven years ago in a cooking class. *See* Exh. 37 (Letter from Blanca Estela Reyes Ramos). Ms. Reyes recounts that after their first class together, Ms. Reyes and Ms. Gonzalez became good friends and "have participated together in different activities related to gastronomy." *See* Exh. 37 (Letter from Blanca Estela Reyes Ramos). Ms. Reyes describes Ms. Gonzalez's warm and optimistic disposition in her letter to the Court:

> In the different classes that we took together [she] always showed me a good disposition and very collaborative, she is really good at socializing with others, she likes to share things and on many occasions she offered to help me so that I could finish my tasks during the cooking lessons. [She] always showed a very respectful attitude towards everyone who was part of the lessons, [she] was very focused on the activities reflecting commitment and punctuality. [It] was very nice to spend time with her [she] made you laugh and transmitted a lot of tranquility with her presence, I consider her hardworking and an honest person.

*See* Exh. 37 (Letter from Blanca Estela Reyes Ramos).

Ms. Gonzalez and her oldest child share a love for soccer, and she is part of a mothers' soccer team. Her teammate Martha Margarita Cota Ruiz describes Ms. Gonzalez as "a friendly person, with a great character and who loves helping others. She is a trustworthy person that makes you feel comfortable and gives you advice when you have any problem." *See* Exh. 38 (Letter from Martha Margarita Cota Ruiz). Ms. Ruiz has also had the opportunity to observe Ms. Gonzalez with her children, and states: "I met her children in the [soccer] fields because they used to love watching her mom play, their interaction was always loving and calm. Sharing with them I realized they followed their mom's example being kind to others." *See* Exh. 38 (Letter from Marta Margarita Cota Ruiz). María de los Angeles Cortés, a marketing professional and another of Ms. Gonzalez's teammates, describes Ms. Gonzalez as "a kind and educated person towards all the team members and me, always cooperating and helpful in every way." *See* Exh. 39 (Letter from Maria de los Angeles Cortes). Celina Velazquez, a mother of four children who has known Ms. Gonzalez for more than five years through their soccer team, describes her comradery with Ms. Gonzalez:

> [Ms. Gonzalez] demonstrated to be an excellent teammate and a great athlete. One time, during a soccer match, our team was doing poorly and we started complaining about our poor performance. We yelled at each other, we insulted each other because we were losing. I remember Jessica tried to calm us, Jessica spoke with us during halftime and to us we were wrong for doing that that being a team was not about pointing out who was doing things wrong but to improve and that insults were not leading us anywhere, only to ridicule ourselves with the other teams who were watching the match. We came back after the halftime very motivated by her words and even though we did not win the game we left happy for having played as a team and for having supported ourselves with good words. I knew that day that Jessica had a very big and sweet heart and that she would soon become one of my dearest friends.

> As time went by, I got to know her personally, as a friend she gives good advice and is always helping those who need it the most. We became closer and I started to get to know her as a family woman where I discovered that she was the best mother since she was always attentive to her sons' needs and I was also able to see how she got along with her sisters and I can tell you that she is very sweet with them supporting their decisions when they were good ones and reprimanding them if the decisions were bad. I was also able to see how she was as an aunt I can assure you that there was little difference in how she treated her sons and nieces and nephews, she always had a very peaceful personality and was sweet to the kids.

*See* Exh. 40 (Letter from Celina Velazquez).  Ms. Gonzalez is also involved in boxing, and her trainer Javier Leon Saavedra, who was a professional boxer for fourteen years and has been training Ms. Gonzalez for over five years, explains that "her best quality is that she is a good person therefore we have established a great friendship, not only with me, but also with all of her classmates at the boxing gym because she has a gift of being a good friend and partner, since she has a great number of friends, all of us at the gym consider her an upstanding individual, an honest, decent person and a good mother, as we have seen the care and love towards her children." *See* Exh. 41 (Letter from Javier Leon Saavedra).

Ms. Gonzalez is a committed and dedicated mother to her children and actively participates in her children's education.  Maria Guadalupe Garcia Reyes, a psychologist and children's teacher met Ms. Gonzalez through Ms. Gonzalez's children's participation in a course taught by Ms. Reyes, which focused on teaching "emotional intelligence for the development of skills like self-knowledge, self-control, decision-making, positive thinking, social conscience[,] and children's interpersonal relationships."  *See* Exh. 42 (Letter from Maria Guadalupe Garcia Reyes).  Ms. Reyes describes her relationship with Ms. Gonzalez and Ms. Gonzalez's dedication to her children in her letter to the Court:

It was among these activities where I had the pleasure of meeting Ms. Jessica Johanna Oseguera González, who since the first moment behaved in a kind manner and interested in her children's welfare, the reason why she enrolled them in the program I lectured. All the time the children attended their sessions constantly demonstrating their mom's responsibility and commitment. Ms. Jessica always demonstrated an interest in the integral development of her children, looking to learn in the sessions how to strengthen the communication and the positive education with them. The [children] always conducted themselves adequately during the sessions, they are attentive children, empathetic and with a great capacity to build relationships with others.

*See* Exh. 42 (Letter from Maria Guadalupe Garcia Reyes).

In addition to her own love of soccer, Ms. Gonzalez saw soccer as an opportunity to instill discipline in her older child. *See* Exh. 9 (Letter from Alejandra Canseco Villegard). Ms. Gonzalez knew that the sport would give her child the "tools and abilities that would help him in his life, like teamwork, learning to cope with frustration, and hard work to achieve his life goals." *See* Exh. 9 (Letter from Alejandra Canseco Villegard). One of her child's coaches, Juan Carlos Vasquez Garcia, has known Ms. Gonzalez for approximately ten years. Mr. Garcia recalls that Ms. Gonzalez was "a woman dedicated to her children, since I was her [child's] soccer coach, I always saw her during the practices and games supporting her [child], always kind and respectful with all the people present at the tournaments and practices." *See* Exh. 43 (Letter from Juan Carlos Vasquez Garcia).

Ms. Gonzalez's older child also plays soccer at school, in addition to the child's academic responsibilities. *See* Exh. 44 (Letter from Oswaldo Vazquez). Oswaldo Vazquez, Ms. Gonzalez's older child's physical education teacher, oversaw Ms. Gonzalez's child's participation as part of the school's representative team and the elementary school's escort, which is "considered an honor group in our section and for the school." *See* Exh. 44 (Letter from

Oswaldo Vazquez).  Mr. Vazquez recalls Ms. Gonzalez's participation in her children's school

events in his letter to the Court:

> I[n] my opinion and it seems like Ms. Jessica was always a person that was
> collaborating to do any event where her help was requested, always demonstrated
> good character, kindness and a lot of disposition.
>
> Like the time [the school] requested [Jessica's] son to participate in conferences
> celebrated at the school's facilities once a year, where great compromise is
> required from parents because it's during the day and after school hours, to be
> able to have a team to exercise and train, she was there during all that
> presentation, with great disposition, and did not leave the place until her son
> finished the training session.
>
> In the honor group previously mentioned, the students have to honor the flag
> every 15 days, and they are required to be there 45 minutes before the rest of the
> students, and her son was always present in time and form, and she was there
> most of the time to see her son's participation, which was at least during one
> school cycle, that her son participated in that group.
>
> Among the school events children participate from at school, we have a festival
> that requires much preparation time, and where most of the parents do not like to
> be involved and Ms. Jessica being the group's collaborator, helped with the
> organization, ensemble, and decorations of her group's event stands, with
> kindness and respect at all times.

*See* Exh. 44 (Letter from Oswaldo Vazquez).

Ms. Gonzalez understands fully the magnitude of her actions, and her punishment has

been underway and severe since February 2020.  In her letter to the Court, Ms. Gonzalez

explains the momentous guilt she feels due to the profound and negative affects her actions have

had on her family, especially her children:

> This has been one of the hardest experiences of my life. I have been away
> from my children. I have never been separated from them before. Not being
> able to hug them, to smell  them, to wake up next to them, to give them my
> blessing before they go to bed or when they wake  up, simply to watch them grow
> every day, hurts a lot.  That is why today I ask for forgiveness, and  say, without
> hesitation, that I regret everything I did that may have caused any harm.  Today,

28

more   than ever, it is clear to me that I should have paid more attention to my actions and my actions' consequences.

\*        \*        \*

Being isolated has given me the opportunity to think about my past, my childhood, and my   life with my family and my children. Being by myself has made me feel upset and angry at myself   for the choices I have made. My children have always been my priority, but spending this much  time by myself makes me question the things I took for granted.  When I am on the phone with my  family and friends, I feel like all I want to do is cherish memories of the good times I had with  them.

\*        \*        \*

All this time has been really hard and has made me reflect on what I have done.  I am very  sorry.  I ask Your Honor to have mercy on my sentence. I know that I made a mistake, but I have  learned from it and will never repeat it.  As a mother, I ask you to give me a second chance to start  over. I ask you to give me a second chance to raise my children and see them grow into a woman  and a man of good. I want to give them a calm life, with no pain, with no bad things. I want to  raise them and protect them.

I feel ashamed and feel that I have failed my mother and my children because I caused us   to be separated. I told them I would never be away from them. I have no words to explain to my  children when I will be able to see them again. My youngest child, my daughter, does  not  understand why I have been away for so long and why I have not been able to come home.

*See* Exh. 45 (Letter from Jessica Johanna Oseguera Gonzalez).  Ms. Gonzalez's children have

been deeply affected by their mother's absence.  Ms. Gonzalez's oldest child writes:

My mom, my sister, and I were always inseparable. She used to accompany us everywhere and was always by our side when we needed her. I knew that besides being my mom, I could always count on her as a friend, to tell her everything that was happening to me. Since she is gone my sister feels sad just like me. My mom besides helping us, always helped those in need. She always taught us values and to treat other people with respect. Without my mom my sister and I feel alone and without her.

*See* Exh. 46 (Letter from J.F.C.O.).  Ms. Gonzalez's younger child, writes to the Court with the

moments she most misses sharing with her mother:

[I] miss my mom very much.
[I] want her to come back to us already.
[I] miss her kisses and hugs and her saying goodnight.
My mom is the best mom in the world.
[She] reads me books and plays with me.
[She] helps me with homework.
[She] makes me food that's why I ask you with all of my heart that you bring her back to me.
So she can take care of me because I am small.
I am 5 years old and I miss her I ask God that [s]he comes back soon thank you for listening blessings.

See Exh. 47 (Letter from J.J.C.O.).  Being away from her family during a global pandemic has been an additional stressor on Ms. Gonzalez:

The uncertainty of how COVID-19 might affect my family has made this time even more difficult. Not knowing whether my family might get sick and what might happen to them while I am isolated so far away from them makes me feel completely helpless. All I can do is pray to the Lord for his blessings and to watch over my family. Both of my grandparents were infected with COVID-19 over the past year, and I learned about it while being in jail. My grandparents are like a mother and a father to me. I could not help them, and I felt like I was just another number in the facility. My grandfather also had a stroke, and had to have surgery. There was nothing I could do to help my grandfather recover, except for praying. My mother also contracted the COVID-19 virus while I have been incarcerated. My mother is taking care of my children, and I was afraid that my children would also be infected. I was concerned about my mom's health and not being with here made it worse because I was worried that there would be no one to take care of my children.

See Exh. 45 (Letter from Jessica Johanna Oseguera Gonzalez).  Ms. Gonzalez must also worry about her own susceptibility to contracting COVID-19 while incarcerated.  Although she has received her vaccine, "even a vaccine with seemingly adequate efficacy, pace, and coverage may be insufficient to alter the fundamental population dynamics that produce high disease prevalence."  See Exh. 48 (Barsky A B., J., Reinhart, E., et al., *Vaccination plus Decarcertaion— Stopping Covid-19 in Jails and Prisons*, New England Journal of Medicine, (Apr. 19, 2021), https://www.nejm.org/doi/full/10.1056/NEJMp2100609).   Indeed, a study conducted in

Massachusetts jail with more than 130 cases of COVID-19 found that less than half of the detained individuals volunteered for vaccination.  *Id.*  According to the New England Journal of Medicine, in the United States prison context, "even a vaccine with 90% efficacy will leave many people at ongoing risk for Covid-19, given the extraordinarily high rate of transmission in jails and prisons attributable to rampant overcrowding, inadequate testing and health care, high-volume daily inflow and outflow of staff and detainees, lack of personal protective equipment, and normalized systematic neglect of the welfare of incarcerated people." *Id.*

Apart from the stress of being away from her family during a global pandemic, the isolation caused by her nearly round-the-clock solitary confinement because of COVID-19 has had a real, substantial, and incredibly difficult impact on Ms. Gonzalez during the past fifteen months she has spent in custody.  Ms. Gonzalez describes her life as an inmate during the COVID-19 pandemic in her letter to the Court:

> Being incarcerated is hard.  Being in solitary confinement for more than a year is even  harder. If you are not mentally strong, you start to struggle. No family visitation, lack of basic  services like laundry or haircare, and no outside recreation for over a year due to COVID-19 makes  incarceration almost unbearable.

> Because of the pandemic, for over a year, we were in lockdown for 23 hours a day. Since  we only had one hour outside of our cells, we had to prioritize talking to our family on the phone,  cooking food, and showering. I did not care if I did not eat; my priority was to talk to my family,  hear how they were doing, and learn about my children's day.

> It is hard to be in a room looking at a wall for 23 hours a day. I have no one to talk  to because I am alone in my cell.  I can hear people talking to themselves, and I watch them walking  around in circles inside their cells.  I have tried to pass the time through exercise, drawing, reading, and doing the courses that we have on the tablets that the facility provided us for school.  I just try  to keep myself busy, but there are times that I break down. I find myself talking to my pictures  and to myself.  Sometimes I feel like I am going to lose my mind.

*See* Exh. 45 (Letter from Jessica Johanna Oseguera Gonzalez).   As stated in her letter, Ms. Gonzalez has tried to cope with over a year of 23-hour lockdown by engaging in activities like reading and taking educational courses on the facility-provided tablets.   *See* PSR at ¶ 67.   Ms. Gonzalez also participates in the Free Minds Book Club, a program offered at the Correctional Treatment Facility.   *Id.* at ¶ 64.   Kelli Taylor is the Co-founder of the Free Minds Book Club & Writing Workshop, a "nonprofit introducing teens and adults at the DC Jail to the transformative power of books and creative writing, mentoring them throughout their incarceration and into reentry so that they might pursue and achieve positive educational and life goals," which has served more than 1,700 incarcerated individuals since 2002.   *See* Exh. 49 (Letter from Kelli Taylor).   Ms. Taylor describes Ms. Gonzalez's dedicated involvement in the virtual book club in her letter to the Court:

> Jessica has been extremely engaged in our program. She consistently reads all of the titles assigned, submits answers to posted discussion questions and completes writing assignments. In addition to the Women's Book Club assigned reading, Jessica has also been requesting, reading and participating virtually in the book club for Spanish-speaking individuals on a men's unit. Her writing demonstrates thoughtfulness, creativity, compassion, intellectual curiosity, and a strong motivation to pursue positive personal growth.

*See* Exh. 49 (Letter from Kelli Taylor).   The strength of the connection Ms. Gonzalez has made through the Free Minds Book Club is clearly demonstrated by Ms. Taylor's commitment to providing support to Ms. Gonzalez, even if she is sentenced to a period of incarceration that is not based in Washington, D.C.   *See* Exh. 49 (Letter from Kelli Taylor).

Although Ms. Gonzalez's participation in the Free Minds Book Club has been a positive experience, the lockdown conditions at the Correctional Treatment Facility have caused tremendous stress on Ms. Gonzalez directly by impacts on her personal health, as well as

indirectly, through the stress Ms. Gonzalez has witnessed from her fellow inmates.  As Ms.

Gonzalez explains:

> Being incarcerated has also affected my physical health. For the first time in my life, I  started having issues with my thyroid during my incarceration. I have not ever had an issue with  my thyroid before, and I do not know if those issues were caused by the stress of being incarcerated  alone for 23 hours a day.  We did not have access to nail clippers until October 2020.  I had to use  the corner of my bed as a nail file. In the beginning, we were not getting our laundry done. We  could not change our sheets or towels for two or three weeks. I know the people in the facility  were doing their best to protect us from COVID-19, but it made my isolated incarceration even  more difficult.
>
> <p style="text-align:center">*      *      *</p>
>
> It is hard to see other inmates suffering from mental health issues, gaining weight, and  struggling because not all of us have the ability to stay strong being in a room 23 hours a day.  I  have seen the burden the lockdown has had on all of us and the anxiety it has caused.  Being around  mentally unstable people is hard on me because I have never been in that environment before. I  have learned to understand where they come from, see life from a different point of view, to appreciate  and  value  life,  and  help  and  support  the  ones  going  through emotional difficulties. I  always tell them to be strong and to try to manage the situation.

*See* Exh. 45 (Letter from Jessica Johanna Oseguera Gonzalez).

The extreme 23-hour lockdown to which Ms. Gonzalez was subjected for over a year was

a national anomaly.  *See* Exh. 50 (Peter Jamison, "An 'insane' coronavirus lockdown two miles

from  the  Capitol,  with  no  end  in  sight,"  THE  WASHINGTON  POST  (Apr.  19,  2021),

https://www.washingtonpost.com/dc-md-va/2021/04/19/dc-jail-lockdown-covid/).   According to

the Washington Post, such "extreme confinement has been adopted at other jails and prisons

during the pandemic as a temporary, last-ditch measure.  But the District's lockdown differed in a

crucial way:  It never ended."  *Id.*  Instead, "[f]or almost 400 straight days, the entire population

of the D.C. jail has been subjected to what experts say is essentially a form of mass solitary

confinement – without some of the basic services afforded even to those in solitary during normal times." *Id.* "[H]ealth experts and advocates for the incarcerated say that protective impulse has evolved into a grave human rights abuse as days and weeks have turned to months of around-the-clock confinement, either alone or with a cell mate." *Id.* Craig Haney, a psychology professor at the University of California, Santa Cruz, has studied the psychological effects of solitary confinement. *Id.* According to Haney, a "year of '23 and 1' lockdown would ordinarily be reserved for those who commit extraordinary breaches of prison rules, most likely involving acts of violence." *Id.*

Ms. Gonzalez has been an exemplary inmate during her 15 months of incarceration in these extreme conditions. On October 8, 2020, she participated in the initial phase of the Women's Reentry COVID 19 Tablet Program. *See* PSR at ¶ 67. She took and passed classes on Work Essentials and Money Essentials in 2021. *Id.* And, she was awarded third place in the Department of Corrections Voluntary Service Appreciation Contest, a facility-wide art contest. *Id.* Still, she must contend with the "psychological and physical harms that such prolonged isolation can cause," which can include depression, anxiety, and an "erosion of a sense of self," all of which can "last well after an inmate's release." *See* Exh. 50.

According to the Washington Post, "officials at a half-dozen correctional systems said the kind of across-the-board restrictions in place at the D.C. jail had either never been used or used only as a short-term approach to suppress infections. One official outside the nation's capital, speaking on the condition of anonymity to avoid publicly attacking correctional colleagues, offered a frank assessment of the District's approach: 'That's insane.'" *Id.* Yale University Professor of Medicine and Public Health and infectious-disease physician Jaimie Meyer, who has

"served as an expert witness in lawsuits across the country brought by incarcerated people over inadequate coronavirus controls" found that the D.C. jail is the "only system she examined that has adopted a continuous 23-hour lockdown since early in the pandemic." *Id.* According to Meyer, "[t]emporary lockdown made sense.  This extended lockdown doesn't make sense . . . This isn't meant to be a forever strategy." *Id.*

Neither Ms. Gonzalez nor her counsel criticizes the D.C. Department of Corrections' response to the COVID-19 pandemic.  In fact, Ms. Gonzalez had intended to file an additional motion seeking release due to lack of access to her counsel, but she and counsel concluded that such a motion would have been unfounded, because the Department of Corrections staff regularly made her available for video meetings with counsel.  The Department of Corrections staff has been extremely responsive and diligent in responding to counsel's inquiries, and in scheduling frequent video visits for counsel and Ms. Gonzalez.  Ms. Gonzalez understands that the Department of Corrections has been faced with an unprecedented event, and officials made the decisions they felt were necessary to safeguard inmates and staff against the COVID-19 pandemic.  The conditions under which Ms. Gonzalez has lived for the past 15 months, however, must be taken into account when determining a just and reasonable sentence in this case.

In early May, the Correctional Treatment Facility shifted from a 23-hour lockdown to a 22-hour lockdown.  Even though Ms. Gonzalez now has two hours per day outside of her cell, "[t]his small amount of time still forces [Ms. Gonzalez and the other inmates] to prioritize between talking with [their] family and taking care of [their] other basic needs." *See* Exh. 45 (Letter from Jessica Johanna Oseguera Gonzalez).  Also, even with the transition to a 22-hour

lockdown, Ms. Gonzalez still has no access to in-person or video visits with her family.  As she

explains in her letter:

> Being away from my children, not having the opportunity to see them, hug them,
> and kiss them due to the lockdown is  really hard.  I have been trying to keep
> praying to God to give me strength to handle this situation.  It has also been very
> difficult to receive mail from my family.  My family sent me Christmas cards last
> year, and I did not receive them until February of this year.

*See* Exh. 45 (Letter from Jessica Johanna Oseguera Gonzalez).  Ms. Gonzalez closes her letter to

the Court by emphasizing her acceptance of responsibility for her actions:

> It has been a year and three months of learning, pain, anguish, analyzing what is
> good and  what is not, and allowing myself to start over and live in peace.  I have
> had time to think about my  actions, and I understand what I did was wrong, and I
> know, without hesitation, that I will never  make the same mistake again.  I ask
> for Your Honor's mercy.

*See* Exh. 45 (Letter from Jessica Johanna Oseguera Gonzalez).

A careful reading of the letters of support demonstrates that Ms. Gonzalez is a woman

who worked hard to achieve an education and provide for her children.  These letters portray a

strong woman of faith[7] who always practices empathy and love for others.  Ms. Gonzalez

profoundly cares for her loved ones and deeply regrets the harm she has caused them.  She has

also suffered the extremely negative effects of living in nearly 24-hour solitary confinement for

over a year.  Given this, and given Ms. Gonzalez's history and personal characteristics, we

respectfully submit that a sentence of time served represents a just sentence while also satisfying

the goals of the SRA.

---

[7] On the morning just prior to her arrest, Ms. Gonzalez attended Ash Wednesday mass, which
marks the beginning of the penitential Lenten season.

C.    **The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3)).**

Since the Guidelines are now advisory, the sentencing table and the restrictions on probationary sentences, sentences of home confinement, and split sentences in USSG §§ 5A, 5B1 and 5C1 are also advisory.

D.    **Pertinent Policy Statements (18 U.S.C. § 3553(a)(5).**

We are unaware of any pertinent policy statements issued by the Sentencing Commission that should be specially considered in determining Ms. Gonzalez's sentence.

E.    **The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct (18 U.S.C. § 3553(a)(6)).**[8]

Section 3553(a)(6) directs sentencing judges to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  As set forth below, a sentence of time served will avoid these unwarranted sentencing disparities.

1.    **Legal Analysis**

A 51-month sentence, as recommended by the government and the USPO, would result in a severe sentencing disparity between Ms. Gonzalez and similarly situated defendants.  As demonstrated by the 47 cases analyzed below, comparably situated defendants received an average 15-month reduction from their government-recommended sentences, with more than 50% of the reductions resulting in a below-Guidelines sentence.  Considering Ms. Gonzalez's conduct when compared to the defendants in the cases below, a reduction of far more than 15

---

[8] The documents corresponding to the docket entries in this section total 2,486 pages.  For this reason, counsel has not filed these documents as Exhibits to Ms. Gonzalez's Memorandum in Aid of Sentencing.  Should the Court or the government request copies of any of the below-referenced case documents, counsel will provide the documents in hard-copy or via electronic transmission.

months is warranted, as Ms. Gonzalez's conduct is not nearly as severe as that of the other defendants.

In *United States v. Sanchez*, Case No. 07-cr-20587 (S.D. Fla.), the defendant was charged, along with her husband, Fernando Melciades Zevallos Gonzales, with one count of Conspiracy to Violate the Kingpin Act (21 U.S.C. § 1904(c)(2)), eight counts of violating the Kingpin Act (21 U.S.C. §§ 1906(a), 1904(b)(1), (c)(1)), one count of Money Laundering Conspiracy (18 U.S.C. § 1956(h)), six counts of Money Laundering (18 U.S.C. §§ 1956(a)(1)(B)(1), (2)), and a Forfeiture Allegation (18 U.S.C. § 982). *See* Dkt. No. 1. Sanchez ultimately pleaded guilty to only one count of conspiracy to violate the Foreign Narcotics Kingpin Designation Act ("the Kingpin Act"). *See* Dkt. No. 93, at 1. The remaining 15 charges were dismissed by the government. *Id.* Nonetheless, the government clarified that the conspiracy and money laundering charges were dismissed only based on the plea agreement between the parties and "reject[ed] any suggestion that its dismissal of the money laundering counts in the indictment should be read as a proclamation of the defendant's innocence." *See* Dkt. No. 62, at 1.

Sanchez's actions were far more egregious than the conduct underlying the charges against Ms. Gonzalez. Sanchez's husband and co-defendant, Mr. Zevallos Gonzales, founded Peru's largest airline, AeroContinente. *See* ECF 49, at 11. At the time he and his wife were charged in the United States, Mr. Zevallos Gonzales was "serving a 20-year prison sentence in Peru for 2005 drug trafficking and money laundering convictions. *Id.* He was ordered to pay a $29 million fine for conspiring to ship more than 3 tons of cocaine to Mexico . . . ." *Id.* Sanchez was alleged to have "caused the execution of four wire transfers totaling approximately

$1,408,402.99 . . . from a lawyer's trust account . . . to bank accounts in Lima, Peru of the two shell corporations that the [she and her husband] controlled." *Id.*  Ms. Gonzalez was not charged with wiring drug proceeds.  *Id.*  Finally, any consideration of Ms. Gonzalez's familial connections, even if relevant, would not call for a greater sentence than time served, as Sanchez was sentenced to probation.  *Id.*

Ms. Gonzalez's conduct involved acting in a managerial capacity at a sushi restaurant for roughly 28 months and registering and owning the trademarks of three OFAC-designated entities.  Ms. Gonzalez registered the trademark for Las Flores Cabañas in June 2012, Mizu Sushi Lounge in May 2012, and Tequila Onze Black in February 2012.  *See* ECF 214 at ¶¶ 14, 16, 18.  Ms. Gonzalez registered these trademarks, which remain active for a period of ten years, three years before OFAC designated the underlying entities on September 17, 2015.  *See* 80 Fed. Reg. 57,433 (Sep. 23, 2015).  Ms. Gonzalez also granted a power of attorney in October 2009 to an individual who registered the trademark for J&P Advertising.  *See* ECF 214 at ¶ 12.  Ms. Gonzalez's grant of this power of attorney occurred six years before the entities in the Superseding Indictment were designated by OFAC.  Sanchez's conduct in support of her husband's shell corporations, including her deposit of $100,000 of checks written by Zevallos into her account, and her transfer of over a million dollars of illegal real estate transaction proceeds stand in stark contrast to Ms. Gonzalez's employment at a sushi restaurant and registration of trademarks that significantly pre-dated the OFAC designations of the entities in the Superseding Indictment.

Unlike Sanchez, Ms. Gonzalez was not charged with money laundering.  Indeed, the materials produced by the government in discovery do not support a finding of money laundering

in this case.  Paul Dopp, CPA/CFF/ABV, CVA, CFE is the "Senior Managing Director in the Atlanta office of the forensic accounting practice of B. Riley Advisory, a national specialty financial advisory services firm with over 130 professionals in offices through the United States."  *See* Exh. 51, at 4 (B. Riley Forensic Accounting Report).  Mr. Dopp is a "Certified Public Accountant ('CPA') licensed in the state of Georgia, a member of the American Institute of Certified Public Accountants ('AICPA') and the Georgia Society of CPAs[, he is] Certified in Financial Forensics ('CFF') and Accredited in Business Valuations ('ABV'), specialty credentials awarded by the AICPA as well as a Certified Valuation Analyst ('CVA') designated by the National Association of Certified Valuation Analysts ('NACVA')[, and he is] a Certified Fraud Examiner ('CFE') designated by the Association of Certified Fraud Examiners ('ACFE')." *Id.*  Mr. Dopp has "over 35 years' experience in the area of forensic accounting, the quantification of complex financial damages, investigation of business disputes, corporate internal investigations, financial fraud investigations, funds tracing, business valuations, and financial analysis consulting."  *Id.*

B. Riley Advisory Services performed an analysis of financial records and bank statements provided by the government in discovery for the time period of 2013 through 2017. *Id.* at 1.  Based on his review of the discovery provided by the government and from his analyses, education, experience and training, Mr. Dopp found that the "volume of the monthly bank account activity was consistent with the levels of receipts and disbursements for a small business."  *Id.* at 2.  In addition, Mr. Dopp "reviewed the available monthly sales tax reports for the restaurants [identified in the Superseding Indictment], bank account activity reports, and general ledger reports and confirmed that the sales tax reports remitted monthly to the Mexican

federal tax authorities were consistent with the bank statement deposits and general ledger reports relating to revenues." *Id.* at 3.   Indeed, the financial documents produced by the government "did not have a significant increase in receipts" or "any marked increase in cash deposits or payments" as would be expected in a money laundering scheme. *Id.* at 4.   Instead, Mr. Dopp made the following findings:

> The observed bank transactions appear to reflect typical restaurant activity such as payroll and food and beverage purchases. The amounts of these transactions, individually and in aggregate, were small and inconsistent with money laundering activity. We noted that the accounts appear to have borrowed funds from time to time to cover payroll and/or sales tax payments. These were quickly repaid to the lender when American Express deposited debit/credit card sales into the business account. The loan account activity was via transfers rather than cash.

*Id.*

Ultimately, Mr. Dopp concluded that ***"[t]he bank account activity reviewed and analyzed was inconsistent with the attributes of money laundering***." *Id.* at 2 (emphasis added). Indeed, Mr. Dopp observed that "[t]he magnitude of the amounts processed through the bank accounts were in amounts significantly smaller than any bank accounts I have investigated in my experience in connection with allegations of money laundering activity." *Id.*

The Indictment against Sanchez and Zevallos marked the first time a violation of the Kingpin Act was charged. *See* Exh. Dkt. No. 74, at 13.   In determining Sanchez's sentence in this first-impression Kingpin Act case, the Court applied U.S.S.G. § 2S1.1(a)(2), the Guideline provision for money laundering offenses, which resulted in a 12 to 18 month recommended sentence. *Id.* at 4.   The Court sentenced Sanchez to three years of probation. *Id.*   Given the vast difference in the severity of Ms. Gonzalez and Sanchez's conduct, and the fact that the

government's evidence would not have supported any finding of money laundering activity involving Ms. Gonzalez, a sentence of time served is appropriate here.

On April 1, 2021, Victor Mones Coro was sentenced in *United States v. Victor Mones Coro*, Case No. 19-cr-144 (S.D.N.Y.).  *See* Dkt. No. 195, at 3.  The agreed-upon total offense level in *Coro* was 27, three levels higher than the recommended total offense level in this case. Coro received a sentence of 55 months, which was 15 months below the low end of his Guidelines range.  A variance greater than 15 months is warranted here, because a review of the facts of *Coro* makes clear that his conduct was far more pronounced than the conduct engaged in by Ms. Gonzalez.  That said, neither counsel, nor Ms. Gonzalez, in making this argument, is seeking to minimize the seriousness of her crimes.

Coro was charged with facilitating and directing a scheme to provide flight services to Specially Designated Narcotics Traffickers ("SDNTs").  In furtherance of this scheme, Coro provided private charter flights to "prominent members of Venezuela's President Nicolas Maduro's inner circle," whom OFAC sanctioned in February 2017.  *See* Dkt. No. 200-1, at 3. Coro's Florida-based company, American Charter Services ("ACS"), provided between 20 to 25 flights in furtherance of Maduro's re-election campaign, resulting in the illegitimate seizure of Venezuela's Presidency.  *Id.*  Coro agreed to a 4-level role enhancement for being an organizer or leader of the charged scheme.  Here, the government is not seeking any such enhancement, stating:

> In particular, the Government is not seeking an aggravating role enhancement pursuant to § 3B1.1 of the Sentencing Guidelines. As charged in the Superseding Indictment, and as admitted in the Statement of Facts that accompanies this Agreement, the Defendant was a sole administrator and an "officer, director, or agent of an entity" within the meaning of 21 U.S.C. § 1906(a)(2). The definition of an "officer, director, or agent" under that section, however, is not coextensive

42

with the definition of an "organizer or leader" or "manager or supervisor" of criminal activity within the meaning of § 3B1.1 of the Sentencing Guidelines, and under the particular facts and circumstances of this case, the Government has agreed not to seek that enhancement here.

*See* ECF 213, at 3 n.1.  The "government is also not seeking an adjustment for obstructing or impeding the administration of justice pursuant to § 3C1.1 of the Sentencing Guidelines, and the government does not believe that such and adjustment is warranted by the facts and circumstances of this case." *Id.*

Ms. Gonzalez was a part-owner and the sole administrator of J&P Advertising, S.A. de C.V. and JJGON, S.P.R. de R.L. de C.V. ("JJGON").  *See* ECF 214.  JJGON was never a functioning entity.  For a little over two years, she acted as the manager of Kenzo Sushi, a sushi restaurant.  *Id.*  She registered, co-registered, or granted a power of attorney to register, four trademarks.  *Id.*  Although both Ms. Gonzalez and Coro knowingly engaged in transactions with designated entities or designated individuals, Coro took further steps to conceal his actions. "[Coro] and his co-conspirators used code names, falsified flight manifests and invoices, communicated over encrypted messaging applications, received cash flown in from Venezuela, and accepted wire transfers from a front company tied to the sanctioned Venezuelan leaders." *See* Dkt. No. 200-1, at 4.  Coro even instructed one of his pilots to lie to law enforcement, falsified flight manifests and invoices, and directed other employees to provide services to OFAC-sanctioned individuals.  *Id.* 38.

Furthermore, the effects of Coro's actions significantly differ from Ms. Gonzalez's actions.  ACS was based in the United States, and Coro's scheme involved multiple jurisdictions, millions of dollars of flight services, and "the evasion of sanctions and aviation regulations."  *See Id.* at 4.  Coro provided flight services to Lopez Bello, a front man for former Venezuelan Vice

43

President El Aissami who has been sanctioned for laundering drug proceedings, from the Dominican Republic to Turkey and Russia. *Id.* at at 23.   Venezuelan leaders traveled to Russia "to obtain financial support for circumventing U.S. sanctions efforts. *Id.* at 40.   Additionally, as part of his scheme, Coro undermined the integrity of the United States' financial system when he accepted payments in his U.S.-based bank account from a foreign front company linked to the sanctioned Venezuelan leaders, in order to bypass the system's controls. *Id.* at 38.   In Ms. Gonzalez's case, all of the entities identified in the Superseding Indictment were based in Mexico.   The government has not produced any evidence that Ms. Gonzalez's profits from engaging in the charged transactions with designated entities totaled even a fraction of Coro's millions of dollars in illegal transactions.

Coro's disregard of OFAC's sanctions and his conduct that directly assisted Maduro's illegitimate election and fraudulent presidency weighed heavily on Venezuelans and disproportionately impacted international efforts to restore Venezuela's democratic values. *Id.* at 37.   Indeed, "Maduro and his regime have abused their power by committing heinous extrajudicial killings and imprisoning and threatening opposition politicians who challenge his authority." *Id.*

Coro's total offense level was 27, resulting in a range of 70 to 87 months imprisonment. *See* Dkt. No. 137, at 23.   The applicable fine range for Coro's offense was $25,000 to $5,000,000.   *See* Dkt. No. 200-1, at 33.   Coro was sentenced to 55 months imprisonment.   *See* Dkt. No. 133, at 1-4, 8.   Thus, Coro received a 15-month reduction from the bottom of his Guidelines range.   Given the stark contrast between Coro's actions – aiding in the illegitimate

election of a despotic foreign leader – and Ms. Gonzalez's, a sentence of time served here is appropriate.

According to § 2M5.1, an offense level 26 applies if "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded;" or if "the offense involved a financial transaction with a country supporting international terrorism." *See* U.S.S.G. § 2M5.1(a)(1)(A). The typical actions of defendants sentenced under this Guideline, therefore, significantly differ from those of Ms. Gonzalez.

For instance, in *United States v. Ali Soofi*, Case No. 16-cr-825 (S.D.N.Y.), the defendant acted as a broker on behalf of Iranian clients, including a high-ranking military official in the Iranian Revolutionary Guard Corps ("IRGC"), previously designated as a Specially Designated Global Terrorist. *See* Exh. 52 (Dec. 15, 2017 U.S. Department of Justice Press Release). Soofi sought to purchase and ship military items like "helicopters, high-tech machine gun parts, and military vehicles from the United States to Iran" and was sentenced to 32 months imprisonment and a year of supervised release. *Id.* In short, Soofi was sentenced to 19 months less than the government's recommended sentence despite the fact that he supported IRGC, a group with extensive military presence and support for terrorist groups like "Hezbollah, Hamas, and the Taliban." *Id.*

*United States v. Resit Tavan, et al.*, Case No. 17-cr-122 (E.D. Wis.), is another case where the defendant was sentenced to a term significantly below the government's recommendation. In *Tavan*, the defendant used his business based in Turkey to supply military equipment to Iran's military forces. *See* Dkt. No. 73, at 25-26. Tavan also signed a contract to design and build a High-Speed Composite that provided clearance for Iran's missile system. *Id.*

45

Tavan's base offense level was 26.  *Id.* at 4.  Unlike Tavan, Ms. Gonzalez was never involved in preparing or designing weapons of mass destruction.  Notwithstanding, the district court sentenced Tavan to 28 months imprisonment.  *See* Dkt. No. 87, at 2.  This is thirteen months less than the sentence recommended by the government here.

Defendants who actively participated in the furtherance of Iran's terrorist actions have also received sentences below what the government is recommending here.  In *United States v. Erdal Akova, et al.*, Case No. 12-cr-220 (N.D. Ga.), Akova had an ownership position with a company based in Turkey.  *See* Exh. 53 (2018 U.S. Department of Commerce Report on Foreign Policy-Based Export Controls).  Akova allowed the use of his company to ship epoxy to an Iranian government-owned company that had been previously designated by the U.S. Department of Treasury as a proliferator of weapons of mass destruction.  *Id.*  This epoxy is highly sought after by the Iranian government, because it is used to repair old helicopters that were made before the Iranian Islamic Revolution.  *See* Dkt. No. 1, at 1-2.  Akova was sentenced to concurrent terms of 36 months on each of his two charged counts.  *See* Dkt. No. 49, at 1-2.

In *United States v. Behzad Pourghannad, et al.*, Case No. 13-cr-507 (S.D.N.Y.), the defendant shipped thousands of kilograms of carbon fiber from the United States to Iran, knowing the carbon fiber would produce nuclear centrifuge rotors and nose cones for ballistic missiles essential to Iran's weapons of mass destruction program.  *See* Dkt. No. 21, at 9.  In that case, the government recommended a sentence of 50 months, one month below the 51-month sentence recommended by the government here.  *Id.* at 19.  Pourghannad was ultimately sentenced to a term of 20 months imprisonment, 30 months less than the government's

recommendation.  A below-Guidelines sentence of time served for Ms. Gonzalez, therefore, is reasonable and would avoid an unwarranted sentencing disparity.

In *United States v. Arash Sepehri*, Case No. 16-cr-81 (D.D.C.), the defendant owned and managed a company in Iran sanctioned for procuring parts for Iran's nuclear program.  These parts included "night vision materials, satellite thrusters and control systems."  *See* Dkt. No. 30, at 3.  Sepehri's illegal transactions totaled more than $10 million and promoted the proliferation of a nuclear program that jeopardizes the security and foreign policy interests of the United States.  The government told the sentencing judge that the illegally exported parts were "dangerous and [could] facilitate the death of numerous people, including potentially U.S. service personnel, in military operations inside and outside Iran."  *Id.* at 8.  Sepehri's Guidelines range was calculated to be 46 to 57 months.  *See* Dkt. No. 20, at 3-4.  Although the government recommended a period of imprisonment consistent with the Guidelines, in February 2019, Judge Rosemary Collyer sentenced Sepehri to 25 months imprisonment.  Given this, a sentence of time served here is reasonable.

In *United States v. Olaf Tepper*, Case No. 18-75 (N.D.N.Y.), the defendant founded a company he then used, for over 10 years, as part of a conspiracy to export $1 million in turbine parts from the United States to Iran.  Unlike Ms. Gonzalez, the defendant in Tepper received a two-level enhancement for his role as a founder and managing director of the company.  *See* Dkt. No 29, at 3.  Without a plea agreement, Tepper pled guilty to conspiring to violate the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and Sanctions Regulations ("ITSR").  *Id.* at 1.  The government recommended a sentence of 57

months, but the district court ultimately sentenced Tepper to 24 months imprisonment – a 33-month downward variance from the bottom of Tepper's Guidelines range.

Similarly, in *United States v. Mahin Mojtahedzadeh*, Case No. 19-cr-235 (N.D.N.Y.), for several years, the defendant leveraged her management position with her employer to illegally export millions of dollars of turbine parts from the United States to Iran, helping to "keep the lights on" in a country the United States has sanctioned for years for its support of terrorism.  In *Mojtahedzadeh*, the government requested a sentence at the lower end of the Sentencing Guidelines range.  *See* Dkt. No. 30, at 3.  The district court declined to follow this recommendation and, instead, imposed a sentence of time served.  This was 32 months less than the bottom of the Guidelines range, which was 46 months, and 37 months less than the government's recommended sentence for Ms. Gonzalez.

The sentences imposed in these cases, for conduct involving the exporting of materials needed to build weapons of mass destruction, assisting illegitimate and violent international regimes, and involving illegal transactions totaling millions of dollars, involved significant downward variances from the defendants' respective Guidelines ranges.  Given this, and given the disparity between Ms. Gonzalez's conduct and the conduct of these defendants, a sentence of time served is appropriate and justified.

> **2.**     **Recent Sentences Imposed Under U.S.S.G. § 2M5.1 Support a Downward Variance from the Government's Recommended Sentence of 51 Months**

As set forth above, defendants who have been sentenced under U.S.S.G. § 2M5.1 have received significant downward variances at sentencing.  A review of the following cases

demonstrates that a sentence of time served for Ms. Gonzalez would serve the purposes of the SRA and would not result in any unwarranted sentencing disparities.

- ***U.S. v. Sandra Elisa Sanchez,*** **Case Number 07-cr-20587 (S.D. Fla.)**

On March 17, 2009, Sandra Elisa Sanchez pleaded guilty to conspiring to violate the Kingpin Act, and the government agreed to dismiss the rest of the counts in the indictment after sentencing.  *See* Dkt. No. 62, at 1.  Sanchez married her co-defendant, Fernando Meliciades Zevallos Gonzales, on December 18, 2000.  *See* Dkt. No. 58, at 5.  Zevallos was known as "one of the most notorious and violent drug traffickers operating out of Peru."  *See* Dkt. No. 77, at 2. He flew cocaine from Peru to Colombia, operated an airline to continue the trafficking of cocaine, and later created an airline based in Peru.  *Id.* at 2.  In 1995, the government of Peru seized 3.3 tons of cocaine linked to Zevallos.  *Id.*

In 1999 and 2000, Zevallos incorporated two shell companies in Florida, La Hacienda (USA) LLC ("La Hacienda") and Running Brook, LLC ("Running Brook"), respectively.  *See* Dkt. No. 1, at 2-3.  Zevallos and Sanchez were members of La Hacienda, and each had 100% interest in the company.  *Id.* at 2.  Zevallos and Sanchez were also members of Running Brook. *Id.* at 3.  Both entities were created by Zevallos "to conceal and disguise the nature, location, source, ownership, and control of the proceeds of narcotics trafficking owned and controlled" by Zevallos.  *Id.* at 5.

On June 1, 2004, Zevallos was designated by OFAC as a significant foreign narcotics trafficker.  *Id.* at 1.  That same date, Sanchez requested the drafting of a deposit slip for two checks totaling $100,00 and written in co-defendant Zevallos's account for deposit into her bank account.  *See* Dkt. No. 62, at 7.  The next day, knowing about the OFAC designation, Sanchez

allowed the bank's processing of the deposit of Zevallos's money into her account.  *Id*.  Sanchez did not have the required OFAC license to engage in this financial transaction.  *Id*.

Moreover, as of September 2004, Sanchez was the new registered agent and manager of La Hacienda and signed the warranty deed transferring a property previously acquired by La Hacienda for $731,500.  *See* Dkt. No. 1, at 2-3, 6.  That same month, Sanchez became the new registered agent and manager of Running Brook.  *Id*.  On October 27, 2004, a property controlled by Zevallos was sold for approximately $850,000.  Around $1,408,402.99 of the proceeds from the two illegally sold properties were transferred to the shell companies' accounts in Peru.  *Id*. at 5.

Zevallos was convicted in 2005 in Peru, in connection with the 1995 seizure of 3.3 tons of cocaine by Peruvian authorities. *See* Dkt. No. 77, at 2.  In 2007, Sanchez was charged with one count of conspiring to violate the Kingpin Act, eight counts of violating the Kingpin Act, one count of money laundering conspiracy, and six counts of money laundering.  *See* Dkt. No. 1, at 15.  After pleading guilty to conspiring to violate the Kingpin Act, the government agreed to dismiss the remaining 15 counts.  *See* Dkt. No. 62, at 1.  The parties agreed that the applicable Sentencing Guideline was U.S.S.G. § 2S1.1(a)(2) for a base offense level 8, "plus the 8 levels under § 2B1.1(b)(1)(e), for a total Base Offense Level of 16."  *Id*. at 4.  After a three-level reduction for acceptance of responsibility, the total offense level was 13.  *Id*. at 3.  The resulting Sentencing Guideline range was 12 to 18 months.  *See* Dkt. No. 74, at 4.  On November 24, 2009, the district court sentenced Sanchez to three years of probation.  *See* Dkt. No. 93, at 2.

- ***U.S. v. Victor Mones Coro,* Case Number 19-cr-144 (S.D.N.Y.)**

On January 4, 2021, Victor Mones Coro pleaded guilty to five separate counts of violating criminal provisions of the Kingpin Act.  *See* Jan. 4, 2021 Minute Entry; Dkt. No. 200, at 42.  Coro's Florida-based company, American Charter Services ("ACS"), provided flights to former Venezuela's Vice President, Tareck Zaidan El Aissame and his front man, Samarck Jose Lopez Bello, and the President of Venezuela's Supreme Court, Maikel Moreno.  *See* Dkt. No. 200-1, at 3.  OFAC designated el Aissame and Lopez Bello in February 2017.  Moreno was designated in May 2017 and charged with money laundering offenses by the U.S. Attorney's Office in the Southern District of Florida in 2020.  *Id*. at 10.  In July and August 2017, Coro, through ACS, provided Moreno with more than $423,000 in flight services.  *Id*.  El Aissami and his associates benefited from more than $4 million in flights from Coro between March 2017 and March 2018. *Id*.

The charter services were provided in furtherance of Maduro's campaign for re-election. Nicolas Maduro, the President of Venezuela, was designated by OFAC as a "Specially Designated National," after illegally decreeing a national election "National Constituent Assembly to rewrite the constitution in an effort to sidestep Venezuela's newly resurgent legislature."  *Id*. at 11-12.  On July 30, 2017, the National Constituent Assembly was allegedly authorized, named Maduro's wife and son as its members, and "gave itself the power to pass legislation and veto National Assembly acts."  *Id*. at 12.  Despite all of this, Coro and ACS continued providing flight services to the designated individuals.

In furtherance of Venezuela's presidential elections, Coro arranged 20 to 25 flights to support Maduro's campaign."  *Id*. at 15.  Calls recorded under the direction of Homeland

Security Investigations ("HSI") agents demonstrated that Coro was aware of the illegality of his actions. *Id*. at 12. To conceal his actions, "[Coro] and his co-conspirators used code names, falsified flight manifests and invoices, communicated over encrypted messaging applications, received cash flown in from Venezuela, and accepted wire transfers from a front company tied to the sanctioned Venezuelan leaders." *Id*. at 4. The scheme involved multiple jurisdictions, millions of dollars' worth of flight services, and "the evasion of sanctions and aviation regulations." *Id*.

Coro's actions undermined the efforts of the United States and other nations to impose sanctions on Venezuela's political leaders and undemocratic institutions. Through AMC's flight services, Coro "likely enabled [members of Maduro's inner cycle] to alleviate the financial pressure of the international sanctions program." *Id*. at 37. For example, Coro provided El Aissami and Lopez Bello flight services to Russia, "Venezuela's chief economic benefactor in the wake of the increasing global isolation." *Id*.

In November 2019, Coro pled guilty to conspiring to evade the Kingpin Act and its regulations. *See* Dkt. No. 137, at 2. The parties stipulated to a sentence under U.S.S.G §2M5.1. *See* Dkt. No. 200-1, at 25. The USPO determined that Coro's base offense level was 26. *See* Dkt. No. 179, at 23. The USPO adopted a three-level reduction for acceptance of responsibility, and a four-level role enhancement because Coro acted as an "organizer or leader" pursuant to U.S.S.G. §3B1.1(a). *Id*. at 23. Considering Coro's criminal history Category I, his total offense level was 27, for a corresponding Guidelines range of 70 to 87 months imprisonment. *See* Dkt. No. 137, at 23. The applicable fine range for Coro's offense was $25,000 to $5,000,000. *See* Dkt. No. 200-1, at 33.

On October 30, 2020, with the government's consent, Coro withdrew his plea offer after the district court denied his motion seeking relief from the government's alleged *Brady*/*Giglio* violations.  *See* Dkt. No. 133.  On January 4, 2021, Coro pleaded guilty to all counts.  *See* Dkt. No. 137, at 2.  On March 17, 2021, Coro was sentenced to 55 months imprisonment, a supervised release term of 2 years, and a monetary fine of $250,000.  *See* Dkt. No. 133, at 1-4, 8.

- ***U.S. v. Behzad Pourghannad*, Case Number 13-cr-507 (S.D.N.Y.)**

On August 29, 2019, Behzad Pourghannad pleaded guilty to one count of violating IEEPA.  *See* Dkt. No. 24, at 1.  Pourghannad, an Iranian citizen, shipped thousands of kilograms of carbon fiber from the United States to Iran without first obtaining licenses from OFAC.  *See* Dkt. No. 21, at 3.  According to the government, Pourghannad knew "the carbon fiber was to be used in the production of nuclear centrifuge rotors and in nose cones for ballistic missiles," and it would accelerate Iran's weapons of mass destruction program.  *Id*. at 9.

Pursuant to U.S.S.G. § 2M5.1, Pourghannad's base offense level was 26.  *See* Dkt. No. 20, at 4.  Pourghannad received a three-level reduction for acceptance of responsibility, for an adjusted offense level of 23, and a recommended Guideline range of 46 to 57 months.  *Id*. at 5-6.

The USPO recommended a sentence of 50 months.  *See* Dkt. No. 21, at 19.  The government recommended a sentence between 46 and 57 months.  *Id*. at 3.  On November 13, 2019, the district court sentenced Pourghannad to a term of 20 months imprisonment.  *See* Dkt. No. 24, at 2.

- ***U.S. v. Mehmet Atilla*, Case Number 15-cr-00867 (S.D.N.Y.)**

Mehmet Atilla was a Turkish national with no connections to the United States.  *See* Dkt. No. 498, at 1.  Atilla was convicted for conspiracy to defraud the United States, conspiracy to

violate IEEPA and the Iranian Transactions and Sanctions Regulations ("ITSR"), bank fraud, conspiracy to commit bank fraud, and conspiracy to commit money laundering.  *Id.* at 7-8. Atilla, acting as the Deputy General Manager of a Turkish bank, conspired to transfer the proceeds of Iranian oil deposited in the Turkish bank to exchange houses and front companies controlled by one of the co-conspirators.  *See* Dkt. No. 293, at 14, 18.  The exchange houses and the front companies then bought gold on behalf of the Iranian government, for export from Turkey to Dubai, in violation of U.S. restrictions, to obtain currencies used to fund the Iranian government and individuals' activities.  *Id.* at 17-18.  Atilla designed a fraudulent scheme to complete these transfers and concealed them for the U.S. government by pretending the transfers were related to the sale of food and medicine to Iran from Dubai.  *Id.* at 23.  When confronted by the U.S. Department of Treasury, Atilla denied that the Turkish bank he managed knowingly evaded or avoided U.S. sanctions against Iran.  *Id.* at 28-29.  Atilla played a key role in undermining international efforts to dismantle Iran's nuclear operations.  *See* Dkt. No. 505, at 5.

On May 16, 2018, Atilla was sentenced to 32 months on five of the six counts against him, to be served concurrently.  *See* Dkt. No. 518, at 1, 3.

- *U.S. v. Ali Soofi*, **Case Number 16-cr-825 (S.D.N.Y)**

Ali Soofi pleaded guilty to a single count of conspiring to violate IEEPA.  For two years, Soofi, a Canadian-Iranian citizens, conspired to export military equipment directly and indirectly from the United States to Iran without the required OFAC license.  *See* Exh. 52 (Dec. 15, 2017 U.S. Department of Justice Press Release).  Soofi's Iranian clients included a high-ranking official in the Iranian Revolutionary Guard Corps, previously designated as a Specially Designated Global Terrorist, "for its activities in support of the Qods Force," which supports

terrorist groups "including Hezbollah, Hamas, and the Taliban."  *Id*.  Soofi shipped a variety of goods to Iran, including "helicopters, high-tech machine gun parts, tank parts, and military vehicles from the U.S."  *Id*.

According to his plea agreement, Soofi's Guideline range was 46 to 57 months imprisonment.  *See* Exh. 54 (Soofi Plea Agreement, at ¶ C).  On September 7, 2017, Soofi was sentenced to 32 months in prison and a one-year supervised release.  *See* Exh. 52.

- ***U.S. v. Ali Reza Parsa*, Case Number 14-cr-710 (S.D.N.Y.)**

Ali Reza Parsa, a Canadian Iranian dual citizen, pleaded guilty to conspiring to violate IEEPA and ITSR.  *See* Exh. 55 (May 23, 2015 U.S. Department of Justice Press Release).  Parsa owned Metal PM, a Canadian company, to place orders of high-tech electronic parts manufactured in the United States.  After placing the orders, Metal PM shipped the electronic components to Canada or to a freight forwarder in the United Arab Emirates ("U.A.E.") and transshipped the parts to Parsa's clients in Iran, without the required OFAC license.  *Id*.  Parsa misidentified the parts' end destination to U.S. tech companies to conceal the illegal procurement of cryogenic accelerometers, which have commercial and military uses, including applications to ballistic missile propellants aerospace components like liquid-fuel rocket engines.  *Id*.  While incarcerated, Parsa continued to violate IEEPA and ITSR by ordering parts from German and Brazilian companies for Iranian customers and instructing a relative to delete emails of his ongoing illegal transactions while in jail.  *Id*.

On May 20, 2016, Parsa was sentenced to 36 months imprisonment for repeatedly violating economic sanctions in place to protect the United States' national security interests.  *Id*.

- *U.S. v. Hamid Reza Hashemi*, **Case Number 12-cr-804 (S.D.N.Y.)**

In 2012, Hamid Reza Hashemi was charged with one count of conspiracy to violate IEEPA and two substantive IEEPA counts.  *See generally* Dkt. No. 2.  For five years, Hashemi and others arranged for the export of carbon fiber and other carbon fiber-related materials from the United States to Iran without first obtaining the required OFAC license.  *Id.* at 2-3, 10. Hashemi and other co-conspirators successfully arranged to import 1,102 pounds of carbon fiber and attempted to import an additional 5,952 pounds, which was seized by the United Kingdom. *See* Dkt. No. 22, at 20.

Hashemi pleaded guilty to the three charges in the indictment.  *Id.* at 19.  Hashemi was a dual citizen of Iran and the United States with no criminal history.  *Id.* at 8.  Pursuant to § 2M5.1(a)(1), Hashemi's base offense level was 26.  *Id.* at 9.  Three levels were subtracted for Hashemi's prompt acceptance of responsibility, resulting in an adjusted offense level of 23.  *Id.* at 8.  On November 15, 2013, after serving over 11 months in prison, Hashemi was sentenced to 46 months in prison and one year of supervised release.  *See* Dkt. No. 19, at 4; Dkt. No. 26, at 2-3.

- *U.S. v. Amir Abbas Tamimi*, **Case Number 12-cr-615 (S.D.N.Y.)**

On July 10, 2013, Amir Abbas Tamimi pleaded guilty to a single count of conspiracy to violate IEEPA.  *See* Dkt. No. 25, at 2.  Tamimi was an Iranian national who illegally attempted to export components of a Bell 26 helicopter, made in the United States, and known to have military applications, including "for reconnaissance, tactical insertion, and as a missile platform" from the United States to South Korea and subsequently to Iran.  *See* Dkt. No. 27, at 2-3. Neither Tamimi nor his co-conspirators sought or obtained the required OFAC license to ship to

Iran.  *Id*. at 2.  Tamimi was aware of the U.S. sanctions as he asked his co-conspirators to declare false information in the shipment paperwork "to disguise the [shipment's] true destination."  *Id*. at 4.

Tamimi had no criminal history in the United States.  *Id*. at 16.  Both parties agreed that U.S.S.G. § 2M5.2 was the applicable Sentencing Guideline but disagreed on which section governed.  *See* Dkt. 25, at 6.  Tamimi submitted that the proper offense level was 14 because the offense was limited to procuring the parts and not the actual exportation.  *Id*.  Both the USPO and the government proposed a base offense level of 26, according to § 2M5.1(a)(1).  *See* Dkt. No. 27, at 11.  Since Tamimi timely accepted responsibility, three levels were subtracted, resulting in an offense level 23.  *Id*. at 16.  On November 15, 2013, the district court sentenced Tamimi to 46 months imprisonment.  *See* Dkt. No. 32, at 2.

- *U.S. v. Seyed Amin Ghorashi Sarvestani*, **Case Number 13-cr-214 (S.D.N.Y.)**

On May 8, 2013, Sarvestani waived his right to an indictment and pleaded guilty to conspiracy to violate IEEPA.  *See* Dkt. No. 22, at 6.  Sarvestani, acting as the manager and part-owner of companies located in the U.A.E., engaged in purchasing thousands of dollars in "satellite technology and hardware" and other equipment from the United States and illegally transshipped the items to companies in Iran.  *Id*. at 4-5.  Sarvestani was aware of these purchases' illegality and instructed company officials to make false statements about the satellite parts' ultimate destination.  *Id*. at 5.

The USPO concluded that, under U.S.S.G. § 2M5.1(a)(1), the base offense level was 26.  *Id*. at 6.  Sarvestani's leadership role warranted a two-level increase, and three levels were deducted for his timely acceptance of responsibility, for an adjusted offense level of 25.  *Id*. at 6.

On August 14, 2013, the district court sentenced Sarvestani to 30 months imprisonment and a $100,000 fine.  *See* Dkt. No. 25, at 1-3.

- ***U.S. v. Saeed Talebi***, **Case Number 12-cr-295 (S.D.N.Y.)**

Pursuant to a plea agreement, on September 26, 2012, Talebi pleaded guilty to conspiracy to violate IEEPA.  *See* Dkt. No. 2, at 5.  For approximately three years, Talebi ordered more than $300,000 in industrial parts from at least four U.S. suppliers to be shipped to Iranian petrochemical companies.  *Id*. at 2-3.  Talebi engaged in these purchases knowing of the U.S. sanctions on exports to Iran.  *Id*. at 3-4.

The USPO and the parties agreed that, under § 2M5.1(a)(1)(B), a base offense level 26 applied.  *See* Dkt. No. 18, at 6.  Ultimately, the USPO calculated an adjusted offense level 23, based on Talebi's timely acceptance of responsibility and Criminal History Category of I, for a Guideline range of 46 to 51 months.  *Id*.  On May 29, 2013, Talebi was sentenced to 12 months and one day.  *See* Dkt.  No. 24, at 2.

- ***U.S. v. Mahmood Reza Banki***, **Case Number 10-cr-8 (S.D.N.Y.)**

Mahmood Reza Banki was convicted for conspiring to violate IEEPA and the Iranian Transaction Regulations ("ITR"), violating the unlicensed money transmitting statute, aiding and abetting to conspire to violate IEEPA and ITR and to violate the unlicensed money transmitting statute, and making false statements to OFAC.  *See* Dkt. No. 102, at 1-2.  Banki owned a U.S. bank account, where he received approximately $3.34 million in wire transfers from foreign companies and individuals, including Iranian expatriates living in the United States.  *See* Exh. Dkt. No. 1, at 6.  Banki then sent the funds to co-conspirators based in Iran who disbursed the corresponding amounts, minus the fees, to the intended recipients.  *Id*. at 7.  Banki benefited

from these transactions and purchased a $2.4 million condominium in Manhattan.  *Id*.  Banki conducted his money transmitting business without an OFAC license, did not have a money transmitting license as required by the state of New York, and was not registered as a money transmitting business with the U.S. Treasury Department.  *Id*. at 8.  Banki facilitated the transmission of millions of dollars to Iran, without any regulations, while strengthening the economy of a country that supports international terrorism.  *See* Dkt. No. 102, at 13.

The government submitted that the proper offense level was 28, and, since Banki had no criminal record, the corresponding Guideline sentencing range was 78 to 97 months imprisonment.  *Id*. at 1.  On August 16, 2010, the district court sentenced Banki to 30 months on each count, to be served concurrently, and supervised release for a term of 3 years on each count.  *See* Dkt. No. 104, at 1, 3.  On appeal, Banki's IEEPA and ITR convictions were vacated on grounds unrelated to the calculation of Banki's Guidelines range, and the district court imposed an amended sentence of zero months imprisonment.  *See* Dkt. No. 164, at 1.  In 2021, Banki received an Executive Grant of Clemency.  *See* Dkt No. 166.

- *U.S. v. Ahmad Sheikhzadeh*, **Case Number 15-cr-182 (E.D.N.Y.)**

Ahmad Sheikhzadeh pleaded guilty to engaging in financial transactions in violation of IEEPA and filing false tax return forms from 2009 to 2013.  *See* Dkt. No. 2, at 4-5.  Sheikhzadeh was a U.S. citizen who acted as a consultant to the Government of Iran's Permanent Mission to the United Nations, and provided money remitting services to two co-conspirators in the United States who wanted to make investments in Iran, without the required OFAC license.  *See* Dkt. No. 2, at 1.  As part of the scheme, Sheikhzadeh's co-conspirators provided funds to Sheikhzadeh, which he deposited in his U.S. Citibank account.  *See* Dkt. No. 2, at 1-2.

59

Afterwards, a co-conspirator in Iran disbursed the funds to individuals in Iran, corresponding to the deposits made into the Citibank account, from one or more Iranian bank accounts controlled by Sheikhzadeh. *See* Dkt. No. 2, at 1-2. The remitting proceeds were then transferred from Sheikhzadeh's Citibank account to his brokerage account with T.D. Ameritrade. *See* Dkt. No. 2, at 12. These financial transactions totaled approximately $187,000.00. *See* Dkt. No. 38, at 1.

Sheikhzadeh's falsification of his tax returns caused the United States to lose $51,959.00, and he was ordered to forfeit $85,000. *See* Dkt. No. 38, at 1. Sheikhzadeh submitted that his applicable offense level was 12, while the government and the USPO proposed an offense level 23, with a corresponding Guideline range of 46 to 57 months. *See* Dkt. No. 38, at 1. In February 2018, Sheikhzadeh was sentenced to 3 months on each count, to run concurrently, one year of supervised release with conditions, and a $10,000 fine. *See* Dkt. No. 41, at 2-3, 6.

- *U.S. v. Erdal Kuyumcu*, **Case Number 16-308 (E.D.N.Y.)**

On June 14, 2016, Erdal Kuyumcu pleaded guilty to one count of violating IEEPA. *See* Dkt. No. 50, at 1. Kuyumcu exchanged a series of emails with an agent of an Iranian company and the owner of a Turkish company about pricing for AMDRY 9954 (the "Cobalt Compound"), "a thermal spray powder composed primarily of cobalt and nickel," which can be used to coat gas turbine components like "turbine blades and shrouds and can be used in aerospace, missile production, and nuclear applications." *See* Dkt. No. 1, at 7. The Turkish company owner corresponded with Kuyumcu to obtain the Cobalt Compound from the United States. *See* Dkt. No. 1, at 7. An Ohio-based company agent emailed Kuyumcu about the availability of a different brand of cobalt powder and warned in its invoice that the materials were exported from

the United States "in accordance with the export administration regulations. Diversion contrary to U.S. law is prohibited." *See* Dkt. No. 1, at 9.

Kuyumcu concealed the Cobalt Compound's end destination from the Ohio Company and contacted the Ohio Company a second time with a request for the Cobalt Compound, at which time the company provided an invoice with the same restrictive statement about U.S. export regulations. *See* Dkt. No. 1, at 14. This second shipment misrepresented the Turkish company as the end-user of the Cobalt Compound. *See* Dkt. No. 1, at 14. Kuyumcu exported around 1,000 pounds of Cobalt Compound without the required OFAC license. *See* Dkt. No. 1, at 12, 14. Kuyumcu acted against the United States' security interests, as Cobalt Compound has been used to strengthen Iran's nuclear program. *See* Dkt. No. 50, at 11.

On September 7, 2017, Kuyumcu was sentenced to 57 months, three years of supervised release, and a $7,000 fine. *See* Dkt. No. 61, at 2-3, 6.

- ***U.S. v. Mahin Mojtahedzadeh***, **Case Number 19-cr-25 (N.D.N.Y.)**

On June 6, 2019, Mahin Mojtahedzadeh pleaded guilty to one count of conspiring to violate IEEPA and ITSR. *See generally* Dkt. No. 20. ITSR prohibits the export and re-export of turbine parts from the United States without obtaining an OFAC license. *See* Dkt. No. 1, at 3. Until 2017, Mojtahedzadeh was the President and/or Managing Director of ETCO-FZC ("ETCO"), an export company in the U.A.E. *See* Dkt. No. 20, at 2-3. ETCO supplied turbine parts for "power generation industries" to countries, including Iran, and profited from acquiring turbine parts from vendors, including U.S. vendors, and selling those parts in Iran. *See* Dkt. No. 20, at 3-4. Companies A and B, both located in the United States, sold parts "for installation and

use in gas and/or steam turbine engines" and had a business relationship with ETCO.  *See* Dkt. No. 20, at 4.

On behalf of Mojtahedzadeh and ETCO, Energy Republic, a German distributor for Company A, paid at least $2,859,000 to Company A on parts sent from the United States to Germany and shipped to one of ETCO's clients in Iran.  *See* Dkt. No. 20, at 4.  Mojtahedzadeh employed the same scheme with Industrial Parts Solutions ("I.P.S"), an export company based in Canada, ordered and paid at least $38,492.74 in turbine parts from Company B, and shipped the parts from Canada to ETCO's customers in Iran.  *See* Dkt. No. 20, at 8.  Mojtahedzadeh knowingly misidentified Iran as the shipment's destination to Company B.  *See* Dkt. No. 20, at 8. Neither Mojtahedzadeh, ETCO, the U.S.-based companies, I.P.S., nor Energy Republic, had the required OFAC license.  *See* Dkt. No. 20, at 5.

Mojtahedzadeh had no criminal history.  *See* Dkt. No. 31, at 4.  The parties agreed that under U.S.S.G. § 2M5.1(a), the applicable offense level was 26.  *See* Dkt. No. 31, at 4.  After a two-level reduction for acceptance of responsibility and a one-level reduction for cooperating with the authorities to investigate the misconduct, the total offense level was 23, for an applicable Guideline range of 46 to 57 months.  *See* Dkt. No. 20, at 9.  On January 30, 2020, after having been in custody since November 14, 2018, the district court sentenced Mojtahedzadeh to time served, and order her to pay a fine of $5,000.  *See* Dkt. No. 37, at 2-3.

- *U.S. v. Majid Ghorbani*, **Case Number 18-cr-255 (D.D.C.)**

On November 4, 2019, Majid Ghorbani pleaded guilty to one count of violating IEEPA. *See* Dkt. No. 110, at 1.  Ghorbani was born in Iran in 1959 and became a Lawful Permanent Resident of the United States in 2015.  *See* Dkt. No. 21, at 2.  In 2017, Ghorbani attended a

Mojahedin-e Khalq ("M.E.K.") rally in New York to collect photographs, names, and contact information of members of groups hostile to the Iranian regime, including M.E.K.  *See* Dkt. No. 109, at 3.  M.E.K. was created by individuals who oppose the Iranian revolutionaries who took control of the Iranian government after the revolution.  *See* Dkt. No. 110, at 5.  Iran has sought to eradicate M.E.K. and considered it an opponent of the regime.  *See* Dkt. No. 109, at 6.  Ghorbani listed the identity of the individuals he photographed and shared those photographs with his co-defendant, knowing that his co-defendant would share the photographs with individuals in Iran. *See* Dkt. No. 109, at 10.  In 2018, after visiting Iran, Ghorbani returned to the United States to collect more intelligence on M.E.K.-associated individuals.  *See* Dkt. No. 109, at 11.  Ghorbani did not apply for the required OFAC license "to supply services, directly or indirectly, to the government of Iran."  *See* Dkt. No. 109, at 13.  He was arrested in California on August 9, 2018. *See* Dkt. No. 109, at 12.  Ghorbani's actions allowed Iran's hostile regime to target individuals exercising constitutionally protected activities. *See* Dkt. No. 109, at 3.

Pursuant to U.S.S.G. § 2M5.1, Ghorbani's base offense level was 26.  *See* Dkt. No. 82, at 2.  The USPO and the government agreed to a three-level reduction for timely acceptance of responsibility, resulting in adjusted offense level 23, and a recommended Guidelines range of 46 to 57 months.  *See* Dkt. No. 82, at 2-3.  On January 15, 2020, Ghorbani was sentenced to 30 months imprisonment with credit for time served, and 36 months of supervised release.  *See* Dkt. No. 119, at 2-3.  The District Court granted a motion for compassionate release submitted by Ghorbani due to his exposure and vulnerability to COVID-19 at the detention facility, reducing his 30-month sentence to time served and location monitoring for 10 months.  *See* Dkt. No. 119, at 4-11; Dkt. No. 133.

- ***U.S. v. Behrooz Behroozian***, **Case Number 16-cr-185 (S.D. Ohio)**

October 24, 2019, the district court accepted Behrooz Behroozian's guilty plea to one count of violating IEEPA.  *See* Dkt. No. 43; Dkt. No. 34, at 1.  Behroozian was born in Iran in 1955 and entered the United States in 1976.  *See* Dkt. No. 34, at 3.  He was the owner and operator of Comtech Intl., L.L.C. ("Comtech"), a computer parts supplier in Ohio.  *See* Dkt. No. 34, at 3.  Comtech primarily exported equipment to Sumar, a U.A.E. company, even after OFAC designated Sumar for exporting American goods to Iran.  *See* Dkt. No. 34, at 3.  For twelve years, Behroozian illegally shipped through Comtech "American-made Swagelok manifolds, valves, and connectors to the Sumar Company," and then exported the goods from the U.A.E. to the Arman company in Iran.  *See* Dkt. No. 34, at 34.  As part of his illegal conduct, Behroozian submitted false Electronic Export Information, including mislabeling the shipments' value to portray a lesser amount.  *See* Dkt. No. 34, at 4.

The Arman company compensated Behroozian with U.S. dollars, and he also received $274,601 in "hawalas," an informal Middle Eastern value transfer.  *See* Dkt. No. 34, at 3.  These exports benefited the Iranian gas and petrochemical industry.  *See* Dkt. No. 34, at 7.

Behroozian had no criminal history, and the government and the USPO found a total offense level of 23, with a corresponding Guidelines range of 46 to 57 months.  *See* Dkt. No. 34, at 2.  The USPO recommended a sentence of 36 months and two years of supervised release.  *See* Dkt. No. 34, at 2.  Ultimately, on October 24, 2019, Behroozian was sentenced to 20 months imprisonment and a supervised release term of two years.  *See* Dkt. No. 41, at 2, 4.  Behroozian submitted a motion for Temporary Release to Home Detention Due to COVID-19, and later filed a supplemental motion requesting compassionate release.  *See* Dkt. No. 55, at 3.  The district

court denied the motion for temporary release but recommended a temporary period of home confinement due to the pandemic.  *See* Dkt. No. 55, at 5.

- ***U.S. v. Green Wave Telecommunications (Negar Ghodskani)***, **Case Number 15-cr-00329 (D. Minn.)**

On August 9, 2019, Negar Ghodskani pleaded guilty to conspiring to defraud the United States in violation of IEEPA and ITSR.  *See* Dkt. No. 102, at 1, 6.  For two years, Ghodskani communicated with two U.S. companies and inquired about the price and availability of controlled digital communications devices.   *See* Dkt. No. 102, at 1.   During these communications, Ghodskani represented herself as a Green Wave Telecommunication, Sdn Bhn ("Green Wave") employee.  *See* Dkt. No. 95, at 4.  Green Wave was based in Malaysia and acted as the front company for Fanavar Moj Khavar ("Fanar Moj"), an Iranian company, and Ghodskani's true employer.  *See* Dkt. No. 95, at 2.  Ghodskani and her co-defendants created Green Wave to engage in unlawful commercial transactions on behalf of Fanar Moj and avoid U.S. sanctions.  *See* Dkt. No. 95, at 2.  As part of the scheme, Ghodskani would represent Green Wave as the end-user for U.S.-made products and shipped goods first from the United States to Malaysia, and then to Iran.  *See* Dkt. No. 95, at 4.  One of Ghodskani's co-defendants facilitated the transfer of funds from Fana Moj to Green Wave's account in Malaysia, and the funds were then transferred from Malaysia to the U.S. sellers.  *See* Dkt. No. 95, at 4.  The volume of technology illegally shipped to Iran was substantial and benefited Iran's main television and broadcasting networks.  *See* Dkt. No. 102, at 9. At all times, Ghodskani understood the motive of the scheme was to evade U.S. sanctions against Iran.  *See* Dkt. No. 101, at 1.

The parties agreed that pursuant to U.S.S.G. § 2M5.1(a)(1), the base offense level was 26, and the government recommended a three-level reduction for acceptance of responsibility.

*See* Dkt. No. 95, at 8.  Because Ghodskani had no criminal history, the Guidelines range was 46 to 57 months imprisonment.  *See* Dkt. No. 95, at 8.  On September 24, 2019, after having been in custody for 31 months, Ghodskani was sentenced to time served, with no term of supervised release.  *See* Dkt. No. 104, at 2-3; Dkt. No. 101, at 2.

- *U.S. v. Resit Tavan*, **Case Number 17-cr- 122 (E.D. Wisc.)**

Resit Tavan was a Turkish citizen resident who pleaded guilty to one count of conspiracy to defraud the United States and commit an offense against the United States by smuggling, in violation of IEEPA.  *See* Dkt. No. 87, at 1, 13.  Tavan was the sole owner and President of Ramor Dis Ticaret, Ltd. ("Ramor"), a commercial supply business.  *See* Dkt. No. 73, at 13.  Ramor's primary customer was Qeshm Madkandalou Shipbuilding Cooperative of Iran ("Madkandalou"), an Iranian entity.  *See* Dkt. No. 73, at 23.  Madkandalou's business involved marine engineering and boat construction for Iran's military forces.  *See* Dkt. No. 73, at 24.

On behalf of Ramor, Tavan and his co-conspirators illegally ordered U.S.-made goods for use in the Iranian military from two U.S.-based companies, and shipped the goods from the United States through Turkey to evade U.S. sanctions against Iran.  *See* Dkt. No. 73, at 24-25.  Tavan and his co-conspirators inquired about obtaining two high-powered outboard engines manufactured in the United States.  *See* Dkt. No. 73, at 13, 18.  On behalf of Ramor, Tavan entered into a purchase agreement with the manufacturer's brokerage company and falsely declared to the U.S. Department of Commerce that the engines would be used in Turkey.  *See* Dkt. No. 73, at 4.  Tavan also signed a contract with Madkandalou to design and build a High-Speed Composite Boat ("RMS-16") for Iran's use.  *See* Dkt. No. 73, at 25-26.  Tavan knew the design for the RMS-16 provided clearance for Iran's missile system.  *See* Dkt. No. 73, at 25-26.

66

Neither Tavan, Ramor, nor Tavan's co-conspirators obtained an OFAC license authorizing exports for the United States to Iran.  *See* Dkt. No. 73, at 15.

Pursuant to U.S.S.G. § 2M5.1(a)(1), Tavan's base offense level was 26, and no upward or downward adjustments were warranted.  *See* Dkt. No. 73, at 4.  On August 29, 2019, the District Court sentenced Tavan to 28 months imprisonment, with credit for the 25 months he served in federal custody prior to his sentencing.  *See* Dkt. No. 87, at 2.

- *U.S. v. Mojtaba Biria*, **Case Number 18-cr-163 (N.D.N.Y.)**

On June 20, 2018, Mojtaba Biria, a German citizen, pleaded guilty to conspiring to violate IEEPA and U.S. sanctions against Iran.  *See* Dkt. No. 1, at 2, 4.  Biria was the Technical Managing Director for Energy Republic, a German company.  *See* Dkt. No. 1, at 4.  Energy Republic had an established business relationship with a U.S.-based company ("Company A") that exported gas turbine parts internationally.  *See* Dkt. No. 1, at 6.  During a visit to the United States, Biria admitted, to U.S. Custom Inspection, he knew about U.S. regulations but denied having any plans to meet with U.S. companies.  *See* Dkt. No. 1, at 8.  Biria and his co-conspirator met with a representative for Company A, made statements concerning their intent to circumvent U.S. sanctions to deliver the gas turbine parts to Iran, and agreed to pay $400,000 towards a $1 million order.  *See* Dkt. No. 1, at 13.  Ultimately, Energy Republic wired $399,970 to Company A's bank account in the United States.  *See* Dkt. No. 20, at 9-10.

Pursuant to U.S.S.G. § 2M5.1(a)(1), Biria's base offense level was 26.  *See* Dkt. No. 20, at 10.  A three-level reduction was recommended for Biria's acceptance of responsibility and cooperation with the prosecution, resulting in a total offense level of 23 and a corresponding Guidelines range of 46 to 57 months.  *See* Dkt. No. 20, at 10; Dkt. No. 33, at 1.  On August 14,

2019, after having been in custody for 21 months, Bria was sentenced to time served and ordered to pay a $5,000 fine.  *See* Dkt. No. 33, at 1; Dkt. No. 35, at 1-3.

- ***U.S. v. David Levick***, **Case Number 12-cr-52 (D.D.C.)**

On February 1, 2019, David Levick pleaded guilty to four counts of violating IEEPA and defrauding the United States.  *See* Dkt. No. 16, at 1, 12.  Levick was an Australian national and the general manager of I.C.M. Components ("I.C.M.") in Australia.  *See* Dkt. No. 1, at 2. I.C.M., acting on behalf of an Iranian person, obtained goods from the United States, including aircraft parts, without the required authorizations from OFAC.  *See* Dkt. No. 17, at 2.  The Iranian person worked for a company in Iran ("Iranian Company"), which controlled companies in Malaysia acting as intermediaries to ship U.S. goods.  *See* Dkt. No. 17, at 2.  Levick placed orders with U.S.-based companies, used a broker to conceal the end-user, arranged for the shipment of the goods from Malaysia to Iran, and structured the payments between his co-conspirators.  *See* Dkt. No. 17, at 4-5.

Levick acquired miniature vertical gyroscopes, used to "measure and control pitch and roll in helicopters, target drones, missiles, torpedoes, and remotely piloted vehicles," shock mounted light assemblies, used for helicopters and fixed-wing aircrafts, precision pressure transducers, sensor devices used to measure altitude, instrumentation, and record barometric pressure, series servo actuators, designed or aircraft use, and an emergency flotation system kit, designed for Bell 206 helicopters.  *See* Dkt. No. 1, at 6-7.  The total value of goods involved in Levick's illegal transactions was $199,227.41.  *See* Dkt. No. 17, at 4-5.

The parties agreed that U.S.S.G. § 2M5.1 applied, and the base offense level was 26.  *See* Dkt. No. 16, at 1.  A three-level reduction for acceptance of responsibility was applied, resulting

in an adjusted offense level of 23 and an estimated Guideline range of 46 to 57 months.  *See* Dkt.

No. 16, at 3-4.  On March 21, 2019, Levick was sentenced to 24 months, to run concurrently,

with credit for time served and a supervised release term of 12 months.  *See* Dkt. No. 26, at 1, 3-

4.

- *U.S. v. Arash Sepehri*, **Case Number 16-cr- 81 (D.D.C.)**

On November 7, 2018, Iranian citizen Arash Sepehri pleaded guilty to conspiring to

violate IEEPA and ITR.  *See* Dkt. No. 20, at 1.  Sepehri was the owner and managing director of

an Iranian company Tajhiz Sanat Shayan ("TSS"), which illegally transshipped goods to Iran.

*See* Dkt. No. 1, at 1.  In May 2011, the European Union listed TSS as an entity sanctioned for its

involvement in procuring components for the Iranian nuclear program.  *See* Dkt. No. 1, at 2.  As

part of the conspiracy, Sepehri used false names to contact companies in the United States, made

false statements about the use of the goods and the shipments' destinations, and had the goods

delivered to Hong Kong or distributed by a company in the U.A.E., where a co-conspirator

shipped the goods to Iran.  *See* Dkt. No. 1, at 8-9.

In 2010, Sepehri, using an alias, shipped U.S.-manufactured electronic equipment to

Hong Kong and then to Iran.  *See* Dkt. No. 1, at 2, 10.  In 2011, Sepehri, using an alias, shipped a

side scan system to Iran, which required an export license.  *See* Dkt. No. 1, at 11.  A side scan

system is "a small portable scan sonar system that was suitable for towing by small watercraft,

provided high resolution images, and has possible military application."  *See* Dkt. No. 1, at 11.

Sepehri also shipped a U.S.-manufactured underwater acoustic transducer valued at $2,447 to

Hong Kong and then to Iran.  *See* Dkt. No. 1, at 12.  The transducer was designed for military

and scientific use in underwater environments.  *See* Dkt. No. 1, at 12.  Sepehri also obtained or

attempted to obtain other equipment, including "night vision materials, satellite thrusters and control systems, satellite remote-imaging technology, radar, GPS materials, underground testing technology, advanced industrial camera technology (with military application), radio technology, and a sonar." *See* Dkt. No. 30, at 3. Sepehri's illegal transactions totaled more than $10 million and violated U.S. and International laws prohibiting personal profit and support of Iranian end-users. *See* Dkt. No. 30, at 3-4.

Under U.S.S.G. § 2M5.1(a)(1), Sepehri's base offense level was 26. *See* Dkt. No. 20, at 3. A three-level reduction was applied for timely acceptance of responsibility and assisting the government, resulting in an adjusted offense level of 23, and a Guidelines range of 46 to 57 months. *See* Dkt. No. 20, at 3-4. On February 26, 2019, the district court sentenced Sepehri to 25 months imprisonment with credit for time served since June 23, 2017, and a money judgment of $125,661. *See* Dkt. No. 40, at 1-2, 7.

- ***U.S. v. Arzu Sagsoz*, Case Number 16-cr-179 (D.D.C.)**

On November 4, 2018, Turkish citizen Arzu Sagsoz entered a guilty plea for conspiring to violate IEEPA. *See* Dkt. No. 32, at 2. Mahan Air was a private Iranian passenger airline listed in the Specially Designated Nationals ("SDN") list "for providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"). *See* Dkt. No. 32, at 2. Sagsoz acted as an agent for purchasing logistics for Kral Havacilik Ic Dis Ticaret Sirketu ("Kral Aviation"), a Turkish company that brokered aircraft parts and related materials on behalf of foreign customers. *See* Dkt. No. 1, at 2. Kral Aviation and Mahan Air were interested in purchasing a commercial craft engine made in the United States and sold by a U.S. company. *See* Dkt. No. 32, at 4.

Sagsoz was responsible for purchasing the commercial aircraft engine valued at $810,000, and other goods from a U.S. company, notwithstanding his knowledge that such conduct was unlawful.  *See* Dkt. No. 32, at 7.  Sagsoz intentionally listed the commercial aircraft engine's buyer as an aviation company in Turkey to avoid U.S. sanctions and to conceal that the aircraft engine was destined for Iran.  *See* Dkt. No. 32, at 4.

The USPO concluded Sagsoz had criminal history Category I, and the parties agreed to a base offense level of 26 under U.S.S.G. § 2M5.1.  *See* Dkt. No. 32, at 6.  The government agreed to a three-level reduction for acceptance of responsibility and an additional three-level reduction for Sagsoz's role in the offense, for a total offense level 20 and a Guidelines range of 33 to 41 months. *See* Dkt. No. 32, at 6-7.  Sagsoz spent nine months detained in the country of Georgia and almost seven months in the United States prior to sentencing.  *See* Dkt. No. 33, at 1, 4.  On January 10, 2019, Sagsoz was sentenced to 20 months, with credit for time served, including her detention in the country of Georgia before her extradition to the United States and one year of supervised release.  *See* Dkt. No. 35, at 3-4.

- *U.S. v. Ghobad Ghasempour*, **Case Number 18-cr- 80 (W.D. Wash.)**

On April 19, 2018, Ghobad Ghasempour plead guilty to conspiring to export U.S. goods and technology to Iran unlawfully and to defraud the United States.  *See* Dkt. No. 33, at 1. Ghasempour, an Iranian-Canadian national, established various Chinese front companies to facilitate the sales of U.S. goods to Iran by diverting these goods through Portuguese and Turkish companies and concealing the end-user.  *See* Dkt. No. 24, at 5-6.  Ghasempour helped to export, "or attempt[ed] to export, to Iran in violation of U.S. export control laws," a thin film measurement system for $93,000, an inertial guidance system test for 550,040 Euros, and

thermal imaging cameras for more than $466,000, among other equipment.  *See* Dkt. No. 33, at 2.  These technologies were all manufactured in the United States and had commercial and military uses.  *See* Dkt. No. 33, at 2.  Ghasempour knew facilitating the exportation of U.S. goods to Iran without a license was illegal, but he considered the profit outweighed the risks. *See* Dkt. No. 33, at 5.

Ghasempour had no previous criminal convictions and was a criminal history category I. *See* Dkt. No. 33, at 4.  It was undisputed that under U.S.S.G. § 2M5.1, Ghasempur's base offense level was 26, which was reduced by three levels for acceptance of responsibility, resulting in an adjusted offense level of 23 and Guidelines range of 46 to 57 months.  *See* Dkt. No. 24, at 11. On August 11, 2018, Ghasempour was sentenced to 42 months imprisonment and a supervised release for a term of three years.  *See* Dkt. No. 39, at 1-3.

- *U.S. v. Olaf Tepper*, **Case Number 18-cr-75 (W.D. Wash.)**

On March 16, 2018, Olaf Tepper pleaded guilty to conspiring to violate IEEPA and ITSR.  *See* Dkt. No 29, at 1.  Tepper was a German citizen and the founder of Energy Republic, a longtime customer of a company in New York that internationally exported gas turbine parts commonly used in power plants.  *See* Dkt. 1, at 6.  For several months, Tepper communicated with an agent of the New York company to acquire turbine parts from the United States and re-export the parts to Iran.  *See* Dkt. No. 1, at 6-7.  Tepper traveled to the United States to meet with the New York company's agent and discussed a $1 million deal.  *See* Dkt. No 1, at 7-8.  Upon entry to the United States, federal agents asked Tepper about the purpose of his visit and whether he was aware of the U.S.'s export regulations and restrictions on Iran.  *See* Dkt. No. 1, at 8. Tepper stated he was not conducting any business in the United States and stated he was aware

of the U.S. sanctions.  *See* Dkt. No. 1, at 8.  At various times during the meeting with the New York company's agent, Tepper and his co-conspirator were warned about U.S. sanctions on exporting goods to Iran.  *See* Dkt. No. 1, at 9.  Notwithstanding, Tepper and others conspired to obtain $1 million in turbine parts from the United States through Energy Republic and re-export the parts to Iran.  *See* Dkt. No 29, at 1.

Tepper had no prior criminal history, and total offense level 25, for a recommended Guidelines range of 57 to 71 months.  *See* Dkt. No 29, at 3.  The total offense level included a two-level enhancement since Tepper organized, led, managed, or supervised the total offense, and then a 3-level downward adjustment for acceptance of responsibility.  *See* Dkt. No 29, at 3. Tepper owned Energy Republic and was involved in acquiring turbine parts and delivering them to Iran for almost a decade.  *See* Dkt. No 29, at 3.

On April 3, 2018, Tepper was sentenced to 24 months imprisonment and was ordered to pay a $5,000 fine.  *See* Dkt. No. 31, at 1.

- *U.S. v. Green Wave Telecommunication (Alireza Jalali)*, **Case Number 15-cr-329 (D. Minn.)**

On November 29, 2017, Alireza Jalali pleaded guilty to conspiring to defraud the United States.  *See* Dkt. No. 68, at 1.  Jalali was an employee of Green Wave, a telecommunications company in Malaysia that acted as a front company for Iranian company Fana Moj to acquire "export controlled technology" from the United States and illegally export it to Iran.  *See* Dkt. No. 68, at 2.  Jalali facilitated the receipt of funds from Fana Moj to Green Wave's bank account in Malaysia, and then wired the funds to the company selling the export controlled technology. *See* Dkt. No. 68, at 4.  Once the export-controlled technology was shipped from the United States to Malaysia, Jalali repackaged the items for export to Iran and altered the invoices by

misidentifying the items' true value to avoid full custom duties.  *See* Dkt. No. 68, at 4.  In 2011, Jalali concealed, from a U.S. Department of Commerce representative, that the majority of Green Wave's business involved shipping to Iran.  *See* Dkt. No. 68, at 5.  Jalali was aware that exporting U.S. goods without an OFAC license was illegal, but he continued working for Green Wave.  *See* Dkt. No. 68, at 5.  Jalali's actions were instrumental in Fana Moj's acquisition of U.S.-manufactured goods.  *See* Dkt. No. 68, at 8.

The parties agreed that under U.S.S.G. § 2M5.1(a)(1), the base offense level was 26.  *See* Dkt. No 67, at 3.  After a three-level reduction for acceptance of responsibility and a two-level decrease for Jalali's minor role in the offense, the adjusted offense level was 21.  *See* Dkt. No 67, at 3.  At the time of sentencing, Jalali had served approximately 10 months in prison.  *See* Dkt. No 67, at 1.  On March 20, 2018, Jalali was sentenced to 15 months imprisonment.  *See* Dkt. No 77, at 1-2.

- *U.S. v. Joao Manuel Pereira De Fonseca*, **Case Number 16-cr-89 (D.D.C.)**

On July 15, 2017, Joao Manuel Pereira De Fonseca, a Portuguese citizen, pleaded guilty to one count of conspiring to unlawfully export goods, technology, and services to Iran without the required OFAC license, and to defraud the United States.  *See* Dkt. No. 56, at 1.  Fonseca was a contractor for a Portuguese company whose owner purchased precision lens equipment for a co-conspirator in Iran and sent Fonseca to the United States to receive training on installing and using the precision lens equipment.  *See* Dkt. No. 56, at 1-2.  The exportation of precision lens equipment to Iran is controlled for national security and anti-terrorism reasons, because of its military applications.  *See* Dkt. No. 6, at 2.  While in the United States, Fonseca signed an end-user agreement falsely stating that the equipment would be installed and used in Portugal, "and it

would not be re-sold to any end user in Iran." *See* Dkt. No. 56, at 2.  Through his training in the United States, Fonseca was aware that the Portuguese company planned to deliver the equipment to the Iranian company.  *See* Dkt. No. 56, at 2.

The parties agreed that U.S.S.G. § 2M5.1(a)(a) applied, and therefore, a base offense level of 26 was appropriate.  *See* Dkt. No. 52, at 3.  After a two-level reduction for acceptance of responsibility, considering that Fonseca had no criminal history, the adjusted offense level was 24, resulting in an estimated Guidelines range of 51 to 63 months.  *See* Dkt. No. 52, at 4.  On September 14, 2017, Fonseca was sentenced to 20 months imprisonment and 12 months of supervised release.  *See* Dkt. No. 69, at 1-3.

- *U.S. v. Erdal Akova*, **Case Number 12-cr-220 (N.D. Ga.)**

On March 8, 2017, Turkish national Erdal Akova pleaded guilty to two counts of conspiring to export military grade epoxy to Iran without the required OFAC license, in violation of IEEPA.  *See* Exh. 53 (2018 U.S. Department of Commerce Report on Foreign Policy-Based Export Controls); Dkt. No. 47 at 1.  Akova was a 50% owner of Esa Kimya Metal San Ve Tic Ltd. ("Esa Kimya"), which manufactured composite parts and profiles from fiber composites. *See* Dkt. No. 1, at 3.  For several years, Esa Kimya allowed Utia Chem Company ("Utiachem") to use Esa Kimya's name on invoices as the buyer of epoxy from the United States to be delivered to Iran.  *See* Dkt. No. 1, at 3.  Utiachem supplied an epoxy, commonly requested by companies owned or controlled by the Iranian government, to repair helicopters acquired before the Iranian Islamic Revolution, among other composite and reinforcement materials.  *See* Dkt. No. 1, at 1-2.  One of Utiachem's customers was owned and controlled by Iran's Ministry of Defense and Arms Forces Logistics ("MODAFL").  In 2007, MODAFL was designated by the

United States as a "Weapons of Mass Destruction proliferator or supporter" because "it engaged, or attempted to engage, in activities or transactions that have materially contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass destruction or their means to delivery." *See* Dkt. No. 1, at 2-3.

On March 8, 2017, Akova was sentenced to 36 months on each count, to run concurrently, with credit for the eight months Akova had served prior to his sentencing. *See* Dkt. No. 49, at 1-2.

- *U.S. v. Mansour Moghtaderi Zadeh*, **Case Number 10-cr-309 (D.D.C.)**

On October 27, 2016, Iranian citizen Mansour Moghtaderi Zadeh, pleaded guilty to conspiring to unlawfully export U.S. goods to Iran to defraud the United States. *See* Dkt. No. 18, at 1. For almost three years, Zadeh, using companies he owned, "conspired with employees of an aircraft part supplier in the Netherlands to export U.S.-origin goods to Iran." *See* Dkt. No. 1, at 1. The Netherlands co-conspirator paid Zadeh's companies a 10% commission for these shipments. *See* Dkt. No. 1, at 9-10. Iranian clients, including the Islamic Republic of Iran's Air Force, procured fiber optic video transmitters, receivers and aviation course indicators using Zadeh's company. *See* Dkt. No. 1, at 9-10.

Zadeh used an alias to mislead the U.S. Department of Commerce to release a shipment of aerospace metal rods, but his actions resulted in a Temporary Denial Order ("TDO") against Zadeh in his alias' name. *See* Dkt. No. 18, at 2. Zadeh ignored the TDO and created another company to continue his illegal exports of goods from the United States to Iran. *See* Dkt. No. 18, at 2. Zadeh ultimately illegally exported $69,159 in goods to Iran. *See* Dkt. No. 18, at 1.

76

Pursuant to U.S.S.G. § 2M5.1(a)(1), Zadeh's base offense level was 26, and after a three-level reduction for acceptance of responsibility and timely notice of his intention to enter a plea, the adjusted offense level was 23.  *See* Dkt. No. 11, at 3.  Considering Zadeh had no criminal history, his Guidelines range was 46 to 57 months.  *See* Dkt. No. 11, at 4.  On December 14, 2016, Zadeh was sentenced to 18 months imprisonment with credit for time served, 12 months of supervised release, and forfeiture of $69,159. *See* Dkt. No. 29, at 1-3, 7; ExhDkt. No. 11, at 9.

- ***U.S. v. Shantia Hassanshahi***, **Case Number 13-cr-274 (D.D.C.)**

On September 14, 2016, Shantia Hassanshahi, a dual citizen of Iran and the United States, pleaded guilty to conspiring to unlawfully export goods, technology, and services to Iran without the required license from OFAC, and to defrauding the United States in violation of IEEPA and ITSR.  *See* Dkt. No. 132, at 1.  Hassanshahi was the founder, president, and the only employee of a U.S.-based company called Hasston.  *See* Dkt. No. 132, at 1-2.  Through Hasston, Hassanshahi and other co-conspirators purchased protection relays from a Canadian company to ship to Iran, in violation of U.S. export laws.  *See* Dkt. No. 132, at 2.  The purchase orders concealed Iran as the true end-user, and instead falsely listed Armenia or Iraq as the end destination.  *See* Dkt. No. 132, at 2.  Hassanshahi engaged in these illegal shipments for nearly four years.  *See* Dkt. No. 132, at 3-4.

According to U.S.S.G. § 2M5.1(a)(1), Hassanshahi's base offense level was 26.  *See* Dkt. No. 126, at 3.  Hassanshahi had no prior criminal history.  *See* Dkt. No. 126, at 3.  After a three-level reduction for acceptance of responsibility and for providing timely notice of his intention to plead guilty, Hassanshahi's adjusted offense level was 23, for an estimated Guidelines range of 46 to 57 months.  *See* Dkt. No. 126, at 3-4.  The government recommended a sentence of 36

months.  *See* Dkt. No. 132, at 1.  On December 12, 2016, Hassanshahi was sentenced to 12 months and one day in prison, a supervised release term of one year, and 100 hours of community service.  See Dkt. No. 139, at 1-3, 5.

- *U.S. v. Sihai Cheng*, **Case Number 13-cr-10332 (D. Mass.)**

Sihai Cheng was a citizen of the People's Republic of China ("PRC") who pleaded guilty to "two counts of conspiring to commit export violations and smuggle goods from the United States to Iran, and four counts of illegally exporting U.S. manufactured pressure transducers to Iran."  *See* Exh. 56 (Jan. 27, 2016 U.S. Department of Justice Press Release).  For approximately eight years, Cheng used his PRC-based companies to supply parts, including U.S.-manufactured parts, to an Iranian company for use in Iran's "nuclear and ballistic missile activities."  *See* Dkt. No. 83, at 7.  The Iranian company acted as an agent of Kalaye Electric Company ("Kalaye"). *See* Dkt. No. 83, at 7.  The U.S. Department of Treasury designated Kalaye as a proliferator of Weapons of Mass Destruction for supporting Iran's nuclear centrifuge program.  *See* Dkt. No. 83, at 8.

For three years, Cheng supplied Kalaye with 1,185 U.S.-manufactured pressure transducers.  *See* Dkt. No. 83, at 1.  Pressure transducers "can be used in gas centrifuges to convert natural uranium into a form that can be used for nuclear weapons."  *See* Dkt. No. 83, at 8-9.  Cheng received over $1.8 million for the pressure transducers.  *See* Dkt. No. 83, at 8. Cheng and his co-conspirators did not have the required OFAC license to export these goods to Iran.  *See* Dkt. No. 83, at 9.  Instead, Cheng supplied these goods to Iran, knowing they would be used for nuclear purposes, invoked the threat of a third world war, and understood he played an integral role in supplying Iran with the material needed to expand its nuclear program.

Under U.S.S.G. § 2M5.1, Cheng's base offense level was 26.  *See* Dkt. No. 83, at 21. The government requested a sentence of 15 years and recommended an upward adjustment of four levels for Cheng's aggravating role in the offense, a 12-level terrorism enhancement, and criminal history category VI.  *See* Dkt. No. 83, at 5, 21-22.  On January 27, 2016, the district court sentenced Cheng to 9 years in prison.  *See* Dkt. No. 91, at 1-2.

- *U.S. v. Modir Trading (Ali Mohammadi)*, **Case Number 12-cr-591 (N.D. Ill.)**

Ali Mohammadi was an Iranian-American who owned Modir Trading, a company registered in California.  *See* Dkt. No. 1, at 2.   On February 26, 2015, Mohammadi pleaded guilty to violating IEEPA.  *See* Dkt. No. 89, at 3.  On behalf of Modir Trading, Mohammadi purchased rate integrating gyroscopes, which have military applications, from undercover Company A ("UC").  *See* Dkt. No. 1, at 3.  Mohammadi falsely stated that the equipment would be used in California.  *See* Dkt. No. 1, at 5.  Mohammadi and his co-conspirators knew that they needed a license to export the gyroscopes but concealed and misrepresented the products' final destination.  *See* Dkt. No. 1, at 7-8.  Ultimately, the federal government intervened, and Mohammadi could not ship the gyroscopes to Iran.  *See* Dkt. No. 89, at 5.  Had law enforcement not stopped Mohammadi, he would have provided the gyroscopes to Iran, "threatening [the] national security, foreign policy, and economy of the United States."  *See* Dkt. No. 100, at 5.

Mohammadi's total offense level was 25, his criminal history category was I, and the applicable Guidelines range was 57 to 71 months imprisonment.  *See* Dkt. No. 100, at 5. Mohammadi requested a term of five years of probation.  *See* Dkt. No. 100, at 1.  On August 25, 2015, Mohammadi was sentenced to a five-year probation term and a $2,000 fine.  *See* Dkt. No. 104, at 3, 5.

- *U.S. v. Ali Saboonchi,* **Case Number 13-cr-100 (D. Md.)**

Ali Saboonchi was a U.S. citizen and the creator and operator of ACE Electric Company, which was based in California. *See* Dkt. No. 1, at 1. In 2015, Saboonchi was convicted of conspiring to export to an embargoed country and unlawfully exporting to an embargoed country in violation of ITSR. *See* Dkt. No 262, at 1. As part of his scheme, Saboonchi caused U.S. companies to deliver goods regulated by U.S. export laws to an address in Maryland. *See* Dkt. No 1, at 6, 7-9. Saboonchi then shipped the goods to the U.A.E, where his co-conspirator arranged for shipment and delivery of the goods to Iran. *See* Dkt. No 1, at 6, 7-9. At least three times, Saboonchi caused U.S. companies to directly ship restricted goods to the U.A.E, Turkey, or China, knowing that the final destination was Iran. *See* Dkt. No. 1, at 6, 7-9.

For more than two years, Saboonchi's actions contributed to the illegal exportation from the United States to Iran of equipment that had "industrial applications in the chemical and petrochemical field," while others could be used in "water plants, hydrocarbon plants, and nuclear plants." *See* Dkt. No. 1, at 6-7. A co-conspirator paid Saboonchi "for the goods and associated shipping and other costs by wire transfers and other deposits" to Saboonchi and his wife's bank account. *See* Dkt. No. 1, at 5. On February 2, 2015, Saboonchi was sentenced to 24 months imprisonment and a one-year term of supervised release. *See* Dkt. No. 262, at 1-3. On January 15, 2016, Saboonchi's sentence was commuted. *See* Dkt. No. 296, at 2.

- *U.S. v. John Alexander Talley,* **Case Number 13-cr-28 (M.D. Fla.)**

On August 27, 2013, John Alexander Talley pleaded guilty to conspiring to violate IEEPA and ITR. *See* Dkt. No. 84, at 1, 21. "Talley was a computer engineer who provided maintenance services on commercial-grade computers and related equipment" to customers in

Iran, through his business Tallyho Peripherals, Inc. d/b/a Enterprise Solution System ("Tallyho"). *See* Dkt. No. 84, at 3. Talley conspired with an individual who unlawfully sold commercial-grade computers, equipment, and services to Iran, through a co-conspirator in the U.A.E, without the required OFAC license. *See* Dkt. No. 84, at 2, 10. Talley's job was to implement a storage platform, which had military defense applications, and train Iranian users to ensure the equipment's productivity. *See* Dkt. No. 84, at 2, 11.

Federal agents requested Talley's cooperation to investigate Talley's co-conspirators' illegal export of technology from the United States to Iran. *See* Dkt. No. 77, at 16. During his "cooperation," Talley revealed the government's investigation to his co-conspirators. *See* Dkt. No. 77, at 17. Talley received compensation for his illegal exports, and his actions contributed to providing Iranian individuals with $1,221,928.39 in equipment, parts, and services that could be used for Iran's defense programs. *See* Dkt. No. 77, at 2, 9, 11, 16-17.

Under § 2M5.1(a)(1)(a), the USPO applied a base offense level of 26. *See* Dkt. No. 125, at 12. Talley, however, received a two-level downward adjustment for being a minor participant in the offense, reducing his offense level from 26 to 24, and reducing his Guidelines range to 37 to 46 months. *See* Dkt. No. 129, at 15. The government proposed a two-level downward departure for Talley's substantial assistance. *See* Dkt. No. 128, at 1. He then received a one-level adjustment for acceptance of responsibility. *See* Dkt. No. 130, at 1. Although the downward level adjustments reduced Talley's offense level to 21, Talley received a two-level enhancement for obstruction of justice, bringing his final offense level to 23, and a Guideline range of 45 to 57 months. *See* Dkt. No. 125, at 8; Dkt. No. 135, at 2. On April 30, 2014, Talley

was sentenced to 30 months in prison and a three-year term of supervised release.  *See* Dkt. No. 136, at 1-3.

- ***U.S. v. Mark Mason Alexander,* Case Number 11-cr-36 (N.D. Ga.)**

Mark Mason Alexander was charged with one count of conspiracy to violate IEEPA and ITR.  *See* Dkt. No. 140, at 3-5.  Alexander was the Chief Executive Officer and part-owner of Hydrajet Technology, LLC ("Hydrajet Technology"), a U.S.-based company that manufactured waterjet cutting systems.  *See* Dkt. No. 140, at 3-5.  Water cutting machines "were used for the precision cutting of materials to include aluminum, glass, granite, and steel."  *See* Dkt. No. 140, at 2.  Alexander authorized the shipment of waterjet cutting systems, which retailed for $120,000 to $180,000, to Iran via the U.A.E, using a Middle Eastern distribution company.  *See* Dkt. No. 140, at 2.  Alexander did not obtain the required OFAC license for these shipments to Iran.  *See* Dkt. No. 140, at 7.

The USPO calculated Alexander's "total offense level at level 26, with a criminal history category of I, resulting in a guideline sentencing range of 63-78 months."  *See* Dkt. No. 178, at 1. On January 6, 2014, Alexander was sentenced to 18 months imprisonment and a three-year supervised release term.  *See* Dkt. No. 180, at 2-4.

- ***U.S. v. Nader Modanlo,* Case Number 10-cr-295 (D. Md.)**

Nader Modanlo, born in Iran and a naturalized U.S. citizen, was convicted of conspiring to provide satellite-related services to Iran, violating IEEPA, violating the Iran Trade Embargo, money laundering, and obstruction of bankruptcy proceedings.  *See generally* Dkt. No. 254. Modanlo was the principal owner, president, and served as Chairman of Final Analysis, Inc. ("FAI"), a U.S.-based company that worked with its subsidiary, Final Analysis Communication

Services ("FACS"), "to construct, launch and operate a constellation of low earth orbit satellites for global wireless communications."  *See* Dkt. No. 254, at 2.  After FAI's voluntary bankruptcy in 2001, Modanlo established and served as Chairman of New York Satellite Industries, LLC ("NYSI").  *See* Dkt. No. 254, at 2.  Working through Polyot, a Russian government-owned corporation, Modanlo agreed with Iranian officials "for the design, development, assembly, integration, test, and launch" of a low-orbiting spacecraft.  *See* Dkt. No. 254, at 7.  Modanlo and his Iranian co-conspirators then formed a Swiss front company to conceal their illegal transactions, evading the United States' embargo laws, and transferring at least $10 million to Modanlo and NYSI.  *See* Dkt. No. 254, at 7-8.  Mondalo's illegal actions assisted the Iranian government's launch of an earth observation satellite, equipped with a Russian camera system. *See* Dkt. No. 254, at 7-8, 18.  Modanlo and his co-conspirators also concealed information about the Swiss front company and its transfer of funds to NYSI's U.S. bank accounts during Mondalo and NYSI's federal bankruptcy proceedings.

Both the government and the USPO advocated for a base offense level of 26, pursuant to § 2M5.1(a)(1)(B).  *See* Dkt. No. 495, at 8.  In addition, the government and the USPO advocated for a four-level enhancement for Mondalo's leadership role, a two-level enhancement for obstruction of justice, and an additional two-level enhancement for sophisticated money laundering, resulting in a total offense level of 34 and a Guideline range of 151 to 188 months. *See* Dkt. No. 495, at 11-12.  The District Court sentenced Modanlo to 60 months on Count 1, and 96 months as to the remaining counts, all counts running concurrently to Count 1, and a three-year term of supervised release.  *See* Dkt. No. 503, at 1, 4-5.  Modanlo was also ordered to forfeit $10 million.  *See* Dkt. No. 498, at 1.

- ***U.S. v. Omidreza Khademi,* Case Number 12-cr-278 (D.D.C.)**

On May 28, 2013, Omidreza Khademi pleaded guilty to conspiring to violate IEEPA and ITR. *See* Dkt. No. 15, at 1, 10. Khademi was an Iranian citizen living in the U.A.E, and was the owner and managing director of Omid General Trading Company, LLC ("Omid Trading"). Khademi arranged shipments from the United States to Iran without obtaining the required OFAC license. *See* Dkt. No. 28, at 2-3. To provide these shipments to his Iranian co-conspirators, Khademi used an intermediary company in Hong Kong to ship the equipment to Iran, concealing the true end user from the United States. *See* Dkt. No. 3, at 8. Khademi's Iranian clients were subject to international sanctions because of their role in Iran's nuclear weapons program. *See* Dkt. No. 28, at 3.

Through his actions and the actions of Omid General Trading Company, "Khademi transshipped a PCI Analog Board, Breakout board, Cables, 21 laptop computers, a side-scan sonar system, and an underwater acoustic transducer to Iran in violation of U.S. export law." *See* Dkt. No. 28, at 3. Some of the equipment Khademi exported were manufactured specifically for military, not commercial, use. *See* Dkt. No. 28, at 3. The value of the combined shipments was approximately $146,000. *See* Dkt. No. 28, at 3. Khademi's activities endangered the United States' security and foreign policy. *See* Dkt. No. 28, at 1.

Pursuant to U.S.S.G. § 2M5.1(a)(1), Khademi's base offense level was 26. *See* Dkt. No. 15, at 3. The government agreed to a three-level reduction for acceptance of responsibility and a two-level reduction for Khademi's minor role in the offense, resulting in an adjusted offense level of 21 and a corresponding Guideline range of 37 to 46 months. *See* Dkt. No. 15, at 3-4. Khademi also agreed to a forfeiture of $4,400. *See* Dkt. No. 15, at 4. On September 16, 2013,

Khademi was sentenced to 29 months imprisonment, with credit for time served.  *See* Dkt. No. 37, at 1-2.

- ***U.S. v. Mostafa Saberi Tehrani,*** **Case Number 12-cr-260 (E.D. Wisc.)**

On June 10, 2013, Mostafa Saberi Tehrani, an Iranian national and naturalized U.S. citizen, pleaded guilty to violating IEEPA and ITR.  *See* Dkt. No. 22, at 2, 15.  Before coming to the United States, Tehrani owned a business in Iran that sold commercial pumps.  *See* Dkt. No. 22, at 2.   Tehrani subsequently left the business, Sependab-Sazandeh Vertical Pumps ("Sependab"), to his two sons in Iran.  *See* Dkt. No. 22, at 2.  On two separate occasions, Tehrani's sons asked Tehrani to ship items from the United States to Iran.  *See* Dkt. No. 22, at 6.  The first time, U.S. Customs and Border Patrol ("CBP") seized the package and notified Tehrani by mail that the packages violated the United States' embargo against Iran.  *See* Dkt. No. 22, at 6.  The second time, Tehrani placed an order with a U.S. company for a seal and repair kit, signed a compliance form stating that he would not export the parts to "embargoed destinations" without the required OFAC license, and then exported the good to Iran through the U.A.E.  *See* Dkt. No. 22, at 6.

The parties agreed that under U.S.S.G. § 2M5.1(a)(1), the applicable base offense level was 26.  *See* Dkt. No. 22, at 9.  The government agreed to a two-level decrease for acceptance of responsibility and recommended a one-level reduction for Tehrani's timely notification of his intent to plead guilty.  *See* Dkt. No. 22, at 9.  On September 13, 2013, Tehrani was sentenced to two years' probation and 10 annual hours of community service work for two years.  *See* Dkt. No. 28, at 1-3.

- ***U.S. v. Michael Edward Todd,* Case Number 10-cr-58 (M.D. Ga.)**

On May 9, 2011, Michael Edward Todd pleaded guilty to conspiring to violate the Arms Export Controls Act ("AECA").  *See* Exh. 57 (Oct. 26, 2011 U.S. Department of Justice Press Release).  Todd was a U.S. national and President of The Parts Guys, a U.S.-based company. *See* Dkt. No. 1, at 1.  Todd shipped U.S.-origin military aircraft parts through the U.A.E. to Iran, concealing Iran as the true end user.  *Id.*  To complete the $27,228 shipment, Todd "obscure[d] the military components and conceal[ed] the true nature of the shipment from law enforcement detection."  *See* Dkt. No. 1, at 14, 16.  Todd also worked with a co-defendant employed by a French company that also procured U.S.-origin military aircraft parts for transshipment to Iran. *See* Dkt. No. 1, at 2.  As part of the conspiracy, Todd shipped the French company "20 aircraft parts with applications for the J85 military aircraft engine and the T53 military helicopter engine, with an overall value of $138,940."  *See* Dkt. No. 1, at 17.

Under § 2M5.1(a)(1), Todd's base offense level was 26, and his guideline range was 63-78 months.  *See* Dkt. No. 162, at 11-12.  Following the vacatur of his original 46-month sentence on the grounds that the United States breached its obligation to support a three-level reduction for acceptance of responsibility, Todd was sentenced to 35 months imprisonment, a $10,000 fine, and forfeiture of $160,362.  *See* Exh. 57; Dkt. No. 170, at 1-3, 5-6.

- ***U.S. v. Mohammad Reza Hajian,* Case Number 12-cr-0177 (M.D. Fla.)**

On April 27, 2012, Mohammad Reza Hajian pleaded guilty to conspiring to violate IEEPA and ITR.  *See* Dkt. No. 6, at 1, 20.  For almost eight years, Hajian conspired with others to export U.S.-manufactured computer and computer-related equipment to Iran through the U.A.E. without obtaining the required OFAC license.  *See* Dkt. No. 6, at 16.  The shipments

included a Hitachi Data Systems HDS USP V, used by "government agencies, including defense departments." *See* Dkt. No. 42, at 4.  Hajian and his co-conspirators falsified freight forwarders' invoices, lied about the shipments' value, and concealed that Iran was the end-user to avoid the United States' embargo on Iran.  *See* Dkt. No. 6, at 17.  For years, Hajian caused the illegal exportation of equipment with military applications to Iran and received millions of dollars in profits. *See* Dkt. No. 42, at 16.

Hajian's base offense level was 26, and after a three-level downward adjustment for acceptance of responsibility, the USPO determined that his adjusted offense level was 23, with a resulting Guideline range of 46 to 57 months.  *See* Dkt. No. 42, at 7-8.  On October 18, 2012, Hajian was sentenced to 48 months imprisonment, a 12-month term of supervised release, and a forfeiture money judgment of $10,000,000.  *See* Dkt. No. 47, at 1-3, 7-9.  The government subsequently moved for a reduction of Hajian's sentence, based on his ongoing cooperation.  *Id*. On May 23, 2014, Haijan's sentence was amended to 33 months, followed by a 12-month period of supervised release.  *See* Dkt. No. 64, at 3.

- *U.S. v. Massoud Habibion,* **Case Number 11-cr-118 (D.D.C.)**

Massoud Habibion pleaded guilty on February 13, 2012, to conspiring to violate IEEPA and ITR.  *See* Dkt. No. 74, at 2, 14.  Habibion was a United States citizen who, along with his co-defendant, owned and operated U.S.-based company Online Micro, LLC ("Online Micro"). *See* Dkt. No. 54, at 2.  Habibion, through Online Micro, illegally shipped U.S.-origin computer-related goods to Iran, through a company based in the U.A.E.  *See* Dkt. No. 54, at 7.  Funds were wired from international and domestic accounts to Habibion's U.S.-based bank accounts to pay for the shipments.  *See* Dkt. No. 54, at 9.  Habibion was aware of the illegality of his transactions

with Iran and lied to U.S. authorities to conceal the shipments' end destination.  *See* Dkt. No. 54, at 11.  From 2007 to 2010, Habibion and his company sold a monthly average of $300,000 worth of computer-related goods to Iran.  *See* Dkt. No. 54, at 11.

Pursuant to U.S.S.G. § 2M5.1(a)(1), Habibion's base offense level was 26.  *See* Dkt. No. 74, at 4.  Habibion's Criminal History Category was I, the government agreed to a three-level reduction for acceptance of responsibility, and argued for a two-level increase for obstruction of justice, resulting in an adjusted offense level of 25.  *See* Dkt. No. 74, at 4.  This resulted in a Guideline range of 57 to 71 months.  *See* Dkt. No. 74, at 4.  On May 16, 2012, Habibion was sentenced to 13 months imprisonment and a 24-month term of supervised release term.  *See* Dkt. No. 119, at 1-3.

- ***U.S. v. Majid Saboni,* Case Number 11-cr-5296 (S.D. Cal.)**

On December 15, 2011, Majid Saboni pleaded guilty to conspiring to "export laboratory equipment, radiation detection equipment, and radon detection equipment from the United States to Iran, in violation of the embargo on Iran."  *See* Exh. 58, at 74 (2016 U.S. Department of Justice Summary of Major U.S. Export Enforcement, Economic Espionage, Trade Secret and Embargo-Related Criminal Cases).  Saboni purchased and paid for two dose meters that were shipped from Virginia to Saboni in Canada.  *See* Dkt. No. 1, at 6.  For many years, Saboni assisted an Iranian citizen in the procurement and "unlicensed exportation, sale, and supply of goods from the United States to Iran, via Canada."  *See* Dkt. No. 1, at 6.  Saboni conspired with an Iranian citizen to acquire goods from U.S. companies, including but not limited to calibration equipment, water accessory kits, soil probes, water shutoff valves, moisture exchange models, and box dry gloves "used in laboratories working with sensitive or hazardous materials."  *See*

88

Dkt. No 1, at 7.  On May 11, 2012, Saboni was sentenced to 12 months and one day.  *See* Dkt. No. 36, at 1-2.

- ***U.S. v. Mehrdad Yasrebi,*** **Case Number 05-cr-413 (D. Or.)**

On January 10, 2011, Mehrdad Yasrebi pleaded guilty to conspiring to defraud the United States.  *See* Dkt. No. 11, at 6-7.  Yasrebi was an Iranian citizen and a permanent resident of the United States.  *See* Dkt. No. 8, at 1.  In 1994, Yasrebi established and registered Child Foundation, a non-profit corporation formed in the United States, which exercised "substantial control" over Refah Kudak Charity Institute ("Child Foundation Iran").  *See* Dkt. No. 8, at 1. Yasrebi formed Child Foundation Iran in 1999, with help from his relatives in Iran, including his cousin, who acted as Child Foundation Iran's director.  *See* Dkt. No. 45, at 11.  The purpose of Child Foundation was to attract donations in the United States and transfer a substantial portion of those donations to Child Foundation Iran.  *See* Dkt. No. 8, at 5.  To facilitate the money transfers and evade the U.S. embargo against Iran, Yasrebi and his co-defendants transmitted cash to Iran through commodity brokers, creating the appearance of a food delivery to Child Foundation Iran, "re-consigning, re-selling and arranging for the re-selling of quantities of the food commercially, and retaining the proceeds," and providing false documents and invoices to support Child Foundation's ledgers.  *See* Dkt. No. 8, at 6.  Yasrebi transferred over $1.7 million of the Children Foundation's funds to his cousin and Children Foundation Iran, and about $5.4 million from Children Foundation to a Swiss bank account, which transferred the funds into Iranian bank accounts belonging to Yasrebi's family.  *See* Dkt. No. 45, at 6, 17.  The money transfers lacked the required Department of Treasury authorization and hampered the Internal Revenue Service's ("IRS") oversight functions.  *See* Dkt. No. 8, at 5.  Indeed, for almost nine

years, Yasrebi concealed from the IRS the fact that "virtually all of [Child Foundation's] revenue" went to Iran.  *See* Dkt. No. 45, at 14.  Child Foundation donated at least $100,000 to Grand Ayatollah Makarem Shirazi, a member of the Iranian clerical establishment and a government representative.  *See* Dkt. No. 45, at 12.  Yasrebi then gave Child Foundation supporters and United States taxpayers' charitable contribution receipts to deduct funds donated to the Ayatollah.  *See* Dkt. No. 45, at 13.

Yasrebi's base offense level was 26, pursuant to U.S.S.G. §2M5.1.  *See* Dkt. No. 45, at 31.  Yasrebi was entitled to a three-level reduction for acceptance of responsibility and had a Criminal History category I, resulting in an offense level 24 and a Guidelines range of 46 to 57 months.  *See* Dkt. No. 45, at 31.  On March 6, 2016, the district court sentenced Yasrebi to a 5-year term of probation term and a $50,000 fine.  *See* Dkt. No. 63, at 1-2, 4.

- ### *U.S. v. Jeng Shih,* Case Number 11-cr-119 (D.D.C.)

On October 4, 2011 Jeng Shih pleaded guilty to conspiring to violate IEEPA and ITR. *See* Dkt. No. 28, at 1, 9.  Shih was a U.S. citizen, part owner and operator of Sunrise Technologies and Trading Corporation ("Sunrise").  *See* Dkt. No. 6, at 2.  For several years, Shih conspired with a U.A.E company to procure U.S.-origin computers and exported the computers to Iran through the U.A.E without obtaining a license from OFAC.  *See* Dkt. No. 6, at 2, 8. These illegally exported goods were valued at approximately $34,000,000.  *See* Dkt. No. 44, at 5. Shih knew that exporting goods to Iran was illegal, as evidenced by his submission of various Shippers Export Declarations ("SEDs") to CBP, falsely stating that the shipments' end destination was the U.A.E. *See* Dkt. No. 6, at 11-13.

The parties agreed that Shih's applicable Guideline was U.S.S.G. § 2M5.1(a)(1), resulting in a base offense level 26.  *See* Dkt. No. 28, at 3.  After a three-level downward adjustment for acceptance of responsibility and considering Shih's criminal history Category I, the applicable adjusted offense level was 23, resulting in a Guidelines range of 46 to 57 months. *See* Dkt. No. 28, at 3.  On February 17, 2012, Shih was sentenced to 18 months imprisonment and a 24-month term of supervised release.  *See* Dkt. No. 53, at 1-3.  Shih and Sunrise were also ordered to forfeit $1,429,321.17, and all property seized by CBP in related cases, for which they were jointly liable.  *See* Dkt. No. 53, at 9-10.

- *U.S. v. Hamid Seifi,* **Case Number 10-cr-58 (M.D. Ga.)**

In 2011, Hamid Seifi, also known as Hank Seifi, pleaded guilty to conspiring to violate IEEPA and ITR.  *See* Dkt. No. 117, at 1.  Seifi was an Iranian-born and U.S. national who was president of Galaxy Aviation Services ("Galaxy"), a company in the United States.  *See* Dkt. No. 1, at 2.  Galaxy procured U.S.-origin military aircraft parts for end-users in Iran.  *See* EDkt. No. 1, at 3.  Seifi caused the exportation of military goods from the United States to Iran without the required OFAC license.  *See* Dkt. No. 1, at 6.  On behalf of customers in Iran, Seifi purchased military aircraft in the United States through Galaxy.  *See* Dkt. No. 1, at 17.  Specifically, Seifi requested 20 aircraft parts valued at $138,940 for shipment to a company in France, which eventually delivered the parts to Iran.  *See* Dkt. No. 1, at 17.  The aircraft parts are categorized as "defense articles" and were units of a Bell AH-1 attack helicopter flown by Iran's army.  *See* Dkt. No. 1, at 4-5.

On June 22, 2011, Seifi was sentenced to 56 months imprisonment and a supervised release term of 3 years.  *See* Dkt. No. 117, at 1-3.  Seifi was ordered to pay a fine of $12,500 and

to forfeit $153,940, the latter being jointly and severally imposed against all co-defendants.  *See* Dkt. No 117, at 6.  On March 21, 2016, the district court granted early termination of Seifi's supervised release term.  *See* Dkt. No 176, at 1.

- *U.S. v. Mohammad Reza Vaghari,* **Case Number 08-cr-693 (E.D. Pa.)**

Mohammad Reza Vaghari was charged with conspiring to violate IEEPA, aiding and abetting another in committing the IEEPA violations and attempting to violate IEEPA.  *See* Dkt. No. 276, at 2, 9.  Vaghari was an Iranian citizen and a permanent resident of the United States. *See* Dkt. No. 358, at 1.  Vaghari and his co-conspirator worked at a company based in the United States and, through this company, "conspired to export goods, technology, and services," from the United States to Iran, through co-conspirators in the U.A.E.  *See* Dkt. No. 358, at 2.  Part of the exported goods included "computing equipment, ultrasonic liquid processors, fuel cell technology, electrical equipment, sophisticated laboratory and medical equipment, hydrophones, automobile parts, and centrifuges."  *See* Dkt. No. 358, at 2.  Stimulus isolators and laboratory equipment were to be exported to the Pasteur Institute of Iran.  *See* Dkt. No. 358, at 13.  Vaghari and his co-conspirator did not obtain an OFAC license to export these goods to Iran.  *See* Dkt. No 358, at 5.  While committing these crimes, Vaghari also committed immigration fraud.  *See* Dkt. No. 276, at 2.

On June 3, 2011, Vaghari was sentenced to 33 months imprisonment and a supervised release term of 3 years.  *See* Dkt. No. 521, at 1-3.

- *U.S. v. Amirhossein Sairafi,* **Case Number 09-cr-1344 (C.D. Cal.)**

On November 28, 2011, Amirhossein Sairafi pleaded guilty of conspiring to violate IEEPA and ITR and money laundering.  *See* Dkt. No. 110, at 1; Dkt. No. 18, at 3, 29-30, 32.

Sairafi operated a company in the U.A.E called Avac.  *See* Dkt. No. 18, at 2.  Sairafi contacted

companies in the United States to inquire about pricing and placed purchase orders to be

exported to Avac in the U.A.E, where Sairafi arranged shipment and delivery to customers in

Iran.  *See* Dkt. No. 18, at 7-8.  Sairafi caused the exportation of U.S.-origin "vacuum pumps and

vacuum-related equipment," subject to embargo regulations.  *See* Dkt. No. 18, at 4.  Sairafi knew

that exporting such items without an OFAC license was illegal and re-labeled the shipments'

content to avoid United States' regulations.  *See* Dkt. No. 18, at 7-8.  In four months, Sairafi,

doing business as Avac, caused the transfer of approximately $21,878 from the U.A.E to a U.S.

account in furtherance of the conspiracy.  *See* Dkt. No. 18, at 32.  Neither Sairafi nor Avac

applied for an OFAC license, even knowing that a license was required to ship goods and

technology to Iran.  *See* Dkt. No. 18, at 8.

On March 7, 2011, Sairafi was sentenced to 41 months imprisonment, and a 3 year term

of supervised release.  *See* Dkt. No. 166, at 1.

- *U.S. v. Vikramadity Singh,* **Case Number 09-cr-1344 (D. Del.)**

On November 23, 2010, Vikramadity Singh pleaded guilty to violating IEEPA and ITR.

*See* Dkt. No. 12, at 7.  Singh incorporated Orion Telecom Networks, Inc., a telecommunication

equipment reseller, in the United States.  *See* Dkt. No. 16, at 3.  Part of Orion's business model

was to ship the purchased goods from the manufacturers in India or China.  *See* Dkt. No. 16, at

3-4.  For 20 months, Singh was contacted by an undercover special agent, working under the

name David Ganon, to inquire about the purchase of digital microwave radios.  *See* Dkt. No. 17,

at 1.  Singh knew that Ganon intended to send the digital microwave radios to Iran.  *See* Dkt. No.

16, at 4.  Furthermore, Singh knew that the end-user in Iran could use the digital microwave

radios for military purposes, as Ganon explicitly told him the radios would be used in the "mountains and the desert." *See* Dkt. No. 17, at 8-9.

The USPO and the parties agreed that under § 2M5.1, the applicable base offense level was 26, and the applicable Guidelines range was 46 to 57 months. *See* Dkt. No. 16, at 2. After applying a three-level downward adjustment for acceptance of responsibility, with Singh's criminal history Category I, his adjusted offense level was 23, and the resulting advisory Guideline range was 46 to 57 months. *See* Dkt. No. 16, at 2. The government agreed not to recommend a sentence of more than 18 months of incarceration. *See* Dkt. No. 16, at 2. On March 2, 2011, Singh was sentenced to a three-year term of probation, was ordered to pay a fine in the amount of $100,000, and was ordered forfeit $15,985 to the United States. *See generally* Dkt. No. 16.

As the foregoing cases make clear, a sentence of time served for Ms. Gonzalez would serve the purposes of the SRA, while also avoiding unwarranted sentencing disparities.

### F.     A Sentence of Time Served Complies with the Purposes of the Sentencing Reform Act (18 U.S.C. § 3553(a)(2)).

As stated above, Section 3553(a) directs the Court to impose a sentence that is "not greater than necessary" to: (a) reflect the seriousness of the offense; (b) afford adequate deterrence to criminal conduct; (c) protect the public from further crimes of the defendant; and (d) provide correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Here, each of these factors – just punishment, deterrence, incapacitation, and rehabilitation – would be achieved by a sentence of time served.

**1. <u>Just Punishment</u>**

A sentence of time served is sufficient – but not greater than necessary – to achieve the goal of just punishment. In assessing the adequacy of a sentence of time served, we submit the Court should also take into consideration the substantial hardships Ms. Gonzalez has faced since her February 2020 arrest, and her 15 months of near-complete solitary confinement due to the COVID-19 pandemic. As documented above, Ms. Gonzalez has been subjected to over a year of 23-hour solitary confinement at the Correctional Treatment Facility – the only facility in the country to impose such a condition for such a long period of time.

In addition to the conditions under which Ms. Gonzalez has been confined for over a year, Ms. Gonzalez will bear the weight of the negative consequences of a felony conviction. Her reputation will be diminished in the eyes of persons who do not know her well. Her ability to secure employment may be affected by her criminal record. Ms. Gonzalez also bears great shame and guilt for putting the future of her children and other family members in jeopardy.

These circumstances meet any need for retribution. The offense for which Ms. Gonzalez has been convicted is serious, but a sentence of time served, especially in the conditions under which Ms. Gonzalez has served, is a meaningful sentence, and is truly a just punishment.

**2. <u>Deterrence</u>**

A sentence of time served also achieves the goal of deterrence. *See United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaaid, J. dissenting) ("the disutility of being in prison at all [in white collar cases] and the stigma and loss of earning power may depend relatively little on the *length* of imprisonment") (emphasis in original) (citing A. Mitchell

Polinsky & Steven Shavell, <u>On the Disutility and Discounting of Imprisonment and the Theory of Deterrence</u>, 38 J. Legal Stud. 1, 12 (1999)).

Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of non-custodial sentences and that of imprisonment. *See* David Weisburd *et al*., <u>Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes</u>, 33 Criminology 587 (1995); *see also* Zvi D. Gabbay, <u>Exploring the Limits of the Restorative Justice Paradigm:  Restorative Justice and White Collar Crime</u>, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").   The collateral consequences discussed above are sufficient to deter others from committing similar crimes.

A term of supervised release, following a sentence of time served, would be comparable to the deterrent effects of a probationary sentence.  As the Supreme Court has explained:  "We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."  *Id.* at 48.  *See also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'")  (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)).

Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the Court.  *See* USSG § 5B1.3(c). They must report regularly to their probation officer, permit unannounced visits to

their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. *Id.* Most probationers are also subject to individual special conditions imposed by the Court, such as community service. *See* USSG § 5B1.3(d).

Ms. Gonzalez has already suffered severe consequences, as set forth above. Ms. Gonzalez's children need her presence at home to provide love, support, and guidance. The deterrent effect of a term of supervised release following a sentence of time served will satisfy the goals of the SRA. Punishment through further incarceration is not required to provide deterrence in this case.

### 3.      Incapacitation

Section 3553(a)(2) also requires the Court to consider the need to "protect the public from further crimes of the defendant." No period of additional incarceration is necessary to protect the public from further crimes of Ms. Gonzalez – there is no reason to believe there will be further crimes. The effect that this case has had on Ms. Gonzalez's life and the lives of her children – absent any additional period of incarceration – is a sufficient guarantee that she will never commit another offense. Moreover, as the United States Sentencing Commission has recognized, defendants without any prior contact with the criminal justice system are unlikely to recidivate. *See* United States Sentencing Commission, Recidivism and the "First Offender," A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004) (offenders with no prior arrests or convictions have the lowest recidivism rate). In imposing the least sentence sufficient to account for the need to protect the public from further crimes, this Court should consider the statistically low risk of recidivism presented by Ms. Gonzalez. *See, e.g., United States v. Darway*, 255 F. App'x. 68, 73 (6th Cir. 2007)

(upholding downward variance on basis of defendant's first-offender status); *United States v. Urbina*, No. 06-CR-336, 2009 WL 565485, at *7 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

### 4.      Rehabilitation

A further period of incarceration is not necessary to provide rehabilitation in this case. The USPO has correctly concluded that "<u>rehabilitation</u> is not a specific concern for the defendant." *See* ECF 219, at 2.  Where a prison sentence is not necessary for purposes of rehabilitation, a below-Guidelines sentence is appropriate.  *Gall*, 552 U.S. at 57-59.

### G.      The Need to Provide Restitution to Any Victims of the Offense (18 U.S.C. § 3553(a)(7)).

Section 3553(a)(7) directs sentencing judges to consider "the need to provide restitution to any victims of the offense."  As the USPO stated, "[r]estitution is not applicable in this case." *See* PSR, at ¶¶ 108-109.

### IV.      FINANCIAL INABILITY TO PAY A FINE

Ms. Gonzalez submits she has demonstrated an inability to pay a fine under USSG § 5E1.2.   The draft PSR in this matter correctly concluded that Ms. Gonzalez did not have the financial ability to pay a fine.  *See* ECF 217, at ¶ 86.  In its objections to the draft PSR, the government provided information, mainly concerning the financial resources of a drug trafficking organization and suggested that because the organization purportedly has access to vast financial resources, Ms. Gonzalez does as well.  Ms. Gonzalez maintains that she does not

have access to these financial resources, and respectfully requests that the Court analyze her inability to pay a fine based on her own, not third-party's, finances.

## V.    **CONCLUSION**

The Sentencing Reform Act provides a list of goals for sentencing judges to consider when imposing a sentence, including (1) promoting respect for the law, (2) providing just punishment for the offense given the circumstances, (3) affording adequate deterrence for criminal conduct, (4) protecting the public, and (5) providing Ms. Gonzalez with reasonable rehabilitative services.  A sentence of time served will achieve the above-listed objectives.

Respectfully submitted,


_____/s/ Steven J. McCool_____
STEVEN J. McCOOL
D.C. Bar No. 429369
JULIA M. COLEMAN
D.C. Bar No. 1018085
YASMIN PEREZ ORTIZ
D.C. Bar No. 1721627
McCOOL LAW PLLC
1776 K Street, N.W., Suite 200
Washington, D.C. 20006
Telephone:  (202) 450-3370
Fax:  (202) 450-33346
smccool@mccoollawpllc.com
jcoleman@mccoollawpllc.com
yperez@mccoollawpllc.com

*Counsel for Jessica Johanna Oseguera Gonzalez*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of May 2021, the foregoing was served electronically on the counsel of record through the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and the document is available on the ECF system.


        /s/ Steven J. McCool
STEVEN J. McCOOL