**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **CRIMINAL NO.: 1:20-CR-040** |
| | ) |
| **JESSICA JOHANNA OSEGUERA** | ) |
| **GONZALEZ,** | ) |
|     **also known as "Jessica Johanna** | ) |
|     **Castillo" and "La Negra,"** | ) |
| | ) |
|     **Defendant.** | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits this memorandum in connection with

the sentencing of defendant Jessica Johanna Oseguera Gonzalez ("Oseguera" or the "defendant")

scheduled for June 11, 2021.

The defendant undertook a multi-year effort to evade and avoid economic sanctions

issued by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC")

pursuant to the Foreign Narcotics Kingpin Designation Act (the "Kingpin Act").  Specifically,

when OFAC sanctioned her businesses for their connection to a ruthless and violent drug cartel

called the Cartel de Jalisco Nueva Generacion ("CJNG"), the defendant continued to transact

with the sanctioned entities.  In an attempt to evade the Kingpin Act, she disbanded two

businesses and changed the names of two others without consulting OFAC or seeking a "wind

down" license to permit her—as a U.S. citizen—the limited ability to transact with sanctioned

entities in order to lawfully unwind her relationships with the companies.  One of the businesses

almost immediately rebranded under a new name, retaining the defendant as its manager, and

had to be sanctioned by OFAC again two years later.  Another of the businesses also continued

to operate under a new name, with the defendant's continuing involvement confirmed by the use of her phone number for the business in social media.

Any suggestion that the defendant might not have known about the sanctions, or appreciated their import, or fully understood the potential criminality in continuing to transact with the designated businesses is inconsistent with the factual record.  Among the incontrovertible facts are the following, all demonstrable through documentary evidence:

- OFAC sent an email to known email addresses of the defendant when it sanctioned her businesses, notifying her of the sanctions and inviting her to contact OFAC about them—which she never did.

- OFAC's designations of the CJNG and the defendant's businesses were front-page news in Mexico, where the defendant lived.

- The defendant's own husband was sanctioned as part of the same series of OFAC designations.

- OFAC served notices of the CJNG sanctions on various of the defendant's relatives, including at the California address that the defendant used while in the United States.

- The U.S.-based web hosting provider that the defendant used to host her business websites shut down her websites and suspended her account once it learned of her affiliation with OFAC-sanctioned entities, prompting an immediate phone call to the provider's customer service line from the very phone number that the defendant identified as her own.

Based on previous filings in this matter and the defendant's apparent statements to the U.S. Probation Office ("USPO") in support of the pre-sentence report ("PSR," Dkt. No. 218), it

appears that the defendant may try to minimize her conduct by casting it as a merely "technical" violation of an intricate regulatory regime, akin to simply failing to lodge the appropriate paperwork.  But the background and legislative history of the Kingpin Act show that Congress intended for it to be a major piece of the government's efforts to combat foreign drug trafficking—which Congress specifically identified as a national security threat to the country— with substantial criminal penalties for its willful violation.

A significant sentence is therefore appropriate to reflect the seriousness of the defendant's violation of the Kingpin Act, to promote respect for the law, and to deter other U.S. citizens who seek to evade and avoid sanctions aimed at foreign drug cartels.  Accordingly, as discussed herein, the government asks the Court to impose a sentence of 51 months' imprisonment.  Additionally, because the factual record indicates that the defendant has access to assets, the government respectfully requests that the Court impose a fine within the Guidelines range of $25,000 to $5,000,000.

## BACKGROUND

### A.  Defendant's Personal and Familial Background

The defendant was born in the United States and is a United States citizen.  *See* Pre-Sentence Report, Dkt. No. 217 ("PSR") ¶ 55, Agreed Factual Proffer in Support of Guilty Plea, Dkt. No. 214 ("Statement of Facts") ¶ 4.  (The defendant is also a dual national of Mexico.)  She has availed herself of some of the privileges of U.S. citizenship, such as maintaining a U.S. passport since at least 1998.  *See* Exhibit 1 (Certified Passport Application).  On her most recent U.S. passport application, in 2016, she provided her occupation as "Manager – Kenzo Sushi," a U.S. address of 2775 Newcastle Way in San Jacinto, California, and an email address of

"chica_j@hotmail.com." *See id.* at 6.  Although born in the United States, as an adult the defendant has primarily lived in Guadalajara, Mexico since 2001.  PSR ¶ 59.

Despite primarily residing in Mexico, the defendant was a frequent traveler to the United States.  Records from U.S. Customs and Border Protection produced to the defendant in discovery show that she entered the United States at least 33 times between 2005 and 2020.  Those trips included a 2018 ski trip to Vail, Colorado, during which the defendant entered the United States carrying approximately $10,000 U.S. dollars in cash, a 2019 trip to the Los Angeles area to visit family and attend a soccer tournament for her child, and the 2020 trip to Washington, D.C. during which she was arrested.

The defendant's family is based in Guadalajara and has substantial connections to drug trafficking.  The government proffers to the Court that, based on its investigation into the CJNG, Jalisco and Guadalajara are the headquarters and stronghold of the drug trafficking organization known as the CJNG and an affiliated drug trafficking organization known as Los Cuinis.  The leaders of Los Cuinis are a group of siblings with the surname Gonzalez Valencia.  Three of them—Abigael, Jose, and Gerardo—have been indicted in this Court for drug trafficking charges.[1]  The defendant's mother, Rosalinda Gonzalez Valencia, is their sister.

The defendant's father is the leader of the CJNG and has also been indicted on drug trafficking charges, including being the leader of a Continuing Criminal Enterprise, with a grand jury sitting in this district issuing a second superseding indictment as recently as last year.  *See United States v. Nemesio Oseguera Cervantes and Abigael Gonzalez Valencia,* Case No. 14-cr-051-BAH (D.D.C.), Dkt. No. 15.  He is currently a fugitive and the U.S. government has offered

---

[1] Abigael and Jose are detained in Mexico and Brazil, respectively, pending extradition to the United States.  Gerardo is in custody in this district and his case is pending before this Court (Cr. No. 16-065-BAH).

a $10 million reward for information leading to his arrest and conviction.  The defendant's brother is also alleged to have been a high-ranking leader of the CJNG, and he is also indicted in this district on drug trafficking charges.  *See United States v. Ruben Oseguera Gonzalez*, Case No. 16-cr-229-BAH (D.D.C.).  He was extradited to the United States in February 2020, and his case is currently pending in this Court.  The defendant was arrested in this very courthouse pursuant to the arrest warrant in this case when she arrived to attend her brother's initial appearance and arraignment.

### B.  2009-2012: The Defendant Starts Five Businesses

The defendant's dealings with the five businesses underlying the Superseding Indictment in this case began in 2009.  On September 10, 2009, an application was made with the Secretary of the Economy in the Mexican State of Jalisco to register J&P Advertising, S.A. de C.V.  *See* Exhibit 2 (Corporate Registration Documents)[2]; *see also* PSR ¶ 18.  The defendant was one of two shareholders, and registered as the "sole administrator" of the company.  *See* Exhibit 2 at 5. The next month, a trademark was registered for J&P Advertising, with the defendant—as "sole administrator general"—providing a delegation akin to a power of attorney to the registrant.  *See* Exhibit 3 at 6, 11 (J&P Advertising Trademark Registration).

Records from a U.S. web hosting service, Bluehost, show that a web hosting account was created in March 2010, beginning with registering a website "JP-ADVHOST.com," an abbreviation for "J&P Advertising."  *See* Exhibit 4 at 11.  The customer registered to the account was "jessica oseguera," listing her company as "J&P Advertising" and the phone number of +52 33 36 42 20 44.  *See id.* at 4.

---

[2] For all exhibits herein that are in Spanish and for which the government has a certified English translation, the English translation follows the original Spanish in the respective exhibit.

A year later, in June 2011, JJGON, S.P.R. de R.L. de C.V. was incorporated, with the defendant as one of the five shareholders of the company and its "sole administrator."  *See* Exhibit 5 at 5, 13; *see also* PSR ¶ 19.  The name of the company also appears to be a portmanteau of the defendant's name:  **J**essica **J**ohanna Oseguera **Gon**zalez.

The defendant expanded her business dealings the following year, applying for a trademark for Tequila Onze Black in February 2012.  *See* Exhibit 6 at 2; *see also* PSR ¶ 23.  In that handwritten trademark application, signed by the defendant, she listed her phone number as +52 33 36 42 20 44, the same number as in the Bluehost web hosting records.  The Tequila Onze Black trademark was granted, is still owned by the defendant today, and expires in February 2022.  *See* Exhibit 7 at 2, 4.

A few months after that, the defendant applied for another trademark, for Mizu Sushi Lounge.  *See* Exhibit 8 at 2, 7; *see also* PSR ¶ 21.  As with the Tequila Onze Black trademark, the defendant was the applicant, filled out the application in her own handwriting, and signed it.  This time, she provided a different phone number, 33 39 68 42 25.  This trademark was also granted, is still owned by the defendant, and expires in 2022.  *See* Exhibit 9 at 2, 4.

The next month, in June 2012, the defendant applied for another trademark, for Las Flores Cabanas.  *See* Exhibit 10 at 2, 5; *see also* PSR ¶ 20.  Again, as with the other applications, the defendant herself is the applicant, and her signature appears on the application.  As with the Mizu Sushi trademark application, she provided the phone number 33 39 68 42 25.  This trademark was also granted, still exists today, and expires in 2022.  *See* Exhibit 11 at 2, 4.

In 2009, 2010, 2011, and 2012, therefore, the factual record shows the defendant— herself—incorporating companies, lodging trademarks, and creating a web hosting platform for business websites, all related to the five entities underlying the Superseding Indictment.  The

government's evidence revealed no substantial changes to these companies' corporate structures or operations until late 2015.

### C.  April 2015: OFAC Sanctions the CJNG

On April 8, 2015, OFAC sanctioned the CJNG, the Los Cuinis Drug Trafficking Organization, and their leaders Nemesio Oseguera Cervantes and Abigael Gonzalez Valencia— the defendant's father and uncle, respectively—under the Kingpin Act by designating them as significant foreign narcotics traffickers.  *See* Exhibit 12, 80 Fed. Reg. 20293; *see also* PSR ¶ 27.

Concurrent with those designations, OFAC sent out a round of "blocking notices"— letters intended to reach those likely to have connections to designated persons and entities— notifying them of the designations, warning them of the prohibitions on engaging in transactions and dealings with designated persons, and inviting them to contact OFAC with any questions. *See* PSR ¶ 27.  OFAC's mailing and delivery of these notices took a number of different forms.

First, a number of these notices were hand-delivered to known relatives of the defendant. The government would have presented testimony at trial that on April 8, 2015, an OFAC Sanctions Investigator, a DEA Special Agent, and an Internal Revenue Service ("IRS") Special Agent visited the home of Jose Maria Gonzalez Valenica ("Jose Maria"), one of the defendant's uncles, in Santa Ana, California.  His wife answered the door and directed the agents to a nearby horse racing track.  At the horse racing track, the agents did not locate Jose Maria but did discuss the OFAC sanctions and served blocking notices on multiple of his current and former employees who were present, along with copies of the OFAC press release and designation chart (examples of which are attached as Exhibits 13 and 14).  The same day, the agents located Jose Maria at a ranch in Hemet, California.  Jose Maria indicated that he had heard that the agents had been looking for him and indicated that he wished for his attorney to be present before talking to

them.  The DEA Special Agent provided his contact information and asked Jose Maria to have his attorney reach out.

Thereafter, the agents traveled to 2775 Newcastle Way in San Jacinto, California, looking for Marin Oseguera Cervantes ("Marin"), another of the defendant's uncles.  A woman who answered the door indicated that she was Marin's wife Azucena and that Marin was out of town.[3]  The agents provided a copy of the blocking notice to her and explained the OFAC sanctions regime, including warning her that engaging in transactions or dealings with designated persons could result in civil and criminal penalties.  She additionally indicated that she recognized a photo of Nemesio Oseguera Cervantes—the defendant's father, who is a fugitive indicted in this district—and that she understood the explanation of the sanctions and would provide the blocking notice to Marin upon his return.

Next, the agents visited an apartment in Orange, California, where they provided a blocking notice and explained the OFAC sanctions to Marlyn Gonzalez Lara, the daughter of Abigael Gonzalez Valencia and therefore a cousin of the defendant.  They provided her with a copy of the blocking notice, OFAC's press release, and the designation chart.  She indicated that she had been told not to answer any questions by an unspecified person.

The next morning, the agents received a phone call from Marin, who agreed to meet at a Starbucks to receive a copy of the OFAC blocking notice.  When they met, Marin indicated that he had already seen the blocking notice provided to his niece, Marlyn Gonzalez Lara, and said that he had read news reports about the OFAC sanctions.  Marin asked a number of questions of

---

[3] The government understands that Azucena Oseguera previously attended in-person court hearings in this matter and signed the property bond offered to Magistrate Judge Meriweather in an attempt to secure the defendant's pretrial release, prior to this Court's reversal of Judge Meriweather's release order.

the OFAC Sanctions Investigator who was present, including whether it would violate the OFAC sanctions for him to pay for legal representation for his brother Abigael (who was then, as now, in custody in Mexico awaiting extradition to this district). The OFAC Sanctions Investigator answered Marin's questions and asked Marin to explain the OFAC prohibition to any relatives of his who were U.S. persons. Marin indicated that he would.

Second, in addition to this personal service of OFAC blocking notices on the defendant's relatives, OFAC mailed copies of the blocking notice to Berenisse Gonzalez Valencia (a sister of Abigael Gonzalez Valencia and one of the defendant's aunts), Jasmine Gonzalez Lara (a daughter of Abigael Gonzalez Valencia and one of the defendant's cousins), Alexis Gonzalez Lara (a son of Abigael Gonzalez Valencia and one of the defendant's cousins), and the defendant herself. The defendant's notice was mailed to 2775 Newcastle Way in San Jacinto, California, the address at which the agents had previously met with the defendant's aunt Azucena. *See* Exhibit 15. OFAC and DEA had used proprietary and credit reporting databases such as Accruint and Lexis Nexis to identify the 2775 Newcastle address as connected to the defendant. *See* PSR ¶ 60 (U.S. Probation Office noting the same address through commercial tracking services). And, indeed, the very next year, the defendant identified that address as her own in seeking a renewal of her U.S. passport:



Exhibit 1 at 7.  She also used that address to receive a shipment of Nike shoes in 2016.  Exhibit

16.  Nonetheless, the blocking notice mailed to the defendant was returned to sender.

### D.  September 2015: OFAC Sanctions the Defendant's Businesses and Notifies Her

On September 17, 2015, as a follow-on to the sanctions of the CJNG, the Los Cuinis

DTO, and the defendant's father and uncle, OFAC issued Kingpin Act designations of J&P

Advertising, JJGON, Las Flores Cabanas, Mizu Sushi, and Tequila Onze Black.  *See* Exhibit 17,

80 Fed. Reg. 57433-44 (Sep. 23, 2015); *see also* PSR ¶ 25, 27.  The designations were published

in the Federal Register, *see id.*, and detailed in a press release by OFAC, *see* Exhibit 18, with an

accompanying chart:



Exhibit 19.

As with the April 2015 designations, the designations of the defendant's businesses also

made the news in Mexico. *El Occidental*, a newspaper in the defendant's hometown of

Guadalajara, included an article about the businesses' designations on the front page, with the

headline "CJNG-linked businesses detected," and a subhead explaining that the United States

had named five businesses as associated with the cartel's financing:

11



Exhibit 20.

*Reforma*, a Mexico City daily newspaper, published an article, "U.S. Punishes 5 Companies Linked to CJNG."  *CNN Expansion*, a Mexican language arm of CNN, published an article, "U.S. Sanctions Five Mexican Companies for Ties to Cartel."  So did numerous other publications.  *See* Exhibit 21.

Additionally, OFAC sent an email directly to the defendant on the day of the designations, attaching the original blocking notice addressed to the defendant that had been returned to sender when mailed to the 2775 Newcastle address:

| From: | O F A C |
|---|---|
| To: | "contacto@tequilaonce.com"; "jessicaglez@jp-adv.com"; "administracion@tequilaonce.com"; "ADMINISTRACION2@MIZUSUSHI.MX" |
| Subject: | U.S. Treasury - OFAC |
| Date: | Thursday, September 17, 2015 3:57:00 PM |
| Attachments: | NOTIFICATIONS OF BLOCKING - Jessica Johanna Oseguera Gonzalez.pdf |
| Importance: | High |

To whom it may concern:

Please see the attached notification from the United States Department of the Treasury's Office of Foreign Assets Control (OFAC) concerning the designation of Nemesio OSEGUERA CERVANTES, CARTEL DE JALISCO NUEVA GENERACION, and related individuals and entities.  If you have any questions, please contact OFAC's Crime/Narcotics & Western HemisphereDivision at O_F_A_C@treasury.gov, or the OFAC Attaché at the U.S. Embassy in Mexico City at (52) 55-5080-2165 or ofacmexico@state.gov.  You may also mail inquiries to the Department of the Treasury, Office of Foreign Assets Control, Attn: Crime/Narcotics & Western Hemisphere Division, 1500 Pennsylvania Avenue, N.W., Washington, DC, 20220.

Regards,
OFAC

Exhibit 22 at 2; *see also* PSR ¶ 27.

OFAC's notification email was sent to four email addresses that it identified as connected to the defendant.  OFAC had identified two of these email addresses through the Mexican trademark applications, written in the defendant's own hand and over her signature, for Mizu Sushi and Tequila Onze Black:

Exhibit 8.



Exhibit 6.  *See also* PSR ¶¶ 21, 23 (confirming trademark application).

OFAC personnel also sent the email to "administracion2@mizusushi.mx," an administrator email address that OFAC identified from Mizu Sushi's website, and, noting that the trademark application had mis-spelled the Tequila Onze website as "tequilao*nc*e.com," included an administrator email address for the correctly-spelled tequilaonze.com.  Only one of the four emails bounced back to OFAC's inbox, and it was the one sent to "contacto@tequilaonce.com," the mis-spelled website listed on the defendant's Tequila Onze trademark application.  *See* Exhibit 22 at 8.  OFAC never heard from the defendant or anyone working on her behalf.

### E.  **August-September 2015: The Defendant's Web Hosting Company Shuts Down Her Accounts Because of the OFAC Sanctions**

In addition to the wide press coverage, the delivery of OFAC letters to her family members, and the email that OFAC sent to the defendant, the evidence shows that she knew of the OFAC sanctions because her various business websites were shut down when the designations were promulgated.

Prior to the designations of the defendant's businesses in September 2015, OFAC designated an entity called BRIC Inmobiliaria, a real estate business, on August 19, 2015.[4]  The designation of BRIC Inmobiliaria, like OFAC's designation of the defendant's businesses, was also related to the initial designations of the CJNG and Los Cuinis Drug Trafficking Organization, which had also identified and sanctioned the defendant's father and uncle.

BRIC Inmobiliaria had a website at www.bricinmobiliaria.com, registered through Bluehost, a U.S.-based web hosting provider.  And the defendant, through her company J&P Advertising, was the listed web registrant for BRIC Inmobiliaria's website.  Because of the Kingpin Act's prohibition on U.S. persons transacting or dealing with designated entities, Bluehost regularly reviews OFAC designations and shuts down the accounts of any designated websites that it hosts.  And the defendant's account contained not only the BRIC Inmobiliaria website, but also those of the businesses identified in the indictment:  J&P Advertising (jp-adv.com), Tequila Onze Black (tequilaonce.com, tequilaonze.com), Mizu Sushi (mizusushi.mx, mizusushilounge.com), Las Flores Cabanas (cabanaslasflores.com, lasflorescabanas.com), and others.

Account records from Bluehost that the government produced in discovery and planned to introduce at trial left little doubt that the defendant was the owner of the account, as her name, address, and phone number were registered with Bluehost in its account records:

---

[4] The facts surrounding BRIC Inmobiliaria are detailed at greater length in the government's motion to admit Rule 404(b) evidence, *see* Dkt. No. 63 at 1-18.

| Customer Information - 818871 | |
|---|---|
| Domain | jp-advhost.com |
| Plan | 11.99/Month - $0.00 (0.00qty * 12/Months)    Plus Hosting |
| Phones | Call History<br>day +52.3336422044 [ call ] |
| Name | jessica oseguera |
| Company | J&P Advertising |
| E-Mail | contacto@jp-adv.com    [ Edit | E-mail | Probe ] |
| Address | Antioquia 2123 B |
| City | Guadalajara |
| State | 014 |
| Zip | -44660 |

Exhibit 4 at 4.

Within days after the BRIC Inmobiliaria designation, on August 25, 2015, Bluehost decided to suspend the defendant's web hosting account.  As Bluehost records that would have been presented at trial show, Bluehost internally noted that the account had been "deactivated as a result of U.S. federal regulations which prohibit U.S. businesses from doing business with . . . anyone on the OFAC SDN list."  *See id.* at 7.  A Bluehost representative would have testified at trial that this was a suspension of all of the websites on the defendant's account – including those of the businesses identified in the Superseding Indictment – and would have rendered them entirely inaccessible and inoperative.

Bluehost attempted to send the defendant an email explaining the suspension, which read in pertinent part:

> Jessica,
>
> It has recently come to our attention that a package under your control is providing service to individuals or businesses specifically designated as blocked . . . . Directives enforced by the Office of Foreign Assets Control (OFAC) of the U.S. Department of the Treasury, which administers and enforces trade and economic sanctions in accordance with U.S. policy, do not allow us as a U.S. company to do business with persons or entities on the blocked list . . . .

16

> Subject to the OFAC sanctions, we are unable to provide hosting, domain registration, and related services to any server, reseller, shared account, entity or person in the embargoed region or on the blocked list. . . .
>
> At this time, the account or accounts in question have been suspended and disabled. This means that your websites are not currently accessible to visitors, and you cannot log into your account. . . .

Exhibit 23.

The government learned shortly before the scheduled trial in this matter, however, that because the defendant used a Bluehost-registered email address for her account, this email would not have been received because it was sent simultaneous with the complete suspension of her account.  Nonetheless, the complete shutdown of the account—email address, business websites—would have caused any business owner to promptly notice the interruption and seek to determine its cause.

As it happens, Bluehost's customer service line received a phone call the very next day. The caller spoke to Bluehost customer service for 26 minutes:



Exhibit 4 at 7.

The number that called Bluehost – +52 33 36 42 20 44 – was the number provided by the owner of the account, "jessica oseguera," in Bluehost's records.  *See id.* at 4.  It is also the number provided by the defendant herself, in her handwriting and above her signature, in the Mexican trademark registration for Tequla Onze Black:



Exhibit 6 at 2.

The call from this number leaves the inescapable inference that the defendant herself contacted Bluehost about the account suspension and learned that OFAC's Kingpin Act sanctions had implicated her business interests. Following the conversation, Bluehost agreed that if the BRIC Inmobiliaria domain were removed from the account – because, at the time, it was the only domain sanctioned by OFAC – it would reinstate the other websites. And its records reflect that it did so:

| 08/27/15 12:51pm | Note | **Anthony Sawyer** | **[view]** LEGAL INFO Customer may be reactivated if they remove the bricinmobiliaria.com domain from the account, as well as any associated files/data. Changing deactivation reason to allow cPanel/FTP access. |

Exhibit 4 at 7.

The next month, though, the entities identified in the Superseding Indictment were designated by OFAC, and on October 2, 2015, Bluehost once again shut down the defendant's account:



Exhibit 4 at 6.

As with the earlier account suspension, this would have made the defendant's business websites completely inaccessible, as well as any email accounts run through those sites. But this time, there was no call to customer service to explore that service interruption, likely because there was no need for one: the defendant already knew, from her earlier conversations with Bluehost, why her account would have been suspended again.

### F. October 2015-February 2017:  Demonstrating Attempts to Evade the Sanctions, the Defendant Closes Some Businesses, Renames Others, and Continues Her Dealings With Them

Although OFAC's email to the defendant had invited her to contact OFAC with any questions or to discuss the sanctions, *see* Exhibit 22, and although OFAC's blocking letter— which had been hand delivered to various relatives and attached to the email to the defendant— had notified the defendant of the requirement to disclose blocked property to OFAC and seek a license, *see* Exhibit 15, she never contacted OFAC.  Nor did she seek to remedy her access to her business websites with Bluehost, as she had done with BRIC Inmobiliaria.  Instead, the documentary evidence and the facts set forth in the defendant's plea agreement suggest that she opted for a course of evasion: liquidating some businesses and changing the names of others, shortly after the OFAC sanctions took effect.

First, although J&P Advertising and JJGON had existed since 2009 and 2011, respectively, both companies were formally dissolved under Mexican law in February 2016.  S*ee* Exhibit 2 at 7, 15; Exhibit 5 at 7, 15; PSR ¶¶ 18-19.

Second, Las Flores Cabanas rebranded as Cabanas La Loma.  Social media records and archived websites that the government would have introduced at trial established that "Cabanas La Loma" began to operate at the same address as the OFAC-designated Las Flores Cabanas, with photographs showing the exact same property, purportedly renting the same cabins as vacation rentals.  And the defendant herself appears to have remained personally involved in running the operation.  The government would have presented evidence at trial from Facebook that Cabanas La Loma held itself out as using the phone number 33 39 68 42 25:



*See* Exhibit 24 at 3.

That is the same phone number used by the defendant to register the Mexican trademark for Cabanas Las Flores, in her own handwriting, with her address, above her signature:



*See* Exhibit 25 at 2, 5. *See also* PSR ¶ 20.

   Third, Mizu Sushi restaurant suddenly re-branded as Kenzo Sushi immediately following the OFAC designations.  And the defendant remained Kenzo Sushi's "manager," *see* PSR ¶ 22, with evidence showing staff's total deference to her in making managerial decisions that only the person in control could make.

   Mizu Sushi's name change stands out in a number of respects.  For one thing, Mizu had just moved to a new location in a new, modern shopping plaza in Guadalajara.  A local newspaper's restaurant reviewer reviewed the new location almost simultaneous with the OFAC designation of Mizu, publishing on September 23, 2015, noting the new "Mizu" location in the "Plaza Fusion Galerias" shopping center.  *See* Exhibit 26 at 6 ("Mizu Sushi Lounge . . . moved to Providencia 1545, at the corner of Ottawa, in Plaza Fusion Galerias.").  And photographs posted to the Plaza Fusion Galerias Facebook page also showed signage for "Mizu" at the new shopping center:



*See* Exhibit 27.

By October 2015, however—a month after the designation—"Kenzo Sushi" was in the same location and created a social media presence with a Facebook account:

**Basic Info**    **Name**  Kenzo Sushi Guadalajara
                  **Url**  https://facebook.com/KENZOSUSHIGDL/

**Creation Date**  2015-10-19 22:02:32 UTC

*See* Exhibit 28.  And before long, the "Mizu" signage now read "Kenzo":



*See* Exhibit 29.

The logical inference from this re-branding as "Kenzo" a month after the OFAC sanctions is an attempt to evade the OFAC sanctions, as "Mizu" had just moved to a new location under its former name, making a costly re-branding effort senseless unless driven by the need to get out from under the strictures of the Kingpin Act—which would have prevented "Mizu" from operating a website, using U.S. vendors, using financial services connected to the United States, or conducting business with any U.S. persons or entities.

This inference is also supported because the defendant did not relinquish control of Kenzo Sushi.  The evidence shows that although her sushi chefs became the nominal owners of

the business on paper, the defendant continued to maintain control.  From December 2015 until February 2018, the results of a search warrant executed on the defendant's email account showed that she received near-daily sales reports from the restaurant.  *See* Exhibit 30 (example of daily sales report sent to defendant at "chica_j@hotmail.com" and "poncho_corona@hotmail.com," believed to be Alfonso Corona Romero, the primary chef of Mizu and Kenzo).  She also received pay stubs listing her as a salaried "administrator" of the restaurant.  *See* Exhibit 31 (example of one of 32 pay stubs in the defendant's email account between April 5, 2016 and July 15, 2017).

The email search warrant also showed her as a decision-maker, interacting with designers and architects about chairs and furniture.  In one post-designation email on May 24, 2017, a designer sent her options of chairs to purchase for Kenzo Sushi.  *See* Exhibit 32.  In another, an architect sent the defendant a document showing construction work in progress, noting that he had "took out what you asked me to take out" from the façade of the restaurant and asking her to pay 200,000 Mexican pesos that were due on the project.  *See* Exhibit 33 at 9.  As further evidence that Kenzo was just a re-brand of Mizu, the architect's file name was for "Kenzo" but the document itself showed a project in progress for "Mizu."  *See id.* at 3.  Various other emails between the same architecture firm and the defendant show her inquiring about the status of work, making decisions about décor and purchasing, and discussing payment.  Other emails sent to the defendant's address show the defendant authorizing discounts, approving invitation language for a grand opening celebration, and helping to resolve customers' billing issues.  *See* Exhibit 34 (compilation).

Kenzo Sushi itself, and its parent company Operadora Los Famosos, was designated by OFAC in September 2017.  *See* Exhibit 35, PSR ¶ 26.  The defendant nonetheless continued her relationship with the business thereafter, in violation of the Kingpin Act.  PSR ¶ 22.

Altogether, this evidence shows a sudden effort following the OFAC designations to distance the defendant from the businesses: formally disbanding J&P Advertising and JJGON, re-naming Las Flores Cabanas, and re-branding Mizu Sushi as Kenzo Sushi, all while the defendant maintained operational control of the business.

## DISCUSSION

### I.   Non-Material Factual Dispute in PSR

As an initial matter, the government notes that it is in possession of—and would have presented at trial—information inconsistent with the assertion in the PSR that the defendant has not had contact with her father since 1997.  *See* PSR, Dkt. No. 218 ¶ 55.[5]  It is not necessary that the court resolve this factual dispute in order to determine and impose the sentence in this case, and for that reason, the government did not object to this fact in the draft PSR because it did not view it as "material" within the meaning of Fed. R. Crim. P. 32(f)(1).  Nevertheless, the government proffers to the Court that had this matter proceeded to trial, it would have presented testimony from a witness who personally witnessed the defendant interacting with her father at one of the businesses underlying the Superseding Indictment, Cabanas Las Flores, and that he had personally witnessed the defendant in her father's presence at least as recently as 2013.  This same witness would have testified that the defendant's father gave her the cabanas to manage. Moreover, if the defendant had opened the door to it, pursuant to the Court's ruling on the government's Rule 404(b) motion, this witness would have been able to testify that at the 2011 meeting he observed the defendant's father direct that certain drug accounting ledgers be provided to the defendant so that she could confront a cartel member who was suspected of stealing from the cartel.  Dkt. No. 164  at 38-39.  With respect to the 2013 meeting, the witness

---

[5] This assertion in the PSR appears to have come from USPO's interview of the defendant.

would have testified that he met with the defendant and her father at a ranch concerning a discrepancy about money purportedly owed to the cartel and reflected in ledgers handled by the defendant.[6]

## II.   Section 2M5.1 Is the Appropriate Sentencing Guideline

The Guidelines Manual does not prescribe a specific guideline for the Kingpin Act.  *See generally* Sentencing Manual Appendix A.  Thus, pursuant to Section 1B1.2(a), because the offense of conviction here would be a "statutory provision not listed in the Statutory Index," the "most analogous guideline" should be applied in this case.  *See also* Sentencing Manual § 2X5.1 ("If the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline.").

The government, the defendant, and the Probation Office agree that the most analogous guideline is Section 2M5.1.  *See* Plea Agreement, Dkt. No. 213 at 2 and PSR ¶ 37.  The Sentencing Commission has affirmatively indicated that Section 2M5.1 applies to criminal violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705.  *See generally* Guidelines Manual Statutory Index, Appendix A.[7]  IEEPA gives the president authority to block or prohibit transactions involving the property of foreign countries or foreign

---

[6] The government sought to admit this evidence at trial as Rule 404(b) evidence of "other crimes," *see* Dkt. No. 139 at 5-6.  The Court ultimately ruled that it could be used only in rebuttal if the defendant disavowed a connection to drug trafficking.  *See* Dkt. 164 at 38-39.

[7] The Sentencing Manual's Statutory Index also links criminal violations of IEEPA to offense conduct guidelines Section 2M5.2, which applies specifically to weapons exports, and Section 2M5.3, which applies to providing material support or resource to Specially Designated Global Terrorists.  Because weapons exports are not alleged in this case, Section 2M5.2 is not applicable.  The government considered the applicability of Section 2M5.3, for reasons explained in the Government's Response to Defendant's Third Motion to Compel Production of Evidence and Witnesses, Dkt. No. 114, at 6-7, but ultimately determined that 2M5.1 was the most analogous guideline.  However, both 2M5.1 and 2M5.3 call for a base offense level of 26.

persons in order "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." *See generally* 50 U.S.C. §§ 1701 and 1702.  Through IEEPA and applicable executive orders, the Department of the Treasury can block the assets of individuals and companies owned or controlled by, or acting for or on behalf of target countries, as well as individuals, groups, and entities designated under programs that are not country specific, such as terrorists. *See e.g.* Exec. Order 13876, Imposing Sanctions with Respect to Iran, 84 Fed Reg. 30573 (2019) (blocking the property and interests in property of the Supreme Leader of Iran, Iranian state officials, and Iranian state-owned or controlled entities, as well as any person determined by the Secretary of Treasury "to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly" any of the aforementioned blocked persons or entities). *Compare* 21 U.S.C. § 1904(b) (the Secretary of Treasury can block the property and interests in property of significant foreign narcotics traffickers, as well as any persons or entities "owned, controlled, or directed by, or acting for or on behalf of" a significant foreign narcotics trafficker).

Congress expressly modeled the Kingpin Act on IEEPA, giving the president authority to name "significant foreign narcotics traffickers" for the purpose of imposing sanctions. 21 U.S.C. § 1901(a).  Congress also found that prior to the Kingpin Act's enaction in 1999, "IEEPA was successfully applied to international narcotics traffickers in Colombia." *Id.* § 1901(a)(3).  It is therefore no surprise that the Kingpin Act's penalty provisions are similar to those of IEEPA. Furthermore, similar to IEEPA, Congress expressly envisioned the Kingpin Act as protecting the national security of the United States.  Specifically, the stated purpose of the Kingpin Act is to identify and sanction "significant foreign narcotics traffickers, their organizations, and the

foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States."  21 U.S.C. § 1902.  *Compare* 50 U.S.C. § 1701 (granting the president authority "to deal with any unusual and extraordinary threat … to the national security, foreign policy, or economy of the United States").

Because the Kingpin Act is, by its own terms, a national security control, Guidelines Section 2M5.1 is the appropriate guideline to apply in this case.  Section 2M5.1 is titled "Evasion of Export Controls; Financial Transactions with Countries Supporting International Terrorism."  U.S.S.G. § 2M5.1.  Under this section, a base offense level of 26 applies if "national security controls *or* controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded."  U.S.S.G. § 2M5.1(a)(1)(A) (emphasis added).  Particularly here, where the defendant plead guilty to engaging in transactions or dealings "to evade or avoid, or that had the effect of evading and avoiding" the Kingpin Act's sanctions, Section 2M5.1's reference to "evasion" of national security controls is apt.

Several other courts have looked to the stated purpose of a statute or regulation when determining whether it qualifies as a national security control under 2M5.1.  *See, e.g.*, *United States v. Elashyi*, 554 F.3d 480, 508 (5th Cir. 2008) (finding that export regulation with Libya constituted national security control where relevant Executive Order stated that Libya posed an "unusual and extraordinary threat to the national security and foreign policy of the United States" (internal quotation marks omitted)); *United States v. Min*, No. 99 CR. 875 (KTD), 2000 WL 1576890, at *2 (S.D.N.Y. Oct. 23, 2000) ("While Defendant correctly points out that 'national security' is not defined in the Sentencing Guidelines, his assertion that the goods in question do not threaten 'national security' is misplaced. The more critical analysis is whether the embargo

or prohibition is based on national security concerns. The embargo on the shipment of goods to North Korea is unquestionably based on national security concerns." (citing *United States v. McKeeve*, 131 F.3d 1 (1st Cir. 1997)).  And the government is aware of another, recent Kingpin Act case in which the record indicates that Section 2M5.1 applied at sentencing.  *See United States v. Coro*, No. 1:19-cr-044 (S.D.N.Y.).  Although a transcript of the sentencing hearing is not publicly available, the plea transcript and pleadings in that case make it clear that the parties agreed that Section 2M5.1 was applied.  *See id.*, Transcript of Proceedings, Dkt. No. 169, at 16 and Sentencing Submission by Victor Mones Coro, Dkt. No. 179, at 17.  The Court ultimately sentenced the defendant in that case to 55 months' imprisonment and a $250,000 fine.  *Id.*, Minute Entry, March 17, 2021.

### III.    A Significant Term of Incarceration and a Substantial Fine Are Warranted

The defendant and the government stipulated to a base offense level of 26 in the defendant's plea agreement, with a final level (following a 3E1.1(a) adjustment) of 24, for a Guidelines range of 51-63 months' incarceration.  *See* Dkt. No. 213 at 2-3.  The government recommends that the Court impose a sentence within but at the low end of this stipulated Guidelines range, of 51 months' incarceration.  This sentence is warranted pursuant to the factors set forth in 18 U.S.C. § 3553(a), and will appropriately reflect the seriousness of the offenses and the history and characteristics of the defendant, promote respect for the law, and provide just punishment and deterrence to others who would seek to evade U.S. sanctions imposed under the Kingpin Act.

#### A.  The Nature and Circumstances of the Offenses and the History and Characteristics of the Defendant

The crimes to which the defendant pleaded guilty in this case undermined a sanctions regime that is a critical component of our country's national security.  She willfully and

knowingly engaged in transactions and dealings with businesses sanctioned by OFAC, PSR ¶¶ 29-30, not as a mere consumer or counterparty, but as an administrator, manager, or owner of the businesses underlying the Superseding Indictment, *see id.* ¶¶ 18-24.  This kind of conduct materially worsens the "national emergency resulting from the activities of international narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States."  21 U.S.C. § 1901(a)(4) (congressional findings underlying the Kingpin Act).

Importantly, the defendant's violation of the Kingpin Act's sanctions persisted for years, and included conduct from which it can be inferred that she knew about the sanctions and took efforts to evade them, as detailed above.  And she never once sought to rectify her violation with OFAC.  *See* PSR ¶ 24.  Not when the designations were publicized in the international press; not when her family members personally received notice of the sanctions; not when her web host shut down her business websites and she called customer service to find out why; not when OFAC emailed her at the addresses she had provided as her own to notify her of the sanctions and invite her to contact OFAC.  Instead, she dissolved two businesses when the OFAC sanctions crippled their ability to do business in the United States or using financial systems transiting the United States, and changed the names of two others in an effort to continue doing business as if nothing had changed.  And when OFAC caught up with her again and designated Kenzo Sushi following its re-branding, she still kept her role in the business.

The defendant's personal characteristics do not excuse or mitigate these crimes. Although she predominantly resided in Guadalajara, Mexico, she is a U.S. citizen and no stranger to this country, using a family address in California (the 2775 Newcastle address described above) to obtain a passport and California driver's license.  Her crimes are not simply

technical violations by a naïve businessperson, but reflect willful and knowing decisions to flaunt the Treasury Department's tools for targeting major international drug trafficking organizations.

### B. Deterrence and the Need for the Sentence to Reflect the Seriousness of the Offenses, to Promote Respect for the Law, and to Provide Just Punishment

Two other Section 3553(a) factors that weigh heavily in favor of a Guidelines sentence are the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and to assure adequate deterrence. 18 U.S.C. §§ 3553(a)(2)(A) and (a)(2)(B).

As detailed above, the defendant's criminal conduct directly implicated U.S. national security. International drug trafficking visits serious harm on American communities, including addiction, violence, and death, resulting in Congress's decision to declare drug trafficking a "national emergency" in enacting the Kingpin Act. 21 U.S.C. § 1901(a)(4). The avowed "policy of the United States," therefore, is to impose economic sanctions on international drug kingpins and their organizations. *Id.* at (b). The willful violation of those sanctions by the defendant and other criminals like her undermines this national priority, hampering the ability of the United States to disrupt and dismantle foreign cartels through economic pressures, and thereby threatening the "national security, foreign policy, and economy" of the country. *Id.* at (a)(4). These are therefore serious offenses meriting substantial incarceratory sentences.

A Guidelines sentence of 51 months will promote respect for the law and deterrence for similar reasons, sending a strong message that U.S. persons like the defendant are obligated to comply with U.S. sanctions regimes aimed at protecting national security. It will also emphasize to any future potential violators of the Kingpin Act that OFAC sanctions are a serious matter, and that they risk major consequences if they willfully decide to evade OFAC's efforts to target major foreign drug cartels.

31

## C.  The Government's Proposed Sentence Is Within the Range of Comparable Sentences

A sentence of 51 months would not create an unwarranted sentencing disparity. Although there are not a large number of criminal Kingpin Act cases that provide a substantial body of precedent, one recent Kingpin Act sentencing is instructive.  In *United States v. Coro*, No. 1:19-cr-144-AKH (S.D.N.Y.), the defendant was sentenced on April 1, 2021 to a term of 55 months after pleading guilty to five counts of violating the Kingpin Act.  *See id.* Dkt. No. 195 at 3.[8]  In that case, OFAC sanctioned two Venezuelan nationals with ties to Venezuela's ruling government as Specially Designated Narcotics Traffickers under the Kingpin Act in February 2017.  The defendant, a U.S. citizen named Victor Mones Coro, operated a charter airplane company and provided international charter flights to the two OFAC-designated Venezuelans and others, thereby running afoul of the Kingpin Act by doing business with designated persons. *See generally id.* Dkt. No. 200-1 at 6-10.  There, as here, the defendant never attempted to obtain an OFAC license to engage in transactions or dealings with designated persons.  And there, as here, the defendant engaged in subterfuge that had the effect of evading the Kingpin Act sanctions.  For Victor Mones Coro, that meant leaving the designated individuals' names off of charter flight manifests and receiving payment through front companies intended to disguise the source of the funds.  For Jessica Oseguera, as detailed above, that meant changing the names of two of the designated businesses to continue operating them following the OFAC designations, and dissolving two others.[9]  The government's recommended sentence of 51 months here will not create an unwarranted disparity with the 55 months imposed for Mones Coro.

---

[8] *Mones Coro*, like this case, was centered on Kingpin Act violations, which were the only counts in the indictment, rather than cases that also charge and are more focused on money laundering or fraud, and conduct their sentencing analyses accordingly.
[9] Although the *Mones Coro* court's final Sentencing Guidelines analysis is not apparent from the public record, the Court during the plea colloquy indicated that Guideline 2M5.1 was likely to

Another Kingpin Act sentencing recently occurred in the Eastern District of Texas, in *United States v. James Morris Balagia*, No. 4:16-cr-00176-ALM (E.D. Tex.). There, the defendant was convicted at trial of five counts including conspiracy to commit money laundering, conspiracy to commit wire fraud, conspiracy to obstruct justice, obstruction of justice, and violation of the Kingpin Act. *See id.* Dkt. No. 508 at 1. On May 4, 2021, the Court imposed a sentence of 188 months on the grouping of three counts that included the Kingpin Act violation, as well as 120 months for obstruction of justice, and 60 months for conspiracy to obstruct justice, all to run concurrently. *See id.* at 2. In that case, the defendant was a criminal defense attorney who approached international drug traffickers who had been designated by OFAC under the Kingpin Act, and falsely represented that if retained as their attorney, he could and would bribe U.S. government officials on their behalf to resolve their criminal charges. *See* 4:16-cr-00176 (E.D. Tex.) Dkt. No. 232 at 10-11. As part of that scheme, Balagia received payment from the OFAC-designated drug traffickers, without seeking a license from OFAC to do so, in violation of the Kingpin Act. *See id.* at 8-9. Although Balagia's 188 month sentence for the counts including the Kingpin Act is significantly higher than what the government seeks here, it will not create an unwarranted disparity when contrasted to the government's recommendation of 51 months here in light of the other counts and the extent of the conduct in *Balagia*.

The defendant has repeatedly relied on a nearly 15-year old Kingpin Act prosecution from the Southern District of Florida, *United States v. Sanchez*, No. 07-cr-20587-ASG-2 (S.D.

---

apply, *see* 1:19-cr-00144 (S.D.N.Y.) Dkt. No. 171 at 16, and the parties' sentencing memoranda in that case make clear that they and the USPO came to the same conclusion, *see id.* Dkt. Nos. 179 at 17, 200-1 at 23. Unlike this case, however, it appears that the USPO in *Mones Coro* recommended a downward departure to arrive at a 30 month recommendation. *See id.* Dkt. No. 179 at 1.

Fla.).  In that case, the defendant pleaded guilty to conspiracy to violate the Kingpin Act, with the government dismissing 15 additional counts at sentencing.  *See id.* Dkt. No. 80 at 1.  The government in *Sanchez* stipulated in the plea agreement to a Guidelines level of 13 and recommended a sentence of 12 months, *see id.* Dkt. No. 77 at 1, with the defendant ultimately receiving a probationary sentence, *see id.* Dkt. No. 80 at 2.  But the government submits that the Guidelines analysis set forth above—applying Section 2M5.1—instead sets forth the correct Guideline for Kingpin Act violations.  Additionally, the facts in *Sanchez* were starkly different. There, the defendant's husband was designated by OFAC, and the defendant's crime was to deposit two checks that her husband had written, and to participate in the sale of a home they jointly owned, the proceeds of which were thereafter transferred to foreign accounts controlled by her husband.  *See id.* Dkt. No. 1 at 5-7.  In so doing, Sanchez engaged in a financial transaction with an OFAC-designated person, and committed what was in essence a money laundering offense, since the financial transactions were alleged to have come from the distribution and sale of controlled substances.  *See id.* at 9.  *Sanchez* simply does not provide the correct Sentencing Guidelines analysis, is not factually analogous, and can be clearly distinguished here.

### D.  The Court Should Impose a Substantial Guidelines Fine

In addition to the sentence of incarceration, the Court should impose a substantial fine within the Guidelines range of $25,000 to $5 million.  *See* PSR ¶ 106.  The Sentencing Guidelines provide that a sentencing court should "impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay a fine."  A defendant bears the burden of establishing a purported inability to pay.  *United States v. Sobin*, 56 F.3d 1423, 1430 (D.C. Cir. 1995).

The defendant's personal history, the offense conduct, and the PSR suggest that the defendant has access to the ability to pay a substantial fine. *See* PSR ¶ 86. When the defendant was arrested and seeking release pending trial, she offered to put up a substantial property bond (offered as $500,000 but listed in property assessment databases as closer to $100,000 in value, *see* Transcript, March 3, 2020 Status Hearing at 15), indicated that she was willing and able to lease a $3,785 per month apartment in the District of Columbia pending trial, *see* PSR ¶ 86 and 20 n.7, and informed the government that she would be willing to hire a security team to provide round-the-clock monitoring, in order to guarantee her appearance if she were released, *see id*. When she was arrested, the defendant was wearing a Rolex watch, a Louis Vuitton coat, and a Hermes purse, and was carrying a substantial amount of cash. The defendant retained at least two attorneys to represent her during the pendency of this case and is now retaining a tax attorney. PSR at ¶ 78 and 84. Before the defendant was arrested, she regularly traveled to the United States, including a ski trip to Vail, Colorado during which she entered the United States carrying approximately $10,000 in cash. She was interviewed by U.S. Customs and Border Protection during that entry into the country, and that interview—as well as her possession of such a substantial amount of currency—is memorialized in reports that have been provided to the defendant in discovery. Additionally, as a point of context, the daily sales figures in the defendant's email account for just one of the businesses – Kenzo Sushi – show revenues of approximately $1.5 million USD from between December 2015 through February 2018.[10]

---

[10] Specifically, 709 near-daily sales reports from that time period sent to the defendant showed Kenzo Sushi's total income as 30,077,869 pesos, which is approximately $1.5 million USD at the prevailing exchange rate. These sales reports were provided to the defense in discovery and would have been introduced and totaled in the government's case-in-chief at trial.

All of this suggests that the defendant has the ability to pay at least some kind of fine, and imposition of a substantial fine within the Guidelines range will serve not only as appropriate additional punishment, but also as a critical component of general deterrence to those who might violate the Kingpin Act in the future.

## **<u>CONCLUSION</u>**

For the reasons set forth herein, a sentence of 51 months' incarceration and a Guidelines fine are appropriate in this matter.

Respectfully submitted this 28th day of May, 2021.

Arthur G. Wyatt, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice


By:        /s/
Brett Reynolds, Trial Attorney
Kaitlin Sahni, Trial Attorney
Kate Naseef, Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20530
Telephone: (202) 514-0917

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing (ECF)

system with the United States District Court for the District of Columbia to counsel of record

for the defendant, this 28th day of May, 2021.


By:   /s/_____
                Brett Reynolds
                Trial Attorney
                Narcotic and Dangerous Drug Section
                Criminal Division
                U.S. Department of Justice